1

1                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
2                     NORTHERN DIVISION

3

4

   UNITED STATES OF AMERICA

5

        v.                        CRIMINAL CASE NO.
6                             AMD-08-046

   TROY HENLEY,
7

      Defendant
8    _____/

9

10             (Excerpt: Closing Arguments)
             Tuesday, August 26, 2008
11              Baltimore, Maryland

12

Before:  Honorable Andre M. Davis, Judge
13            And a Jury

14

15 Appearances:

16       On Behalf of the Government:
      Michael C. Hanlon, Esquire
17

18       On Behalf of the Defendant:
      Stuart O. Simms, Esquire
19

20

21

22 Reported by:
   Mary M. Zajac, RPR
23    Room 5515, U.S. Courthouse
   101 West Lombard Street
24    Baltimore, Maryland 21201

25

1          (Excerpt: Closing Arguments)

2          MR. HANLON:  Thank you, Your Honor.  Just barely good

3  afternoon, ladies and gentlemen.  Thank you for your attention

4  during the course of this trial.

5          At the beginning of this case, you were told that this

6  would be a case about four robberies, and four robberies you've

7  heard about.  You heard about a robbery on August 2nd of 2006 at

8  a Wal-Mart store located in Ellicott City.  You heard about a

9  robbery on December 30th of 2006 at a Check Point Check Cashing

10  Store in Baltimore City, Maryland.  You heard about a robbery on

11  January the 23rd of 2007 at Wilkens Liquors Store.  And then

12  finally, you heard about a robbery of a Dunbar Armored Truck on

13  July 3rd of 2007.

14          You heard about all of these robberies and the way that

15  they were carried out.  Two of the robberies were with firearms.

16  The other two were snatch and grab robberies, involving someone

17  physically running up to a victim and physically taking money

18  away from them.  All the robberies took place during

19  approximately the same period of time.

20          That the robberies took place is clear enough from the

21  evidence.  That there were victims is clear enough from the

22  evidence.  That two of them involved firearms is also clear, the

23  Wal-Mart and the Check Point robberies.  You heard about the

24  evidence from the victims.

25          What's at issue in this case, what you will be called

1    upon to consider is the evidence of Troy Henley's involvement in

2    planning, participating, and helping to carry out these

3    robberies.

4        And the evidence does prove, ladies and gentlemen,

5    beyond a reasonable doubt, that the defendant is guilty of

6    planning to carrying out and participating in these crimes, along

7    with other people that you heard about during the course of the

8    trial.  That evidence came in the form of testimony from the

9    defendant's former accomplices, testimony from people that the

10   defendant planned robberies with, testimony from law enforcement

11   officers and other officers about some of the defendant's own

12   conduct, including fleeing from the police.  Corroborating

13   testimony and details concerning the recovery of fingerprints and

14   seeing of cars somewhere near the robbery scenes.  The

15   defendant's own conduct of obstructing justice, intimidating a

16   witness, and even trying to construct a false alibi for himself.

17       And then finally, evidence of the defendant's phones,

18   four phones, all coming back, two to one robbery and then three

19   of those phones to each of the other robberies, linking the

20   defendant to the time, the date, and most importantly, the place

21   of every one of these robberies consistently with the other

22   evidence that we've heard.

23       Judge Davis has already gone over the details of the

24   indictment with you.  I want to do it just briefly as it impacts

25   on some of the specific evidence that we've already seen.

1          A conspiracy under the law, such as the one that's

2     charged in Count One of this indictment, is simply an agreement

3     between two or more people to commit a crime.  It could be as

4     informal as can be.  It doesn't have to be written down and it

5     doesn't have to have a formal name or symbol or color associated

6     with it.  It's simply two or more people getting together to

7     commit a crime.

8          That there was a conspiracy in this case is absolutely

9     clear from the evidence.  Every one of these robberies we've

10    heard about involved more than one participant.  The Wal-Mart

11    robbery, a group of people robbing a store.  Same at the Check

12    Point robbery.  The Dunbar Armored Car robbery in July involved a

13    man, snatching robbery, and then jumping into a car driven by

14    another person.  The Wilkens Liquor Store robbery involved,

15    according to the victim, Mr. Lee, three or four people driving up

16    in a red van, one of them actually snatching the money from him.

17         That the defendant was party to this, to this

18    conspiracy and to the various robberies is also clear from the

19    evidence.  You heard testimony from his former accomplices that

20    the defendant recruited other people to help in these robberies.

21    Was he the only person recruiting people?  Perhaps not.  But he

22    certainly recruited Michael Lonesome.  He certainly recruited

23    Racquel Dingle.

24         The defendant went about discussing robberies with

25    other people, Sean Matthews and Joseph Alexander White in

1    particular, who were involved with him in actually planning and

2    contemplating other robberies.

3           The testimony from the accomplices in this case, from

4    the cooperating witnesses, demonstrated the defendant helped to

5    plan these robberies, recruiting people, bringing them to the

6    right locations, giving them instructions.  The defendant is

7    instructing Racquel Dingle to be a lookout, picking up Michael

8    Lonesome.  The defendant's present when a coconspirator provides

9    Mr. Lonesome with gloves and a mask.  The defendant acts as a

10    lookout, participating in helping the robberies to go forward.

11    In short, ladies and gentlemen, the defendant's actions both

12    before and during the robberies, and then afterward, helping to

13    divide the money, as was done in the Check Point robbery, shows

14    him to be a member of this group.

15           Conspiracies are often proven through conduct because

16    very rarely in a criminal underworld conspiracy are you going to

17    have a group of people getting together around a table and

18    holding up their hands and saying, we hereby form a conspiracy to

19    commit robberies.

20           Criminal conspiracies are proven through the conduct of

21    the participants.  Mr. Henley's conduct, as proven through the

22    evidence in this case, proves his membership in this criminal

23    conspiracy.  And that is, again, the heart of Count One, a

24    conspiracy to commit the various robberies that we heard about in

25    this case.

1          The defendant is also charged with a series of what

2    Judge Davis referred to as substantive counts.  These are the

3    robbery counts and, in the case of Wal-Mart and Check Point, the

4    firearms offenses.  We've gone over this in great detail today

5    and I won't spend as much time on it, I assure you.  But these

6    two concepts of coconspirator liability and aiding and abetting

7    are so important in this case.

8          As the defendant has taken great pains to point out

9    during cross examination of witnesses, and as I discussed during

10   opening, the evidence in this case is not Mr. Henley's committing

11   these robberies by himself.  He's not going in with a gun.  He's

12   not accosting these employees.  The evidence is that he's helping

13   to put the robberies together.  He's helping to advance them.

14   And the evidence proves his guilt under either one of these two

15   theories.  Only one needs to be proven.  In fact, the evidence

16   supports both.

17         Number one is coconspirator liability.  If the

18   conspiracy charged in Count One is proven, then Mr. Henley is

19   guilty of any crimes committed by his coconspirators in

20   furtherance of that conspiracy.  If Mr. Henley's a member of this

21   group designed and committed to planning and carrying out

22   robberies, and if the group does so, as the evidence shows was

23   done at Wal-Mart, Check Point, the Wilkens store and the Dunbar

24   truck, then, in fact, Mr. Henley, as a member of this conspiracy,

25   as a member of the group, is responsible for all of the

1    robberies.  Again, the same evidence showing the defendant's

2    membership in this group, his recruiting, his assistance, his

3    acting as a lookout, helping to put these robberies together and

4    recruit other people, proves his membership in the conspiracy and

5    hence, his guilt to the other counts.

6          The other theory is aiding and abetting.  Alternative

7    theory to coconspirator liability.  If the jury finds beyond a

8    reasonable doubt that the defendant helped to carry out these

9    crimes, even in a minimal way, he is guilty as an aider and

10   abetter, even if he committed the crimes by himself.  Of course,

11   the evidence again proves that the defendant provided substantial

12   assistance to these crimes.  But for the defendant's involvement,

13   Mike Lonesome and Racquel Dingle might not have been involved.

14   He certainly recruited them.  He certainly provided them

15   instructions, told them where to go, made sure they got to the

16   right location.  He worked with other people, acted as a lookout

17   in order to give the robbers confidence that they wouldn't be

18   caught.

19         He's helping, as was evidenced by the testimony of

20   various witnesses.  He's even hitting the Check Point location

21   because he has a contact on the inside, Tamara Johnson, who, as

22   discussed yesterday during Mr. Melvin Wider's testimony and by

23   other cooperating witnesses, tipped Mr. Henley off as to the

24   right time to knock the joint over.  That Mr. Henley's aiding and

25   abetting these robberies is absolutely clear from the evidence

1    that has been presented in this case and is another theory under

2    which the defendant would be guilty, either of these two

3    theories.  And it's particularly important with respect to

4    firearms charges.

5        Mr. Henley, none of the evidence in this case shows Mr.

6    Henley ever held a gun in his hand.  That's absolutely correct.

7    But if he aided and abetted someone else's possession of a

8    firearm by being a lookout, by recruiting people to help with the

9    robbery, by meeting up with them afterward to divide the money,

10    or if he was a member of a conspiracy and the firearm was

11    possessed in furtherance of a robbery done as part of that

12    conspiracy, then Mr. Henley is guilty as a member of this group

13    or as an aider and abetter, of possessing a firearm in

14    furtherance of a crime of violence, as would be the other members

15    of this conspiracy.

16        Michael Lonesome, by way of example, is guilty of

17    possessing a firearm in furtherance of a crime of violence even

18    though by his own testimony he never actually held a gun.  It was

19    Gregory Eason that carried the gun at the Check Point store.

20        Now, with those two ideas in mind, the elements of

21    Hobbs Act robbery are that property or money was taken from the

22    person or presence of another person.  This was the case with

23    every one of the robberies that we've heard about during the

24    course of this case.  The three Wal-Mart witnesses, Mr. Kelbagh,

25    Ms. Gordon, Ms. Jarrett, all of them were the victims of a

1   robbery, all of them there.  And particularly the two ladies

2   during the robberies.  Ms. Nicole Cawthorne from the Check Point

3   store.  Mr. David Lapusnik and Mr. David Lee from the snatch

4   robberies from the liquor store and armored car all had property

5   taken from them.  And this property was taken from them through

6   the use of threatened force or violence, the use of a firearm

7   during the Check Point/Wal-Mart robberies, or through physical

8   force, base physical force at the Wilkens Liquor Store and then,

9   also, at the Dunbar Armored Car robbery.

10          And then finally, there was ample evidence in this case

11  that every one of these robberies had some minimal effect on

12  interstate commerce, as is another element of Hobbs Act robbery.

13  Wal-Mart is a huge business.  We're all familiar with it.  It

14  does business in numerous states, products from multiple states.

15  Revenues taken from that store at the time of the robbery would

16  have gone in part to continue the corporation's interstate

17  commercial activities.

18          With respect to the Check Point, the same thing.  Check

19  Point Store cashes checks from all 50 states.  It's about 50% of

20  their business, according to Ms. Cawthorne.  And the money taken

21  was part of that interstate activity that the company engages in.

22  Cashing checks from out of state often times for people from out

23  of state.  And then part of that store's money goes back to the

24  corporate Headquarters in Utah.

25          The Wilkens Liquor Store, Mr. Lee was the owner, was

1    carrying proceeds from a multistate lottery program when he was

2    robbed.  Proceeds from, obviously, an interstate commercial

3    activity.

4            And then, finally, Mr. Lapusnik was robbed of proceeds

5    of Dunbar Armored truck Car's activities, proceeds which were

6    intended for the Bank of America, a large interstate company, and

7    taken from the hands of Dunbar Armored, a company which operates,

8    according to Mr. Lapusnik, all over the country.

9            So these are all Hobbs Act robberies, all robberies

10   that had some potential to affect interstate commerce.

11           In addition, Mr. Henley's charged once again with

12   possessing a firearm in furtherance of a crime of violence.  The

13   statute, Section 924(c), there are essentially two questions to

14   this.  Number one, for each of these two gun charges, the

15   Wal-Mart and the Check Point store, was there a crime of violence

16   committed?  Well, there were.  There were robberies both days.

17           And the second question, and really the more

18   significant one, is, was a firearm possessed or brandished during

19   the course of the offense?  Judge Davis has already talked to you

20   about the concept of possession.  Brandishing is simply holding a

21   gun up, showing it to people.

22           And again, importantly, the defendant is guilty, not

23   just if he did it himself, the evidence doesn't show that, but if

24   he aided and abetted another person's possession or if the

25   possession was in furtherance of an ongoing conspiracy to commit

1    robberies, then the defendant is guilty of these counts as if he

2    held the gun himself.

3         Now, let's turn now to the evidence.  And I'll discuss

4    the evidence for a few minutes, of each of the individual

5    robberies.

6         Your Honor, is it all right if I block you?

7         THE COURT:  Certainly.

8         MR. HANLON:  August 2nd of 2006 is the first charged

9    robbery that we see in this case.  The victim was Wal-Mart,

10   located in Ellicott City, Maryland and its various employees.

11   You heard testimony from three of them, ladies and gentlemen --

12   Ms. Gordon, Ms. Jarrett, and Mr. Kelbagh.

13        The story they tell, testimony they provided, is

14   chilling.  They were closing down the store one night, around

15   about 11, 11:00, 11:15, and a group of men entered the store,

16   accosting at gunpoint first Sarah Gordon, then Tammy Jarrett in

17   the cash room.  They hold, one armed gunman holds the women, the

18   two victims, essentially hostage in the cash room, forcing them

19   to load a cart with bags of money.

20        You saw surveillance video from the Wal-Mart with carts

21   being taken out at the conclusion of this robbery.  The time

22   index, if my memory serves.  Was 11:20, 11:22, that time frame,

23   p.m., time of the robbery.

24        Steven Kelbagh is another victim.  He comes sweeping at

25   the end after the two initial female victims, Ms. Gordon and Ms.

1    Jarrett, had been left behind.  The gunman and his partners are

2    taking the money, the carts out in the street.  Mr. Kelbagh goes

3    out and there's a struggle in the parking lot.  One detail which

4    Mr. Kelbagh noted which is of some relevance to us is he saw the

5    getaway car or at least, as the evidence will show, one of the

6    getaway cars, trying to get out, but initially meandering around

7    the parking lot for a few minutes, as if it wasn't sure where to

8    go.

9           That car was a Dodge Magnum with dealer tags.  That was

10   Mr. Kelbagh's testimony.  And that's relevant because we hear

11   later on from Racquel Dingle that she was involved, at Mr.

12   Henley's request, in procuring a Dodge Magnum from Musselman's

13   Dodge that very night, the Dodge Magnum that was driven out by

14   Tommy Hill.  Essentially, a predicate to this robbery, put

15   together at Mr. Henley's request by Ms. Dingle driving Tommy Hill

16   to the location.  This detail corroborated by the victim's

17   information, it was, in fact, a Dodge Magnum with dealer tags.

18          That is the Wal-Mart robbery.  Use of a gun to hold up

19   and rob a business.

20          The second robbery that we heard about, ladies and

21   gentlemen, is the robbery of the Check Point Check Cashing store

22   on December the 30th of 2006.  The series of events that we hear

23   from this case through the victim, Nicole Cawthorne, is very

24   similar to what we hear from the Wal-Mart store.  Ms. Cawthorne's

25   testimony is a group of armed men forced their way into the

1    store.  They do so through a ruse.  People inside the store are

2    told that someone's fighting or breaking windows in the parking

3    lot of the Check Point store.  Go out to investigate.  At that

4    point the gunman accosts employees and victims of the store,

5    forcing their way back in.

6            We hear about the events inside the store from Nicole

7    Cawthorne.  But that use of this broken glass ruse, this broken

8    glass booby trap to get people out is corroborated by Michael

9    Lonesome, who testified that that's exactly what they did to try

10   to get into the Check Point store.

11           Ms. Cawthorne's testimony presents a series of events

12   similar to the Wal-Mart.  She's held at gunpoint.  The gunman she

13   identifies is Gregory Eason, who's been identified in this case

14   as Jeezie.  She's held at gunpoint.  And the perpetrators take

15   thousands of dollars, about $30,000 from the Check Point, not as

16   profitable a robbery as the 80,000 or so that had been taken from

17   the Wal-Mart, but not a bad haul, either.  They then flee and

18   they disappear.

19           Again, Gregory Eason, the only person identified from

20   the victim in this case, and his presence in the robbery

21   confirmed by the two cooperating witnesses, Racquel Dingle and

22   Michael Lonesome.

23           Your Honor, it's about 12:15.  Does the Court wish me

24   to --

25           THE COURT:  Is this a good point for you, Mr. Hanlon?

1        MR. HANLON:  It's probably a reasonable stopping point,

2    Your Honor.

3        THE COURT:  Okay.  We'll take a break at this point,

4    ladies and gentlemen, as I said, for an earlier lunch.  I'm going

5    to ask you to be back in the jury room no later than 1:15, one

6    hour from now, so that we will resume at that time with the

7    closing arguments.

8        Continue to keep an open mind about all issues.  Do not

9    begin your deliberations.  Do not have any discussion about the

10   case or about any of the evidence or my instructions.  Please

11   leave your note pads on your chairs.  The jury's excused for one

12   hour.  We're in recess for one hour.  Thank you, Mr. Hanlon.

13       (Luncheon recess.)

14       THE COURT:  Ready, Mr. Hanlon?

15       MR. HANLON:  Yes, Your Honor.

16       THE COURT:  All right.  We'll have the jury, please.

17       (Jury enters the courtroom.)

18       THE COURT:  Good afternoon, ladies and gentlemen.  Mr.

19   Hanlon, you may proceed whenever you're ready.

20       MR. HANLON:  Thank you, Your Honor.  Good afternoon

21   again, ladies and gentlemen.

22       Before we broke for the lunch break, we had talked, we

23   got through two of the robberies that were charged in this case.

24   The two robberies I talked about were the August 2nd Wal-Mart

25   robbery, which was a gun robbery, an armed robbery, in which a

1   group of people took over the Wal-Mart.  Then we discussed the

2   December 30th Check Point robbery, again an armed robbery

3   involving a group of men taking over a business.

4         The next two robberies which you ladies and gentlemen

5   heard about during the last week of testimony was the January

6   27th Wilkens Liquor Store robbery and then the July 3rd Dunbar

7   Armored truck robbery.  Both of these robberies were committed in

8   largely the same way.  In both cases a business person, the owner

9   of the Wilkens Liquor Store, Kevin Lee on January 27th and David

10  Lapusnik, an armored car driver, on July 3rd, was in the process

11  of doing their job, moving money from one place to the next,

12  liquor store deposits in the case of Mr. Lee at Wilkens.  In both

13  cases the witness, the victims, were physically accosted by a man

14  who quite literally ran up, grabbed the money, and ran off.

15        The details of the January 23rd crime were that Mr. Lee

16  was walking from his liquor store to the Provident Bank down the

17  way.  He was carrying an envelope which would have been

18  recognizable to someone familiar with his business as deposit

19  proceeds.  And you will recall there are actually two robberies

20  of this Wilkens Liquor Store discussed during the course of this

21  trial.  January 23rd one is the one linked to Mr. Henley.  The

22  other one was described by Mr. Lonesome, the accomplice witness,

23  but did not involve Mr. Henley.

24        In this case, the January 23rd robbery, Mr. Lee is

25  walking down the street, and a red van suddenly pulls up.  It

1    contained a group of people.  Mr. Lee wasn't 100% certain of the

2    number.  One of those people jumped in, grabbed his money, and

3    jumped back into the red van.  It was something that takes

4    seconds.  Mr. Lee's wife was nearby.  She gets knocked down

5    during the course of the process.  And the red van takes off.

6    There are no suspects, no identified people that day.

7            Police officers in the area, you heard about this from

8    Detective Rachel Aiosa, did observe a black Dodge Charger nearby,

9    no more than a quarter of a mile away, right about the time that

10   the robbery had been reported, and an African male is seen

11   getting into that car.  This Dodge Charger had its license plate

12   numbers noted by Detective Aiosa.  And detective, and Special

13   Agent Bradley testified yesterday that it was, in fact, Racquel

14   Dingle's black Charger which, by her testimony, was being used

15   quite frequently, in fact, almost all the time by Troy Henley

16   during this time frame.

17           Special Agent Bradley also tied the red van to our

18   conspiracy.  Corey Hannah, also known as Whirl, has been seen by

19   Special Agent Bradley driving a red van.

20           So clearly, this is a, the January 23rd Wilkens robbery

21   is part and parcel of our ongoing robbery conspiracy.

22           The evidence of the defendant's involvement, among

23   other things, will be the phone records which I'll describe in a

24   few minutes.

25           Finally, July 3rd, 2007, the armored car robbery

1    committed the same way.  This time Mr. Lapusnik, who's an armored

2    car driver, actually gives chase to the suspect.  He sees the

3    suspect that robbed him jump in to a Chrysler 300.  The Chrysler

4    300 had another driver waiting for when the robber jumped in, and

5    it takes off.  This is the getaway vehicle.  The Chrysler 300 is

6    later located by law enforcement.  It was fingerprinted.  And the

7    fingerprints on the exterior passenger door, this is about where

8    the robber would have been jumping in, are matched up to a Joseph

9    Wright, W-R-I-G-H-T, not to be confused with Joseph Alexander

10   White, who testified in this case.  This is a different

11   individual.

12          Mr. Wright figures later in this case because, as you

13   heard from Detective Julie Pittochelli, in January of 2008 when

14   Mr. Henley's arrested for the second time, he was found in the

15   company of Joseph Alexander Wright.  And the testimony of Mr.

16   Melvin Wider, which I'll describe in a few minutes, ties this

17   robbery together where Mr. Henley described in detail to Mr.

18   Wider how this robbery took place.  Essentially, Mr. Henley was a

19   lookout.  There was a getaway car, which was a Chrysler, and the

20   robber committed the robbery and then jumped into the Chrysler.

21   Mr. Wider's testimony consistent with the facts of the case.

22          Now, I've discussed so far the details of the robbery.

23   And we're applicable, I've talked about a few details which link

24   up to the testimony of other witnesses or other evidence in this

25   case.  But the powerful evidence, the major evidence linking Mr.

1    Henley to this case and to these four robberies is really what

2    this case has been about.  After all, that there were robberies

3    committed seems not terribly controversial.

4         What is the evidence linking Mr. Henley personally to

5    these crimes, to the conspiracy and also to the individual

6    robberies that we've heard.  That's what the trial turns on.

7         You heard several pieces of evidence.  You heard from

8    accomplice witnesses, Racquel Dingle and Michael Lonesome.  You

9    heard from witnesses Sean Matthews and Joseph Alexander White,

10   who were in on the planning of robberies.  You heard evidence of

11   the defendant's own conduct, fleeing from the police, obstructing

12   justice, intimidating witnesses, including Jeezie.  You heard

13   testimony of his jail house confession to Melvin Wider.  And

14   then, finally, you heard testimony and evidence related to the

15   phone records, phone records which tie all of this testimony

16   together and which link the defendant to these robberies again

17   and again and again.

18        All of these pieces of evidence, different sources,

19   different types of evidence, all coming back to the defendant.

20        The challenge in this kind of a case, ladies and

21   gentlemen, where you have a group of people coming together to

22   commit a robbery, is that it's not always easy to identify them

23   right off the hand.  You're not always going to have the

24   advantage of nine fingerprints at the counter and a video camera

25   with perfect Polaroid quality shot and victims who can make an

1   identification.  This robbery scheme was more organized than that

2   and it was smarter than that.

3          We know from the testimony of the cooperating

4   witnesses, Mr. Lonesome, Ms. Dingle and the rest, that there were

5   many people involved in these robberies who didn't necessarily go

6   into the store.  So you're not going to get something from the

7   crime scene.

8          The challenge in a conspiracy case is to break apart

9   the conspiracy by going inside and looking at it from the inside.

10  And the way you do that is through accomplice testimony.  It is

11  the only way to break apart a criminal conspiracy like this.

12         You heard testimony, I'll begin with two witnesses, who

13  actually admitted, confessed and testified about their own

14  involvement, their own participation in robberies with the

15  defendant.  Racquel Dingle and Michael Lonesome.  I'll begin with

16  Ms. Dingle.  What is her testimony?

17         She testifies that in the summer of 2006 she knew the

18  defendant.  She knew a number of the other people who lived in

19  the west Baltimore community, where a lot of these individuals

20  grew up.

21         Counsel's suggested from time to time that we've

22  impugned the character of west Baltimore.  Not at all.  It's not

23  west Baltimore that's at issue, but this particular group of

24  individuals who resided, unfortunately for this community, in

25  that community.  Mr. Henley was one of them, so was Jeezie, so

1    was an individual named Shitty, Whirl, Corey, Dallas, and a great

2    many others.  I don't expect you to keep the names straight.

3    There were many during the course of the trial.

4            They spent time together.  They'd hang out together.

5    They're friends.

6            Ms. Dingle, as well as other witnesses, testified that

7    Mr. Henley always had money, always had money to spend.  You

8    heard something somewhat similar from Robin Thompson.  Yet he

9    never seemed to have any kind of work or identifiable employment.

10   Nobody had any sense of what it was that he did to support

11   himself, including Ms. Dingle, including Ms. Thompson, his

12   girlfriend from Florida.

13           But the defendant has access to money.  He can travel

14   back and forth between Baltimore and Florida.  And he always

15   seems to have access to an automobile and the ability to buy

16   clothes for himself and for others.

17           In August of 2006, the source of the defendant's money

18   becomes more clear to Ms. Dingle, if it wasn't already.  He

19   approaches her about doing something which she immediately knows

20   is illegal.  She is to first of all embark on this odd trip to

21   Musselman's Dodge with Tommy Hill in order to get, pick up a

22   vehicle.  She testifies it was a Dodge Magnum; that Mr. Hill

23   drives off the Musselman's Dodge lot and then back into the west

24   Baltimore community.

25           Somewhat odd trip, why Ms. Dingle would have to do this

1    herself.  But her testimony is corroborated by the phone records

2    of herself and Mr. Hill that day.

3        Later on she's approached by Mr. Henley to go to

4    Wal-Mart and look out for the police.  She knows it's something

5    illegal.  She knows she's doing something wrong.  But she also

6    knows, and she testified about this, she knew that it was going

7    to involve making some money for herself and she needed money.

8    So she says yes.  She testified herself, bad judgment and a need

9    for money.  She didn't disagree with that.

10        On the way out to Wal-Mart, on Mr. Henley's

11   instructions, to Ellicott City and Howard County, Maryland, she

12   drives there with Jeezie and Shitty.  She drives out to the

13   Wal-Mart.  And she's told specifically by Jeezie and Shitty that

14   this is a robbery.  These are members of the conspiracy telling

15   Ms. Dingle exactly what she probably already knew.  They were

16   going to knock this place over.

17        Her job, as instructed by Mr. Henley, is to look out

18   for the police.  And it's a job she does down there.  She parked

19   near the Wal-Mart, she testified about the location, and looked

20   out for the cops.  She testified, I believe, that she was parked

21   right around here off of Ridge Road near the Wal-Mart, which she

22   would have had a view of roads approaching and leaving the

23   Wal-Mart.  No police approach.

24        She testified that she is told about 25 minutes or so

25   after she arrives by Mr. Henley, they meet up at a Super Fresh,

1   and there is a Super Fresh in the area.  We've seen photographs.

2   She's told it's off, you can go home.

3          Her phone records do not put her in the area past, much

4   past 11:00 that p.m.  So her phone records corroborate that she's

5   essentially told to ditch early on.

6          But her phone records and Mr. Henley's records tell us

7   something just as important.  Number one, they place both of them

8   there at that time of day, that time of night, I should say,

9   together.  They're speaking with some of the other people

10  involved in this case, including Jeezie, whose phone records also

11  figure on this day.  And very importantly, although Mr. Henley

12  tells Ms. Dingle to leave and she departs the area, we know from

13  other testimony, number one, that the Wal-Mart was robbed that

14  night as planned; number two, that a Dodge Magnum, the very Dodge

15  Magnum that Ms. Dingle had picked up on Mr. Henley's instruction,

16  is used as the getaway vehicle.  There's your preparation.  And

17  number three, that Mr. Henley's phone records place him in the

18  Ellicott City towers up until 11:25 p.m., much later than Ms.

19  Dingle.

20         So Mr. Henley's there the whole time, so are his

21  confederates, using the getaway car that Mr. Henley made

22  arrangements to pick up that day.

23         Ms. Dingle is cut out.  Bad luck for her.  She

24  associated herself with not a particularly trustworthy crew.  But

25  her testimony, combined with the phone records, combined with the

1    evidence of a witnesses and, finally, the fact that the place was

2    robbed on that very night, and there is no other night that Ms.

3    Dingle and Mr. Henley's records put them there at that time of

4    day, proves that a robbery took place and that Mr. Henley and his

5    crew did it.

6           Then Ms. Dingle's involvement in this conspiracy does

7    not end on that day.  Several months later, notwithstanding, I

8    suppose, the less than satisfactory experience she had at the

9    Wal-Mart, she was approached once again by Mr. Henley, given

10   another opportunity to participate in a robbery.  In need of

11   money and because she exercised stupid judgment, she agrees to do

12   it.  And she testified about that.

13          She agrees once again to look out for the police, this

14   time accompanying Mr. Henley and his crew into the vicinity of

15   this Check Point Check Cashing store on Harford Road in east

16   Baltimore City.  She testifies about getting together with Mr.

17   Henley beforehand, driving over.  She testifies about the fact

18   that multiple cars are used.  She testifies about Mr. Henley's

19   use of the black Charger on this particular day.  She describes

20   that she was with someone named Dallas, who was essentially

21   playing a lookout function with her at the same time.

22          She positions herself on Harford Road, looks out for

23   police and, as before, no police show up.

24          This time she's dealt with honestly by her accomplices.

25   Mr. Henley contacts her.  She wasn't sure if she got a phone call

1    or Dallas got a phone call, but she gets a call.  Mr. Henley

2    tells them, follow us, we're taking off, and she does so.

3            She follows Mr. Henley.  There was another car

4    involved.  Follows them out and ultimately meets up with the

5    group at Whirl's house out in West Baltimore.  Whirl's house,

6    identified in this case as Corey Hannah, another close associate

7    of the defendant's, Mr. Henley.

8            At that house, Jeezie is there, Dallas is there, a

9    number of other people.  Shitty is there.  A bunch of younger

10   guys.  Ms. Dingle wasn't 100% sure of all of the names.  But

11   there was a large group there and there was a lot of money to

12   divide.

13           Mr. Henley divides it out.  Ms. Dingle gets about

14   $1500, which she takes.  Later that day, Ms. Dingle, rich with

15   her $1500 from the defendant, goes shopping in Bethesda, along

16   with the defendant and some other people.  They go to some

17   stores.  They have a good time.  That's the December 30th crime.

18           Ms. Dingle's testimony is notable, also, because it

19   links Mr. Henley up with the black Dodge Charger, which comes up

20   again and again in this case.  It is registered to her.  But this

21   car which Mr. Henley makes frequent use of, and you heard about

22   this Dodge Charger from Sean Matthews and you heard about this

23   Dodge Charger from Michael Lonesome and you heard about this

24   Dodge Charger from Racquel Dingle, all of them describing it was

25   Mr. Henley's vehicle.  Ms. Dingle testified that Mr. Henley had

1    it constantly, particularly in January of 2007, which links this

2    conspiracy again to the Wilkens Liquor Store robbery.

3           You hear a similar series of events from witness

4    Michael Lonesome, the second accomplice cooperator who testified

5    in this case.  Mr. Lonesome is involved in one of the series of

6    robberies.  He was recruited, involved in the December 30th Check

7    Cashing robbery, the one we have here.  His testimony relates a

8    very close, very similar series of events as Ms. Dingle's.

9           He's recruited the night before while he's enjoying the

10   fruits of another robbery that he committed, not one involving

11   Mr. Henley.  He's told by Mr. Henley that night, December 29th,

12   to be ready.  Mr. Lonesome says sure, and he strongly suspects

13   and knows what it is he's to be ready for.

14          Mr. Henley's there with Shitty at the time when Mr.

15   Lonesome's told to be ready.  The next day he's picked up by

16   them.  He gets into the car.  Mr. Henley is drying.  Shitty is in

17   the passenger seat.  Shitty hands Mr. Lonesome a mask and gloves.

18   It's very clear that this is a robbery plan.

19          Mr. Lonesome accompanies the group once again, meets up

20   with them.  Multiple vehicles are used.  There's Mr. Henley in

21   his black Charger.  Mr. Lonesome has reason to believe that

22   Racquel Dingle's going to be in the area acting as a lookout.

23   And there's another car containing a group of individuals that

24   are going to go to the robbery scene together.  This is the

25   primary car.  This is the getaway car.

1          Both Ms. Dingle and Mr. Lonesome both describe how

2     cellular telephones are used by the group to stay in

3     communication.  Mr. Lonesome tells or describes that just as Ms.

4     Dingle did.

5          Mr. Lonesome drives out.  He's a member of the actual

6     robbery group.  They go in.  They break glasses.  Shitty's

7     involved in this process, breaking glass and breaking windows in

8     the parking lot of the check cashing store here, in an attempt to

9     lure out the employees, just as you heard from Nicole Cawthorne,

10    the victim.

11         When the employees come out, the gunmen move in,

12    including Gregory Eason.  The gunmen, according to Mr. Lonesome

13    and according to Nicole Cawthorne, Mr. Lonesome is corroborated

14    on this point in every way by Nicole Cawthorne, they rob the

15    place.  They get about $30,000.  And then they meet up.

16         Mr. Lonesome describes going to a house.  He wasn't

17    sure whose house it was.  They go to a house.  He gets a piece of

18    the action, just like the rest of the group, and the robbery is a

19    success.  That is the testimony, then, of Michael Lonesome and

20    Racquel Dingle, testimony demonstrating the defendant's role in

21    recruiting them and in carrying out, aiding and abetting these

22    robberies, aiding and committing them as part of the conspiracy.

23         Two other cooperating witnesses who testified in this

24    case, in addition to Mr. Lonesome and Ms. Dingle, are more

25    witnesses who were involved not in actual robberies, but in

1    planning and carrying out or -- I'm sorry -- planning these

2    robberies and beginning the preliminary steps of putting them

3    together.  Joseph White and Sean Matthews.  Their testimony is

4    quite consistent with what Ms. Dingle and Mr. Lonesome tell us.

5         Joseph White testifies that at a time when he, Mr.

6    White, was involved in a series of bank robberies not involving

7    this defendant, he's approached by Mr. Henley about doing another

8    robbery.  Mr. White, who was already doing robberies with another

9    group said, Sure, why not?

10        They follow around a gas station owner named Luigi.

11   The idea?  To grab deposits from Luigi.  Where have we heard a

12   story like that before?  Where have we heard testimony like that?

13   Wilkens Liquor Store is committed exactly the same way.  Armored

14   Car robbery is committed exactly the same way.  This is the

15   planning and preparation for an identical offense.  Mr. Henley

16   even tells Mr. White, This Luigi guy's easy, we've done it

17   before.

18        The only thing that prevents a robbery from

19   happening -- and Mr. White's very candid from that stand, he was

20   ready to go, he wanted the money -- the only thing that prevents

21   them is they don't get an opportune moment.  Remember, this is a

22   conspiracy that plans things out.  They watch places.

23        Michael Lonesome described watching a Dunbar Armored

24   truck one day with Mr. Henley.  Mr. Henley's talking about

25   knocking over a truck.  Mr. Lonesome's ready to go, he would have

1    done it.  But the time wasn't right.  It was evidently right on

2    July 3rd of 2007 (sic).  Later on it was right on January 23rd of

3    2007.  But Joseph White's experience, Michael Lonesome's

4    experience, has us seeing the defendant planning the crimes that

5    actually took place in this case.  The phone records prove the

6    defendant's own involvement.

7            The testimony of Sean Matthews serves a similar

8    function.  This is an individual who is dealing drugs in the

9    community.  He testified about that.  He's approached by Mr.

10   Henley and by other people.  Mr. Henley's by no stretch of the

11   imagination the only person.  Mr. Matthews knew that they were

12   doing robberies, Mr. Henley and the rest.  They used to talk

13   about it, knocking over commercial businesses and things like

14   that.

15           One day Mr. Matthews and a group of people in two cars

16   drive around visiting check cashing places.  There were two

17   vehicles Mr. Matthews described.  Mr. Henley was in the other

18   vehicle.  The black Charger once again comes up.  They visit

19   three check cashing places.  Why?  Well, Mr. Matthews knows,

20   because of common sense and because he hears people communicating

21   once again over cell phones -- we're again seeing cell phones

22   used by this group -- they're picking out a place to rob.  Mr.

23   Henley's voice is even heard as well.  What about that place?

24   What about that place?

25           They visit three check cashing spots that day.  Nobody

1    transacts any financial business.  Nobody gets any money.  Nobody

2    sends any money.  Mr. Matthews, I think, testified that they

3    bought some lottery tickets in order to see what the inside is

4    like.  This is preparation.  This is rehearsal for the ultimate

5    check cashing robbery.  Something Mr. Matthews is approached

6    about committing but decides not to because he doesn't feel like

7    it's a good plan.  And it's Jeezie who ultimately approaches him

8    about that.

9         Now, these four cooperating witnesses, every one of

10    them brings a great deal of baggage into this courtroom.  There's

11    absolutely no doubt about it.  They all have criminal records.

12    They're all testifying in the wake of their own criminal charges.

13    There are three admitted armed robbers and one drug dealer.

14    These are individuals who have plenty of reason, who are giving

15    us plenty of reason not to particularly like them and not to

16    think that they're especially good citizens.  And ladies and

17    gentlemen, I don't blame you if that's how you feel.

18         But the challenge here, knowing that this is a

19    conspiracy case, the challenge here is to bear in mind that in a

20    conspiracy the witnesses to the inner workings of a conspiracy to

21    commit robberies are not going to be angels and saints.  They're

22    not going to be second grade teachers.  They're not going to be

23    people who live above board.  They're going to be people who

24    choose to associate themselves with crime.  They're going to be

25    criminals.  There's no getting around it.

1          The inner workings of a conspiracy can only be shown

2     that way.  And the challenge here is to bear in mind that the

3     issue is not whether or not these four people are nice people,

4     not whether or not they've been good citizens.  The issue here is

5     whether they were telling the truth from that witness stand.

6     That's the only issue.

7          And in assessing the truthfulness, the credibility of

8     their testimony, I urge you to look at a number of things which

9     corroborate and back up their testimonies.

10          Number one, the testimonies of these four witnesses are

11     corroborated on point after point after point by each other and

12     also by independent evidence that we've seen presented in this

13     case.  Michael Lonesome and Racquel Dingle, both describe a

14     remarkably close series of events involving the robbery of that

15     Checkpoint Check Cashing store.  Ms. Dingle's description of the

16     Wal-Mart robbery follows a similar, close pattern.  Being

17     recruited by the defendant, Mr. Henley.  Being prepared by the

18     defendant, Mr. Henley.  The use of multiple vehicles described by

19     both witnesses.  Described by Sean Matthews when they were

20     scouting out check cashing locations.  The use of cellular phones

21     as a means of communicating.  The use of lookout people.  Ms.

22     Dingle's actually playing that role in both places.  And you

23     heard about a similar function by Mr. Lonesome.  He went in

24     knowing that there were lookout people.  It helps the robbery be

25     more successful.

1          The dividing of the money afterward described by both

2     witnesses.  Both witnesses get a piece.  Both witnesses describe

3     going to a house afterward.  Both of them describe Mr. Henley's

4     role in the recruiting, the preparation, driving there in the

5     black Charger, finding other people to do this, communicating

6     over the cell phone, and then meeting up after the Check Point

7     robbery and doling out the proceeds, along with other people.

8     Mr. Henley and the other circumstances corroborated on point

9     after point.

10         They also described the other same people.  Jeezie is

11    described by both people.  We know Jeezie was involved because

12    our victim, Nicole Cawthorne, identified him.

13         Dallas is implicated by both and described by both of

14    these witnesses, as well as Sean Matthews who testified to the

15    same group involved in scouting out these check cashing

16    locations.  Shitty is described by both and Corey Hannah, also

17    known as Whirl, comes up in the testimony of all of these

18    witnesses.

19         On point after point after point, they are corroborated

20    on these details.  And also by police testimony.  Black Charger

21    is being seen.  And the rest.  The broken glass in the Check

22    Point robbery.  The time of day corroborated all by phone

23    records.  On point after point these witnesses are proven right.

24         Are there variances between their testimonies?  I'm

25    sure there are.  Mr. Lonesome and Mr., I'm sorry -- Mr. Lonesome

1    and Ms. Dingle are recruited at different times and they're

2    playing different roles.  Of course there are going to be

3    variances between their recollections because they're looking at

4    this robbery and the robberies from different perspectives.  But

5    the degree in which they corroborate and match each other up

6    speaks a great deal about the credibility of their testimony and

7    the fact that they have testified accurately about the

8    defendant's involvement.

9         Another thing that's important and useful in assessing

10   the credibility of these witnesses is what they did and didn't

11   say.  We've talked about the corroboration, how what they said

12   has been proven up by this evidence and this evidence.  Consider

13   also what they didn't say.

14        Michael Lonesome, Racquel Dingle, Sean Matthews and

15   Joseph White, every one of them testified about criminal conduct

16   that they had knowledge of, that they were very, very candid this

17   defendant was not involved in.

18        Michael Lonesome described a robbery on December 28,

19   two days before the check cashing robbery.  Mr. Henley was not

20   involved in that.  Chubbs had nothing to do with that.  That was

21   me and some other guys.

22        Racquel Dingle described the bank robbery that Gregory

23   Eason got arrested for.  When I asked her if Mr. Henley had

24   anything to do with that, she said, no, not to my knowledge.  He

25   actually tried to talk Jeezie out of it.  Joseph White did a

1    series of bank robberies, but was very clear that Troy Henley had

2    nothing to do with those robberies.

3          Where Mr. Henley is not guilty of something, you heard

4    about it from this witnesses.  Every one of them, where Mr.

5    Henley was not involved, you heard about it from that witness.

6    That's a powerful factor in considering the credibility of the

7    testimony of the description they give about the robberies that

8    Mr. Henley did commit which, of course, is corroborated by other

9    evidence.

10          One other thing.  Another couple of elements that are

11   useful in corroborating the cooperating witnesses is the

12   defendant's own conduct.  At every turn, Mr. Henley has done what

13   he could to demonstrate his awareness and his consciousness of

14   his own guilt.  Consciousness of guilt is something that was

15   described to you during the jury instructions and I want to talk

16   to you about some of the specific evidence now.

17          There are at least three things that come up in this

18   case that demonstrate that the defendant's manner of dealing with

19   this investigation proves his awareness of guilt.  Number one,

20   his desperate flight from the police on March 26, 2007.  A

21   terrifying, life threatening flight which demonstrated his

22   willingness to go to any length to evade the consequences of his

23   activity, his robberies.

24          Number two, the defendant's attempt to intimidate and

25   harass Jeezie, who he has been obsessed with as a possible

1    witness, even going so far as to describe Jeezie when he was

2    arrested by Special Agent Bradley.

3         Number three, finally, his attempts to manufacture a

4    false alibi for himself in this case, the testimony of which we

5    heard yesterday from Melvin Wider.

6         Let me begin with the flight.  March 26th of 2007, law

7    enforcement officers are attempting to apprehend Mr. Henley.  He

8    was under suspicion for the robberies at that time.  His response

9    is to jump into a silver Dodge Ram pickup truck and go flying.

10   You heard about that chase from the two police officers who were

11   involved in the chase, among others.  Uniformed, marked police

12   cars with their sirens on are chasing after Mr. Henley.  Mr.

13   Henley smashes.  And he's identified as the driver positively by

14   the police officers who testified in this case.  Mr. Henley

15   smashes into a civilian vehicle, then smashes into a tree.  The

16   car is smashed.  Then Mr. Henley jumps out and is only arrested

17   two or three blocks away.

18        This is the conduct of a guilty man fleeing the police,

19   ladies and gentlemen.  Powerful evidence of the defendant's

20   awareness of his own guilt and the lengths to which he's willing

21   to go to avoid the consequences.

22        What else?  The defendant's treatment of Jeezie.  Mr.

23   Henley has done everything he can to intimidate and terrorize

24   this individual, Gregory Eason, from testifying in this case.

25   And he's done it, ladies and gentlemen, successfully, because you

1   heard no testimony from Gregory Eason in this case.  And what has

2   the defendant done?  Well, you heard about it from Melvin Wider.

3       Mr. Wider testified about how Mr. Henley came up with

4   an idea to spread rumors that Jeezie, Gregory Eason, had sex with

5   a man in the Anne Arundel County Detention Center, to humiliate

6   him, to embarrass him in his neighborhood, and to even hurt his

7   relationship with the mother of his own child.

8       Mr. Henley in his own words, on the reported calls,

9   testified about his efforts to do this in conversations with one

10   of his young friends.  I'm trying to tell you, Yo, that's all

11   right, Yo, I tell him, Yo -- this is discussing Jeezie, who was

12   discussed by name earlier -- I'm going to trial, Yo.  I ain't

13   taking a day, Yo, and if you N's get on that stand, Yo, it's on.

14   It is what it is, Yo.  I told him.  I say, Yo, the whole earth

15   going to be in there.  So you N's want to do a homosexual act,

16   it's going to be on.  The whole hood going to bear witness.

17       This is Mr. Henley's defense to this case, to harass

18   and intimidate one of the people he believed to be a witness.  We

19   know from Special Agent Bradley's testimony that he was obsessed

20   with Jeezie from the moment he was arrested in January of '08.

21   Mr. Wider testified about the same thing.  And we hear it on tape

22   here.  This is an attempt in the defendant's own voice to harass

23   and intimidate a witness.

24       And I would urge you ladies and gentlemen to consider

25   this evidence, not only in assessing the defendant's

1    consciousness of guilt, but consider the effect that this kind of

2    harassment would have on these witnesses.  What is it that these

3    witnesses have to bear coming into court?  What has Troy Henley

4    promised one witness he believed he'd identified?  You come in

5    here, the whole hood is going to bear witness, the whole earth is

6    going to know.

7            Testifying in court in today's day and age is not fun.

8    And the terror and the fear of these witnesses, particularly

9    Racquel Dingle and Michael Lonesome, was apparent when they were

10   on the stand.  Can they be blamed?  Because these are the

11   circumstances under which they have to testify.

12           Special Agent Bradley testified about this even further

13   yesterday, about the steps that need to be taken to keep Racquel

14   Dingle safe in this case.  It is because of the actions of the

15   defendant that this is necessary.  We see it in living color with

16   this conversation with respect to Jeezie, Gregory Eason, who,

17   again, is successfully intimidated.  You heard no testimony from

18   him.

19           The third thing, of course, is the defendant's

20   manufacturing of false alibis for himself.  You see testimony of

21   this from Melvin Wider.  You also saw a copy of the letter which

22   Mr. Wider wrote out.  Essentially, Mr. Henley decides that to

23   deal with the December 30th crime, he's going to have his girl,

24   mentioned in the letter, come up with a story that they were in

25   New York together over New Years.  Mr. Henley gives detailed

1    information to Mr. Wider about how this is to take place, and

2    it's all in the letter.  This young lady is identified as Dionne,

3    is to tell the lawyer that they were together from December 29th

4    on to celebrate the New Years.  It's even specified that this

5    young lady is to tell the lawyer we stayed at a friend's house,

6    Barbara's house.  That way, Mr. Henley advises Mr. Wider in the

7    letter, there will be no way to track down the records.  There

8    will be no hotel records to disprove the alibi.

9          Now, that brings us to the testimony of Melvin Wider,

10   which I'll discuss briefly.  We heard about four witnesses,

11   coconspirators, people involved in carrying out, preparing

12   robberies.  The testimony of Melvin Wider on every step is

13   corroborated by other evidence in this case.  There's not a word

14   Mr. Wider told us that's not backed up by other evidence you

15   heard in this case.

16         Mr. Henley, who trusted Mr. Wider, perhaps because of

17   Mr. Wider's own lengthy criminal history, perhaps because of the

18   charges Mr. Wider's facing, Mr. Henley trusted Mr. Wider and

19   talked to him in detail.  And his comments are essentially a

20   confession, a jail house confession to a jail house buddy.

21         Admits to the December 30th Check Point robbery.  Talks

22   about how it's going to be committed, through the assistance of

23   an insider named Tamara, on December 30th.  Talks about the false

24   alibi and putting all of that together.  Talks about Jeezie

25   getting in trouble doing it.  Mr. Henley discusses how he was

1   able to avoid getting in trouble because he's the one that sets

2   it up.

3          Admits to the Wal-Mart robbery.  Even specifies the

4   location, late at night in Howard County, just like our Wal-Mart

5   robbery.

6          Talks about the July 3rd armored car robbery.  Dunbar

7   Armored truck, $180,000.  Grabbed it from a guy.  Jumped into a

8   Chrysler.  Mr. Henley tells Mr. Wider, I was a lookout guy across

9   the street.  Exactly the M.O. we hear from the other witnesses in

10  this case to a T.

11         Other robberies as well.  Gas stations.  Commercial

12  businesses.  Knocking off joints.  This is what Mr. Henley

13  describes.  The same kind of activity you hear from Ms. Dingle,

14  Mr. Lonesome, Mr. White, and Mr. Matthews.  All admitted to

15  Melvin Wider inside.

16         Mr. Wider's corroborated on every point, even to the

17  point of Mr. Henley's concerns over his own case, concerns which

18  are remarkable in light of some of the evidence and some of the

19  challenges that we've gone through in this case.

20         Mr. Henley's aware that the government believes he can

21  be linked to these robberies through cell phones, but his idea

22  is, well, the cell phones aren't in my name.  The cell phones

23  aren't in my name; how's government going to do that?  They can't

24  do that.  I'm smarter than that.  I put cell phones in the name

25  of companies.  This is what Mr. Wider's told.

1          Well, let's talk about that.  Let's talk about the cell

2   phone evidence in this case.  And don't worry, ladies and

3   gentlemen, I'm not going to pull the records out again.

4          The cell phone evidence in this case tells us

5   essentially this.  These cell phones tell us that the defendant

6   was at the place of every one of these robberies, that the

7   defendant was there at the time of the robbery, and that he's

8   talking to other robbers who were there at the same time.

9          How do we know, first of all, that these are the

10  defendant's phones?  The defendant loves phones.  Likes putting

11  them in other people's names.  We heard about it through Ms.

12  Thompson, Racquel Dingle.  Every piece of evidence in this case,

13  we've gone over this ad nauseam, I'm sure is probably how you

14  feel.  But how do we know that they're the defendant's phones,

15  beginning with what I called the 202 phone?

16          202-373-4804.  It's listed as Bill-Bill in the phone of

17  a coconspirator named Joseph White.  Mr. White testified that he

18  put the phone in his, in his electronic address book so he could

19  contact the defendant, whose nickname, there's been an abundance

20  of evidence about this, is Bill-Bill.  It is one of three

21  Corrigan Sports phones that have been linked to the defendant.

22          There were common calls between this 202 phone and

23  other phones that have been linked to the defendant.  And ladies

24  and gentlemen, this was boring testimony on Wednesday.  I know it

25  was.  But the purpose of that whole exercise was we had a phone

1     that was linked to the deaf, the 303 phone that was taken from

2     the crash scene in March.  Clearly his phone.  Even admitted the

3     phone during his interaction with Special Agent Bradley.

4            Then we had the jail house phone that the defendant

5     tried to flush down the toilet.  We heard about the Supermax

6     officials seizing a phone.  The defendant even talked to Mr.

7     Wider about that phone, the toilet phone, flush down.

8            Both of these phones have electronic address books with

9     lists of numbers, Momma job or Mommy's job -- I'm sorry.  DC.

10    One phone had a listing for Nell.  The other phone had a listing

11    for Shanell.

12           You put together, using these two lists, a series of

13    phone numbers that the defendant often calls people, he's

14    associated with, girlfriends, friends, his own mother, his own

15    home number, which he provided to Special Agent Bradley.  And in

16    particular, you take Robin Thompson's phone number, the young

17    lady from Florida who testified last week.  This is a woman whose

18    relationship is solely with the defendant.  She's not a west

19    Baltimore individual.  She has a relationship with the defendant.

20           Her phone numbers, in combination with the defendant's

21    mom, the defendant's home number, and other associates of the

22    defendant, that is a combination of phone numbers that no one is

23    going to be calling except Troy Henley.  It is a matter of common

24    experience.

25           And the 202 phone has numerous contacts, more than 200

1    in a six month period, with Robin Thompson, 60 contacts with a

2    number listed as Mommy job, and the other phones which, in fact,

3    is the Social Security Administration, where the defendant's

4    mother works, 80 plus calls with Mr. Henley's home phone number,

5    and 300 plus calls with a lady named DC in one of the defendant's

6    other address books.  The conclusion?  This 202 phone is the

7    defendant's phone.  That's what this whole thing is about.

8              Same with the 914 phone.  914-906-8738.  Again listed

9    as Bill-Bill.  Again, a Corrigan Sports phone.  Again, 1000 plus

10   contacts, 1300, I think, may have been the figure the defendant,

11   the agent gave.  1000 plus certainly, with Robin Thompson.  Ms.

12   Thompson's not talking to anybody that much except Mr. Henley.

13             Contacts with a DC.  Contacts with a Shanell/Nell

14   number.  Contacts with the Mommy job number, which is the

15   defendant's mother.  Contacts with the Henley home residence.  It

16   is the defendant's phone, along with the 202 phone,

17   notwithstanding his attempts to hide it.

18             Area code 303-210-8148.  Recovered from the defendant's

19   crashed Dodge Ram truck.  He admits to this phone and another

20   Corrigan Sports phone.  And as if we needed other evidence, call

21   patterns similar to the 914 and 202 phones.

22             Finally, 305-537-8911, listed to Bill Jackson, which,

23   notwithstanding Ms. Thompson's -- and it's understandable she

24   would want to not try to hurt the defendant.  But her testimony

25   in her prior appearance in the grand jury was clear.  Bill

1   Jackson is a name used by the defendant.  Ms. Thompson didn't

2   like having to go that far and she tried to fight it a little

3   bit, but it's very clear who Bill Jackson was.  She testified

4   about it in the grand jury, even if she wasn't enthusiastic here.

5   In any event, phone contacts with Robin Thompson and, again,

6   phone contacts with Mommy job, Shanell and DC.

7           The conclusion is that these four phones are the

8   defendant's phones.  That's what it's all about.  It's a lot of

9   exercise and a lot of time to get around the defendant's attempts

10  to distance himself from these phones.

11          And having established that phones are his, what do

12  those phones tell us?  On August 2nd, 2006 from just before, from

13  just after 10:30 p.m. until 11:25 p.m., the 914 and 202 phones

14  are hitting towers in Ellicott City, Maryland, near the Wal-Mart,

15  precisely the time that Racquel Dingle places the defendant

16  there.  Precisely at the time the defendant told Melvin Wider

17  this robbery took place.  Precisely when the robbery does take

18  place.

19          Special Agent Bradley had six months of records.  Not a

20  single other hit on that tower on either of these two phones

21  except for the night and the time of the robbery.  Late hour,

22  Howard County, Maryland, well outside of Baltimore City.

23  Corroborated as powerfully as a fingerprint the defendant's

24  presence in that location at the time of the robbery.

25          Who else is there, according to their own tower

1    records?  Racquel Dingle's there, just like she said.  Jeezie is

2    there.  Shitty is there.  And of course, we also have contacts

3    between Mr. Henley and Robin Thompson both before and after the

4    robbery on one of those phones, proving that the phone is in his

5    hands.

6         Same story on December 30th of 2006.  This time it's

7    the 202 phone.  The robbery time is about 11:15 a.m.  We have the

8    202 phone hitting off of cell towers in the vicinity of our Check

9    Point location from 10:30 a.m. until 11:21 a.m.  The towers are

10   the closest one to the store.  And also in the area are Ms.

11   Dingle, Dallas, Shitty and Corey.  And Whirl is also nearby,

12   ready to divide up that money at his house.

13        The defendant there at the right place, right time,

14   right date, with the right people.

15        January 23rd, 2007, the same.  The defendant is

16   bouncing off of towers closest to the Wilkens Liquor Store off of

17   Wilkens Avenue.  Robbery at 1:05.  That's incorrect, ladies and

18   gentlemen.  The robbery's about 1:05.  The time frames of the

19   calls, and you can check the records, is roughly 12:45 until a

20   little bit past 1:045, 1:10.  Apologize.  Closest towers to the

21   Wilkens store.

22        The July 3rd, 2007 armored car robbery, same

23   information from the records.  This time it's the 305 phone, the

24   Bill Jackson phone.  The robbery is roughly 11:45 to 12:00 p.m.

25   Remember, there was a chase this time.  The phone records place

1    Mr. Henley there.  The time period is 11:53 until shortly after

2    12:30 p.m.  We have 17 calls on the 305 phone.  The towers are

3    all closest to the Reisterstown Plaza, which is where the robbery

4    took place, which, of course, was the testimony of Melvin Wider,

5    who received a full confession from the defendant about this

6    information.

7            That's the phone information in combination with the

8    corroborating witnesses and the other corroborating testimony.

9    On point after point after point after point the defendant's

10   guilt has been proven in this case.  The cooperating accomplice

11   witnesses, the defendant's own conduct, including fleeing,

12   including intimidating witnesses, including constructing a false

13   alibi.  The defendant's jailhouse confession to Mr. Wider.  And

14   then finally, the phone records, placing the defendant not only

15   at the right place, but the right date and time and talking to

16   the right people.

17           That evidence, ladies and gentlemen, does prove beyond

18   any reasonable doubt the defendant's guilt in this case and the

19   United States does ask that you find him guilty.  Thank you.

20   Thank you, Your Honor.

21           THE COURT:  Thank you, counsel.  Members of the jury,

22   let me invite you to take a stretch break while Mr. Simms

23   approaches the table, if you'd like to.  Stand up, take a

24   stretch.

25           MR. SIMMS:  May it please the Court.

1          THE COURT:  Yes.  Whenever you're ready, Mr. Simms.

2          MR. SIMMS:  May it please the Court, ladies and

3    gentlemen, Mr. Hanlon, Mr. Levine, Mr. Henley, good afternoon.

4    It is now that time for closing argument and closing summation in

5    this case and I want to join with Mr. Hanlon, the Court, the

6    parties present, including Mr. Henley, to thank you for the

7    extraordinary attention that you've given to this particular

8    case, the attention to argument, attention to the proceedings.

9          We also want to thank you for your taking the time to

10   participate in this very important part of public service.  It's

11   important to all parties.

12         Our system of criminal justice, as you know, depends on

13   your participation, on your common sense, on your sense of

14   fairness, your understanding and participation in democratic

15   principles, in asking the very difficult questions and applying

16   scrutiny, as you must, to a case like this, where there is a

17   significant amount of evidence, and following the Court's

18   instructions and insisting on proof beyond a reasonable doubt.

19         Shortly you're going to be hearing or deciding, I

20   should say, a verdict with respect to this case.  And that

21   verdict, obviously, will affect the individual who's accused in

22   this particular matter.  That certainly is important.  And you

23   will do that based on the instructions that the Court has already

24   given to you, as well as applying your common sense and using the

25   standard of reasonable doubt that the Court has described to you.

1          You will not be doing that based on impulse, based on

2     Mr. Hanlon's argument over the last 45 minutes to an hour.  You

3     will not be doing that based on sympathy for some of the

4     individuals who's testified in this case.  You will be basing

5     your verdict, as the Court instructed, based on all of the

6     evidence viewed as a whole, with common sense, with no sympathy

7     for either side.

8          You will be viewing it and looking at the evidence that

9     is alleged with respect to Mr. Henley in this case, and not the

10    acts of other individuals who have committed other crimes.

11         If you do that, and if you follow the Court's

12    instructions, I submit that this case falls short of proof beyond

13    a reasonable doubt; that beneath all of this case, beneath all of

14    the evidence that's just been discussed, lies a different kind of

15    partnership than the conspiracy that's alleged in this case.

16    It's a partnership with witnesses who have testified in these

17    proceedings with the government, that has not presented you

18    accurate picture of what happened in this matter.

19         It is the tale of the fabulous five.  And I will get to

20    that momentarily.

21         Now, as we stated, the government bears the burden of

22    proof in a criminal case of establishing and presenting evidence

23    to prove guilt beyond a reasonable doubt concerning the charges

24    as put forward in this case.  And as you know, and exhaustively

25    know from the Court's description and Mr. Hanlon's description,

1    that this case relates to four alleged robberies and an alleged

2    conspiracy to commit robberies from June of 2006 to January of

3    2008.

4           It charges in Count One a conspiracy to violate the

5    Hobbs Act that's been described by the Court.  It charges in

6    Count Two an August 2, 2006 Wal-Mart robbery, along with an

7    alleged use of a firearm in Count Three related to that same

8    Wal-Mart.  It charges in Count Four an alleged December 30 Check

9    Point robbery, and Count Five, an alleged use of a firearm in

10    connection with that robbery.  And in Count Six, an alleged

11    robbery of a Wilkens Liquor Store on January 23rd, 2006.  And in

12    Count Seven, an alleged robbery of a Dunbar Armored Car robbery

13    on July 3rd of 2007.

14           Through four days of testimony I submit to you that the

15    government's evidence has basically done three things.  First,

16    that the robberies occurred is evident.  We heard testimony from

17    the Wal-Mart witnesses, Ms. Gordon, Mr. Kelbagh, and Ms. Jarrett,

18    about their horrific experience.  We heard from individuals at

19    Check Point, Ms. Nicole Cawthorne.  We heard from the individual

20    at Wilkens liquors.  We heard from Mr. Kevin Lee.  We heard from

21    the individual at Dunbar Armored, Mr. Lapusnik.  All of our

22    hearts go out to them.

23           And the government has even presented to you some of

24    the very individuals who are responsible for some of those acts.

25    But none of them, when they came here during the course of their

1      testimony, identified Mr. Henley as being involved in any of the

2      events that were described.

3           The second thing that the government's shown over four

4      days is that the investigation relating to these events is

5      ongoing.  And so whether it's related to individuals by the name

6      of Bishop or Fats or Christopher Mobley, the government, through

7      its investigation, has somehow focused on this area of northwest

8      Baltimore, identified a huge number of people, and made

9      assessments related to those individuals as to whether or not

10     they are allegedly involved in a conspiracy.

11          And part of that assessment has been to use and develop

12     phone records.  And though the government suggests that I'm

13     trying to impugn individuals, the fact of the matter remains, the

14     government is suggesting to you on one hand that I am impugning

15     them, but on other hand is suggesting that individuals who use

16     cell phones probably shouldn't be in other areas of this

17     community.  That's inappropriate.  And it's unfair to make a

18     presumption that an individual should not be in a particular

19     area.  And I'll come back to those phone records as used in a

20     minute.

21          The third thing that the government showed you through

22     four days of testimony as they brought before you that fab five I

23     talked to you about, they brought before you five individuals who

24     are self-interested, who have an expectation of leniency or

25     obtaining leniency.  That is the fab five of White, Dingle,

1    Lonesome, Wider and Matthews.

2         Now, the government on the one hand comes before you

3    and apologizes for who they are, but then on the other hand steps

4    back and urges you to accept their testimony wholesale as

5    indicative and supportive of proof beyond a reasonable doubt of

6    my client's responsibility for these acts.

7         And the government has attempted to bolster their

8    testimony by suggesting, again, through the cell phone records

9    the virtual presence of Mr. Henley in areas related to these

10   robberies.  This, again, is the evidence based on the cell phone

11   analysis consisting of, first step, obtaining numbers, the common

12   call patterns identification, and using the cell towers to try to

13   identify where or approximately where, because they couldn't say

14   with certainty, where these individual phones were generating

15   calls from.

16        And so whether it's the 202 phone or whether it's the

17   305 phone or the 914 phone or the 303 phone, remember very

18   carefully the testimony of Ms. Ramos and Special Agent Bradley.

19   There is no means of positive identification of the user of the

20   cell phone.  Secondly, there are no voice recordings.  And third,

21   there is no substance in this case of the actual communications

22   themselves.  Whether or not they were talking about bowling,

23   whether or not they were talking about faith, whether or not they

24   were talking about a dance, whether or not they were talk about a

25   club, all of that it is unknown.

1          And virtual presence or not, the Court has instructed

2     you on the issue of conspiracy, that mere presence at the scene,

3     even if you accept that evidence, is not enough.  Mere

4     association is not enough to establish conspiracy as it relates

5     to Count One.  Mere association is not enough to charge or

6     convict someone with respect -- excuse me -- with respect to

7     conspiracy.  Mere similarity of conduct is not enough to convict

8     someone with respect to conspiracy.  And mere assembling together

9     to talk about common names, assuming that happened, is not enough

10    to convict someone with respect to conspiracy.

11         I would suggest, ladies and gentlemen, despite all the

12    evidence displayed with respect to cell phones, despite all of

13    what's been put forward to you in terms of call patterns and

14    communications, even though you don't have the underlying

15    substance of what was discussed, that the evidence is overrated

16    and that the principal reliance in this case, the principal

17    reliance, the thing that buttresses it, the thing that brought

18    Mr. Hanlon up here to talk to you about underlying all of it are

19    the fabulous five, four of whom came out of that door and one of

20    whom did not.  And I'll talk about that one of whom did not in a

21    minute.

22         Now, the government talked about baggage, but at no

23    point in its argument in the last couple of minutes did they

24    identify the almost one inch stack of paper that these

25    individuals brought with them when they walked into this

1    courtroom.

2              Now, the Court's going to instruct you that individuals

3    who come forward, who testify in such cases where they make an

4    agreement with the government, you are certainly free to evaluate

5    their testimony.  But that testimony can be believe in whole or

6    in part.  I'm suggesting in this case that you reject it all.

7    And that the testimony and the evaluation of that testimony, as

8    the Court has already instructed to you, can be considered with

9    respect to whether or not there was motivation to provide

10   favorable treatment and whether or not that motivation caused

11   them to color their testimony.

12             And in this case, it's very interesting because after

13   all of this freelancing by a number of individuals who've

14   admitted that from this particular witness stand, who marched in

15   on this particular parade, the baseline is that they all took

16   advantage of the opportunity to get on the freight train, to use

17   Mr. Henley for the best opportunity that they could get.  Part of

18   that started with Joseph White, Government's Exhibit 15.

19             Joseph White, a fugitive from justice after a bank

20   robbery.  A person who went to a lawyer and then didn't turn

21   himself in.  Who has an expectation, based on Government's

22   Exhibit Number 15, a plea to a bank robbery charge and use of a

23   handgun, to get favorable treatment.  An individual who, on cross

24   examination, not on direct examination, admitted to a minimum of

25   four other bank robberies.  An individual who, during the course

1    of his testimony, admitted that he's very close to Gregory Eason.

2    An individual who, during the course of his testimony, admits

3    that he lied about Eason's contact with Dingle before the robbery

4    occurred in which he was captured.  And an individual who

5    admitted on the stand that he never, never did any business or

6    jobs with Mr. Henley.

7            I asked Mr. White specifically, No one ever forced you

8    to rob anybody, isn't that right?  No.  And during the course of

9    Mr. White's testimony he looked around sometimes as if somebody

10   needed to help him because he was so confused.  This is an

11   individual who took the opportunity to use Government's Exhibit

12   Number 15 to bail himself out, not only of the robbery that he

13   was in, but other events to which he has been involved.  And you

14   can't believe him.

15           Michael Lonesome.  Michael Lonesome, a 22-year-old

16   young man who walked across this way, sat and slumped in the

17   chair, and talked about his lifehood and how he committed himself

18   to crime in the last couple of years to support himself.  Here

19   was an individual who also cooperated with the government, in

20   Government's Exhibit Number 13, has pled guilty to two counts of

21   a superseding indictment charging him with Hobbs Act robbery and

22   brandishing a firearm, and who also has an expectation of

23   leniency and is hopeful that his testimony and his efforts put

24   him in good stead.

25           Also an ally of Gregory Eason.  And it was Eason

1    himself who pitched the plan to him on the drive over to Check

2    Point about what they were going to do in terms of that

3    particular robbery.  Another individual who failed to mention

4    that Eason had spoken to Dingle prior to the bank robbery that

5    occurred, that this individual who's on trial is not charged

6    with.

7            And here is an individual who claims that he rode

8    around with Mr. Henley with respect to looking at armored cars

9    and never participated in any armored car action with him.  At

10   least that's what he claims.  And again, no one forced him to

11   participate in any of the events that he claimed responsibility

12   for as a result of his testimony.  An individual, again, whose

13   testimony you should not accept.

14           And then there was Sean Matthews.  Now, Sean Matthews

15   is one of two individuals who had a fresh deal, a fresh deal.

16   And I'll get to that in a moment.  But Sean Matthews was

17   originally out of state, you might recall I asked him on cross

18   examination.  And so even though he was out of state, he also

19   took advantage of the availability of the opportunity to get in

20   while the getting was good.  And that getting was good was not

21   only his original plea agreement, in which he pled guilty to a

22   superseding indictment charging him with conspiracy to distribute

23   heroin, but also a separate understanding very recently with Mr.

24   Hanlon and the government regarding his testimony in this court.

25           And here was an individual who was asked directly by me

1    about another robbery in which Ms. Dingle was involved, which he

2    did not disclose on cross examination.  But when I asked Special

3    Agent Bradley about it, she said that he did so disclose to her,

4    that Dingle and Eason did participate in a McDonald's robbery.

5            And at no point did this individual, Sean Matthews,

6    talk about his girlfriend ever being involved in a robbery, which

7    he also disclosed to Special Agent Bradley in this case.  Sean

8    Matthews, an individual who also took advantage of an

9    opportunity, has an expectation in this case, and who should not

10   be believed.

11           And then, ladies and gentlemen, there are the two

12   twins.  Who are the two twins, you say?  Well, the first of the

13   two twins is Melvin Wider.  Melvin Wider is a professional

14   witness, without doubt.  I told you that at the beginning of this

15   case and I tell you that now.

16           Here's an individual with a horrendous prior record.

17   Four major convictions, including carrying a dangerous weapon,

18   robbery with a deadly weapon, possession with intent to

19   distribute PCP, and distribution of cocaine base, and who had his

20   own cooperation agreement, was quite lengthy, and now comprises

21   Government Exhibit Number 16, who, despite very serious charges,

22   already received a sentence of 16 years with 33 months

23   consecutive but, as indicated on his examination, pled guilty to

24   racketeering for drug, drug robberies, particularly was also

25   involved in an attempt or an actual murder of an individual after

1    he paid $24,000 for a drug purchase.  Was also responsible for an

2    attempt murder or a second murder -- excuse me -- for a drug

3    debt.  Was responsible for an attempt murder with respect to a

4    child who had found $51,000 in drugs and turned it over to the

5    police, which was foiled by an inmate in DC, which was a moment

6    that certainly Mr. Wider will never forget.  And I'll come back

7    to that.  And also convicted of home invasion, as well as the

8    robbery of a UPS individual.

9           He conveniently arrives, conveniently or coincidentally

10   arrives at Northern Neck in May.  And though concerned and

11   expressing a concern about his own safety, stays through at least

12   two weeks ago, which allows him to get a fresh understanding with

13   the government now about what he should say and what he should

14   do.  But an individual who has expectations, who also met with

15   the government on several occasions, as described by these

16   cooperating witnesses, who has an expectation of assistance based

17   upon his testimony here yesterday, and has now apparently now

18   moved on to the next assignment.  By his own testimony has

19   related, that is Mr. Wider has related, that he's an experienced

20   veteran, experienced veteran of several correctional systems.

21          I submit to you that his testimony, ladies and

22   gentlemen, was almost too perfect.  That his testimony was so

23   rehearsed, that his testimony in those details that he provided

24   was something in which he had to go a long stretch to bring

25   forward here before you yesterday to try to convince you that Mr.

1    Henley somehow provided all of that detail and information

2    directly to him.

3            Now, you say, but he did, where did he get it?  Well,

4    this is an experienced veteran.  That is individual who,

5    obviously, based on his testimony, determined, based on his prior

6    experience having been caught himself in terms of a murder plot,

7    now knows what he needs to do in terms of both documentation and

8    preparation.

9            I submit to you that he, along with the other

10   witnesses, have inaccurately portrayed the truth, have

11   inaccurately portrayed Mr. Henley, and have not told you the

12   truth, and I urge you to reject his testimony.

13           That brings us to Racquel Dingle, who had her own

14   agreement, which is Government's Exhibit Number 12.  And unlike

15   the other witnesses, Racquel Dingle walked through the public

16   door and not the other door.

17           And Racquel Dingle, who the government now is so

18   concerned about, seemed to me to walk very confidently from the

19   door to the witness stand.  She had her own cooperation

20   agreement.  As a matter of fact, when you look at her cooperation

21   agreement, she gets to argue that she had some kind of minimal

22   role with respect to her activities.

23           This individual was more or less a quarterback in

24   whatever operation that she was doing.  I don't understand, and

25   her testimony is certainly self-contradictory, if she's urging

1   and suggesting that she had a minimum role.  But she did not look

2   to me, and you are the judges of credibility, ladies and

3   gentlemen, she did not look to me like she was born yesterday.

4       And I don't know if she sat there and was sneering or

5   whether she was just simply acting like she was disinterested.

6   As a matter of fact, at some point she looked like we were

7   wasting her time.  But this is a person who was calculating.  I

8   submit to you this is a person who was reckless.  I submit to you

9   that this is a person who was not trustworthy.  A person who lied

10  to the Howard County police when asked about her role with

11  respect to anything related to Wal-Mart, who lied to the police

12  in Howard County and to Special Agent Bradley about her using a

13  Honda, who lied about her role in terms of the purchasing of a

14  Charger and the events at Musselman's in terms of a purchase of

15  an automobile, and apparently, based on Special Agent Bradley's

16  testimony, never disclosed anything about her role in a

17  McDonald's robbery with her boyfriend, Gregory Eason.

18      But she made one calculated move to save herself, as

19  did the others.  And that move was to enter a cooperation

20  agreement after being told a story by Special Agent Bradley that

21  there are two sides to the fence, that there are her kids to

22  think about, that motherhood is important.  And she took that to

23  advantage and took that to heart.

24      Why the reliance by the government on these

25  cooperators?  The government apologizes initially and suggests to

1    you that the only way they could really reach evidence related to

2    this conspiracy is by using such individuals when, in effect,

3    this entire case has been built around almost a reconstruction,

4    built on these unpleasant five individuals, the theory that Mr.

5    Henley was somehow involved, engaged as some kind of centerpiece

6    of the operation, and then the cooperators sort of fell in line

7    with that as an opportunity to construct their own testimony.

8            And this is all in a mystery, a mystery of an

9    investigation which has not concluded because, evidently, Bishop

10   and Fats and the rest are still out there.

11           And at no point for an individual that the government

12   now comes to you, that people are afraid of, that the government

13   now comes to you and says that this individual that is my client

14   should be feared, at no point has anyone put a weapon in his

15   hands.  At no point in any of the events related to the so-called

16   chase, which didn't sound like a chase based on what the

17   detective cited, did anyone recover a weapon from him.  And at no

18   point does any of even the cooperators in all of their lies put

19   any weapon in his hands.  Nor does he provide any weapon to

20   anyone.

21           Now, the government gets another opportunity after I've

22   concluded to discuss the evidence with you.  That is because,

23   obviously, the government has the burden of proof.  But I said at

24   the outset of this case, and I say now, that with respect to the

25   Wal-Mart robbery which occurred August the 2nd, there was poor

1    film, there was no material, no recovery of any items tying Mr.

2    Henley to that particular affair.  No prints, no DNA, no weapons.

3    And given all of the resources of the FBI and other allied

4    agencies, no search.  There was no discussion of any search

5    whatsoever that was undertaken of any home, any area, or any

6    other opportunity.

7         Same with respect to Check Point Cashing.  No

8    information documenting identification of Mr. Henley by Ms.

9    Cawthorne who testified here in this court.  By any film.  No

10   prints.  No DNA.  No weapons.

11        At Wilkens Liquors, no discussion, no testimony, no

12   search with respect to any prints, no DNA, and no weapons.

13        The closest thing, Mr. Hanlon says, was to throw that

14   charger at you.  The same black Charger that Racquel Dingle

15   drives and allegedly Mr. Henley's supposed to have access to.

16   The same black Charger that apparently one detective suggests

17   that a black male, and just based on a presumption, Mr. Hanlon

18   urges you, just like with the phone records, to follow the trend

19   and to assume that Mr. Henley was behind the wheel of that car.

20        I suggest to you that he was not.  I suggest to you

21   that the evidence doesn't prove that.  I suggest to you that Mr.

22   Henley is not guilty because it has not been proven.

23        And for Dunbar Armored.  No DNA.  No subsequent search.

24   No finding of any weapon.  No finding of any bounty or anything

25   tying Mr. Henley to that particular responsibility.

1           Oh, the government says, well, sometime later he was

2    with a friend of his and that friend had a fingerprint, and that

3    fingerprint ties him, too.  Well, it's not Mr. Henley's print,

4    and it's not Mr. Henley.

5           Well, it's a Chrysler 300, the same kind of car.  There

6    is no testimony and no evidence before you that Mr. Henley was

7    driving in the car or anything else.

8           Now, you're saying to yourself, well, Mr. Simms, what

9    about the cell phones again?  What about the mapping?  What about

10   all this?  Again, an investigation that had began in 2006 and

11   that continues up through today.  No searches attributable to Mr.

12   Henley to respond to evidence tying him to this matter.  No

13   prints.  No location of him.

14          I would suggest to you that this is not a case where

15   there is guilt associated simply by the mapping of events.  I

16   would suggest to you more; that the government's principal

17   reliance in this case is on evidence of individuals who have

18   partnered with the government for their testimony, evidence of

19   individuals who are desperate and who basically admitted on the

20   witness stand, if you take anything from their testimony, that

21   they were freelancing for opportunities to make money.  And that

22   the evidence in this case, which Mr. Hanlon suggested at the

23   outset and in his closing argument that somehow Mr. Henley

24   participated or knowingly participated and acted with respect to

25   this case, is deficient.  And that the real persons of

1    involvement and the real persons of engagement were some of the

2    individuals who testified here before you, four of whom admitted

3    their responsibilities, and others, such as Gregory Eason,

4    Bishop, Fats, AKA Chris Mobley, who are not here.  And that the

5    real participants and the real leaders are not evident.

6              It is for those reasons that I suggest that you return

7    a verdict of not guilty in this case.

8              Now, the government would have you and suggest to you

9    that the cooperating individuals in this case should be believed

10   also because, well, it's what they didn't say.  They were

11   benevolent.  They picked and chose or they suggested in some ways

12   the acts for which Mr. Henley was not responsible.  Certainly,

13   that's kind of them, but it's also accurate.  And simply because

14   they did that doesn't necessarily mean that they should be given

15   the benefit of the doubt suggesting by implication that somehow

16   they should be believed because of that so-called benevolence,

17   and that somehow we should snatch from their non-acts and

18   non-implications of Mr. Henley that they should be believed.

19             In a close case, and I suggest this is a much closer

20   case than you originally think, such as this, where you weigh the

21   evidence and look carefully at it, the composite of what you come

22   away with at the end of the day is a situation of which five

23   individuals have been promoted and thrust before you in almost a

24   post-investigation sense to try to persuade you that Mr. Henley

25   participated and knowingly participated and acted in a conspiracy

1    and committed the underlying charges in the indictment.  I would

2    suggest to you that he did not.

3              Lastly, ladies and gentlemen, one moment.

4              (Pause.)

5              Is that too much?

6              August 2nd, 2006, Wal-Mart.  Were there guns?  Were

7    there fingerprints?  Were there eyewitnesses that implicate Mr.

8    Henley?  I suggest to you there were none.  There were none

9    testified in this case.  The government's principal reliance is

10   on Racquel Dingle and Melvin Wider.  I suggest to you, for the

11   reasons that I've indicated, that those individuals cannot be

12   believed.

13             On December 30, there's a robbery at Check Point.

14   There was testimony about guns.  There were no fingerprints.

15   There were eyewitnesses but no eyewitnesses testified or

16   identified Mr. Henley.  The principal witnesses were Racquel

17   Dingle, Michael Lonesome, and there were statements given by

18   Melvin Wider.  For the reasons I've indicated to you, I submit to

19   you that their testimony cannot be believed.

20             On January 23rd, there was a robbery at Wilkens

21   Liquors.  There was no testimony of guns.  There was no testimony

22   about any fingerprints.  Whatever eyewitnesses that were

23   identified did not make any identification in this case.  Michael

24   Lonesome testified about committing an earlier robbery, but I

25   suggest to you that he cannot be believed.

1          On January 3rd -- July 3rd, excuse me, there was a

2     robbery at Dunbar Armored.  The only fingerprint evidence was of

3     that of a Joseph Dominic Wright.  The eyewitnesses could not

4     identify or tie that in any respect to Mr. Henley in this case.

5     The government suggests that believe the testimony of Michael

6     Lonesome regarding canvassing other events, Sean Matthews

7     regarding canvassing other events, and Melvin Wider, who comes

8     before you as professional witness giving incredible testimony.

9          Ladies and gentlemen, I suggest to you that when the

10    composite of events is carefully examined, using your common

11    sense and assessing the incredible opportunity that the five

12    individuals that the government principally relies on in this

13    case, that you cannot, you cannot conclude beyond a reasonable

14    doubt that Mr. Henley was involved in these sordid affairs.

15         Sordid they may be.  Nice persons, these individuals

16    are not.  But we are not here basically to talk, as the Court

17    said in its instructions, about character or lack of character

18    with respect to associations or events.  What we are here to do

19    and what the obligations of this process is is to carefully

20    examine evidence using common sense and that very important lens

21    of reasonable doubt and the presumption of innocence that Mr.

22    Henley comes into the courtroom here today, to try to understand

23    what occurred.

24         The government posits and gives to you charts,

25    information and other data.  But in the end, it is on these live

1    individuals that they principally rely.  And it is on that lack

2    of integrity of witnesses, it is on their self-interest and

3    expectation of benefits that they have that you simply cannot,

4    you simply cannot take this as a trustworthy, trustworthy,

5    truthful, accurate recitation of events and conclude that my

6    client is guilty.

7         It is for those reasons that I suggest to you again

8    that any reasonable conclusion and judgment in this case, one

9    that doesn't simply react impulsively to the evidence, is one of

10   simply not proved and, therefore, not guilty.

11        Thank you, ladies and gentlemen.

12        THE COURT:  Thank you, Mr. Simms.  Mr. Hanlon.

13        MR. HANLON:  Thank you, Your Honor.  Good afternoon

14   again, ladies and gentlemen.

15        Mr. Simms made a number of points.  I probably won't be

16   able to respond to everything he said, but I do want to at least

17   respond to a few of the points that he made.  And let me begin by

18   responding to one suggestion that we heard during the closing

19   argument, which is that the government has a problem with Mr.

20   Henley going certain places, with shopping at certain places.

21        If there's one thing that I hope has been clear from

22   this case, and I hope it's been, the United States of America

23   does not care where Mr. Henley does his shopping.  It doesn't

24   care where Mr. Henley makes his cell phone calls unless Mr.

25   Henley is scoping out a place to rob and talking to

1    coconspirators about a planned robbery.

2            I don't care and the government does not care that Mr.

3    Henley was at a Wal-Mart in Ellicott City, Maryland on August

4    2nd, 2006, except that there was a robbery that night, and

5    coconspirators put Mr. Henley there, and his phone confirms his

6    presence.  That's what this case has been about.  It's not about

7    where Mr. Henley can come and go.  It's about where Mr. Henley

8    chooses to do armed robberies.  That's what this case has been

9    about.  That's what the evidence is about.  I hope that that has

10   been clear.

11           Now, defense counsel, Mr. Simms, talked for sometime

12   about the investigation.  There were a number of points he made.

13   I'm not going to cover them in the order of how they came out,

14   but I'll attempt to at least cover a few of them.

15           We heard a number of comments about the investigation,

16   no fingerprints, no DNA, no photographs.  We've been over this

17   time and time again.  Of course there aren't.  We wouldn't expect

18   there to be any.  The testimony of the cooperating witnesses, the

19   way that this robbery, these robberies took place proves that

20   there would not be any fingerprints or DNA or identifying

21   witnesses.

22           There was no camera in operation at the Check Point

23   Check Cashing job.  Remember, it was an inside job.  Mr. Henley

24   had a tip on where to go.  Special Agent Bradley testified

25   yesterday there was no camera footage available from that store

1    because they knew when to rob the place because Tamara Johnson,

2    who's on the inside, the camera logically would have been part of

3    that information.  Mr. Eason, remember, was identified not by

4    camera work.  He was identified because a witness picked him out

5    of a lineup, Ms. Nicole Cawthorne.  And that's because he was

6    silly enough not to wear a mask during the robbery.

7         Mr. Simms make the same point about a number of the

8    vehicles that were used in the case.  Valid points except, again,

9    that's how these robberies were planned and carried out.  This is

10   a case in which we've got to look past the surface.  We're got to

11   look at the guy in the background, Mr. Henley.

12        One point Mr. Simms made which the government agrees

13   with is that there's no evidence that Mr. Henley drove or had any

14   contact with that Chrysler 300 that was used during the July 3rd

15   armored car robbery.  The United States heartily agrees.  Joseph

16   Wright's fingerprint is found on that car but there's no evidence

17   that Mr. Henley was in that car.

18        Melvin Wider tells us he wasn't.  Melvin Wider's

19   testimony was that Mr. Henley put himself in a lookout car across

20   the street.  So we agree, there's no evidence putting Mr. Henley

21   in that initial getaway car, the Chrysler.  Mr. Wider's testimony

22   supports that position.

23        Brings us to another point about Mr. Wider's testimony,

24   which was discussed for some time during closing argument.  Mr.

25   Wider must be the smartest guy on earth and must have had a

1    wiretap bug inside this courtroom to have been able to pick up

2    the information that he picked up during the course of the last

3    couple of days.  He had every detail of information you could

4    possibly get.

5            Defense counsel's alluded to an explanation for this

6    but he provided none.  The fact of the matter is that there's

7    only one possible source of the information Mr. Wider had, and

8    that is our defendant, Troy Henley, because Mr. Henley liked Mr.

9    Wider.  Mr. Wider's a big time guy in the criminal world.  This

10   is how he gets information.  And yes, he has testified a number

11   of times.  Yes, he got a reduction in his case down in District

12   of Columbia.  There's no question, because he's an effective

13   witness.  And in this case he was corroborated on every single

14   point to an amazing amount of detail, but detail that is

15   corroborated on everything.

16           If Mr. Wider were going to tell stories about Mr.

17   Henley's involvement in this armored car robbery, while we're on

18   subject, why not just put him in the Chrysler?  Wouldn't that be

19   the logical thing for Mr. Wider to say?  If he's going to make

20   something up, why not just put Mr. Henley in the Chrysler?  Makes

21   him look more guilty.  Makes him closer to the robbery.  Makes

22   him more of a robber, at least to a laymen's point of view.

23           Mr. Wider didn't say that because that isn't the truth.

24   Consistently with the other robberies in this case, robberies Mr.

25   Wider had nothing to do with and had no direct knowledge of, he

1    even testified from the stand when asked, he has absolutely no

2    idea what any of these underlying details were.  He's just

3    reporting what Mr. Henley told him.

4          And the truth of what Mr. Henley told him is that Mr.

5    Henley was in a lookout car across the way, not in the Chrysler.

6    Again, Mr. Wider's testimony is corroborated by the fingerprint

7    evidence which links Mr. Henley's associate, not Mr. Henley, to

8    the armored car robbery.

9          With respect to all, with respect to Mr. Wider in

10   particular, the detail that he provided isn't just from his

11   voice, but it was corroborated by documents that he provided,

12   documents demonstrating the defendant's attempt to obstruct

13   justice by intimidating a witness and to make a false alibi for

14   himself.  The detail is notable with respect to this testimony.

15   But equally notable is the language of these letters.

16          If there's one thing that is perfectly clear from these

17   letters, which Mr. Wider was very quick to point out is his

18   handwriting, is that this is the voice of Troy Henley in these

19   letters.  Powerful corroboration of this witness who was called a

20   professional witness during closing argument.

21          Hi baby, I spoke to Stanley.  Special Agent Bradley

22   confirms Stanley Needleman was counsel for the defendant early in

23   this case.  There's talk of a robbery in December of 2006, a

24   particular point that Mr. Wider makes.  The kind of point that

25   could only have been provided to him by the defendant and very

1   demonstrative of the defendant's willingness to obstruct justice

2   in the detail with which he is thinking.

3           We stayed at Barber's place, not at any hotel, because

4   they will question you about what hotel to see if we was really

5   there.  Let little, let little, let sister know exactly what's

6   up.  In other words, let's get some other witnesses on board with

7   this proposition.  Let's do it in a way that can't be disproven

8   by the government.  Let's get other people on board with the lie.

9           A similar technique with respect to the letter which

10  was addressed to Yo.  Yo is, this individual who's referred to in

11  the documentation as Yo, an individual who had stayed at the Anne

12  Arundel County Detention Center, an individual that Mr. Henley

13  described as a homosexual.  This is really the only information

14  that Mr. Wider had.  Specifically, in this particular letter,

15  even though this was someone that Mr. Henley obviously knew

16  personally and had detailed conversation with, he specifically

17  asks the recipient of this letter, let Yo know he really don't

18  know me personally.

19          Calculating.  There was talk of calculation during

20  defense closing.  This is calculating.  Going so far as to make

21  sure that this fabricated witness will deny even knowing Mr.

22  Henley.

23          This isn't something that Mr. Wider makes up, ladies

24  and gentlemen.  His imagination isn't that detailed.  He's not,

25  frankly, with respect to him, he doesn't come across as that

1    intelligent on the stand.  And where would he have gotten the

2    information that he provided?  Again, he hasn't been sitting in

3    court for the last five or six days listening to it all come in.

4    He didn't meet Special Agent Bradley or me until a couple of

5    weeks ago, maximum.

6          And he testified himself, almost seemed a little

7    frustrated by it, that he has absolutely to idea whether or not

8    what he was receiving means except that it was coming from this

9    defendant, because no one will confirm it for him.  Which is

10   fine.  He reports what he hears.

11         With respect to the other cooperating witnesses, which

12   I'll discuss kind of as a group, they're referred to that way as

13   the fab five.  They're also referred to as a freight train.

14   Getting on the train together, working together, I suppose, is

15   the image.

16         Right off the bat, this image of these cooperating

17   witnesses as the fab five, as a freight train, doesn't make a

18   whole lot of sense because one thing is very clear is they don't

19   really know each other all that terribly well.  Ms. Dingle

20   remembered seeing a younger guy but wasn't sure of any names.

21   Mr. Lonesome knew Ms. Dingle's face and knew she was somebody's

22   girlfriend.  Joseph White had done robberies with one branch,

23   with one group of individuals but didn't know everyone.  Melvin

24   Wider doesn't know any of these people.  He's just got a bunch of

25   names and he's reporting what he hears.

1          So the notion of the fab five, the notion of this group

2    working as a team doesn't make a whole lot of sense, particularly

3    when you consider that Racquel Dingle and Michael Lonesome to a

4    great degree are implicating each other as much as they're

5    implicating the defendant.

6          Racquel Dingle doesn't mention Michael Lonesome by

7    name, but mentions a bunch of younger guys, obviously including

8    Michael Lonesome, whose name she may not have remembered.

9    Michael Lonesome plainly implicates Racquel Dingle.  To Racquel

10   Dingle's way of thinking, he might as well be testifying against

11   her.

12         This is not a team effort.  These are individuals

13   witnesses testifying about their individual recollections.

14         They're attacked by defense counsel really in two ways.

15   Number one, there's this theory that Mr. Lonesome and Ms. Dingle

16   held something back on a McDonald's robbery, and Sean Matthews as

17   well.  They're all asked about it.  None of them really claimed

18   any memory of this.

19         With respect to counsel recollection -- and your

20   recollection controls, not mine and not Mr. Simms -- but Special

21   Agent Bradley's testimony was that she didn't have anything on

22   McDonald's robbery consistent with the witnesses.  Now, your

23   recollection controls on that point, ladies and gentlemen.

24   Yours.  Not mine and not Mr. Simms.

25         Another point that is made is this, it's alluded to as

1    the theory that there's this attempt to protect Jeezie.

2    Everybody's Jeezie's friend.  Everybody's close to Jeezie and

3    everybody's trying to help Jeezie, I suppose is the image.  If

4    that's how these witnesses helped Jeezie, I don't want to know

5    what his enemies do to him, because Racquel Dingle, Michael

6    Lonesome, and Joseph White bury Jeezie from that witness stand.

7    They put him in every robbery, consistent with the phone records,

8    consistent with Nicole Cawthorne's testimony.  If this were

9    United States versus Gregory Eason, be almost as easy a case as

10   the one we have.

11          There's no attempt to protect him.  There's no attempt

12   to cover up for him.  He is buried as part of this conspiracy.

13   The same testimony that implicates the defendant, Mr. Henley.

14   There's no protection of him.  There's no holding back on him.

15          At bottom, the defense image of this case asks you to

16   take each piece of the government's, of the testimony in this

17   case and look at it individually.  Taking Racquel Dingle,

18   separating herself and looking at her by herself.  Well, she's

19   not enough, so throw her out.  Then we'll take Michael Lonesome.

20   Look at him.  That's not proof beyond a reasonable doubt so throw

21   it out.  Then the other witnesses one by one.  Then the phone

22   records one by one.  That's not enough by itself, throw it out.

23   Each individual thing by itself.  That's what you're invited to

24   do.  And that would be the wrong way of analyzing this case.

25          If you imagine the scales of justice weighing for and

1   against guilt, ladies and gentlemen, I urge you to look at the

2   evidence together.  Put it all on the scale, all of it at the

3   same time.  Racquel Dingle.  Michael Lonesome, Joseph White, Sean

4   Matthews, Melvin Wider.  Five witnesses with limited contact with

5   one another, different perspectives, testifying to the same

6   information, same series of events.

7          The phone records, put it on the scale with these

8   witnesses, see how it fits together.  And you find, as I've

9   discussed already, on point after point these phone records back

10  up and corroborate those cooperating witnesses.

11         And in addition to the witnesses, the cooperating

12  individuals, in addition to the phone records which back them up

13  the date, the time, and place of every robbery, put on some of

14  the other evidence which we didn't hear about during the defense

15  closing.  The defendant's flight from the police on March 26th of

16  2007.  What that tells us about his own consciousness.  The

17  defendant's attempt to construct a false alibi.  And the

18  defendant's attempt to intimidate Gregory Eason by threatening to

19  embarrass him in front of his friends and neighbors.

20         Put it all on at the same time.  And what you will

21  find, proof beyond any reasonable doubt has been provided in this

22  case.

23         There were efforts to camouflage the truth in this case

24  by intimidating witnesses, by staying in the background, by using

25  phones in other people's names.  There were numerous attempts,

1    extensive attempts.  For a long time it was successful.  And the

2    investigation will continue, as Special Agent Bradley testified,

3    as to other robberies.  But the four we have here today, despite

4    the defendant's attempts to hide the truth, you've seen the

5    robberies, you've heard the evidence, and you've seen the

6    evidence proving the guilt of Troy Henley beyond any reasonable

7    doubt.  And the United States again does ask that you find him

8    guilty.

9              Thank you.

10             THE COURT:  Thank you, counsel.

11             (Conclusion of Closing Arguments.)

## REPORTER'S CERTIFICATE

    I, Mary M. Zajac, do hereby certify that I recorded stenographically the proceedings in the matter of USA v. Troy Henley, Case Number(s) AMD-08-046, on August 26, 2008.

    I further certify that the foregoing pages constitute the official excerpt transcript of proceedings as transcribed by me to the within matter in a complete and accurate manner.

    In Witness Whereof, I have hereunto affixed my signature this _____ day of _____, 2009.


                          _____
                          Mary M. Zajac,
                          Official Court Reporter

## $

**$1500** [2] - 24:14, 24:15
**$180,000** [1] - 38:7
**$24,000** [1] - 55:1
**$30,000** [2] - 13:15, 26:15
**$51,000** [1] - 55:4

## '

**'08** [1] - 35:20

## 1

**100%** [2] - 16:1, 24:10
**1000** [2] - 41:9, 44:11
**101** [1] - 1:23
**10:30** [2] - 42:13, 43:9
**11** [1] - 11:15
**11:00** [2] - 11:15, 22:4
**11:15** [2] - 11:15, 43:7
**11:20** [1] - 11:22
**11:21** [1] - 43:9
**11:22** [1] - 11:22
**11:25** [2] - 22:18, 42:13
**11:45** [1] - 43:24
**11:53** [1] - 44:1
**12** [1] - 56:14
**12:00** [1] - 43:24
**12:15** [1] - 13:23
**12:30** [1] - 44:2
**12:45** [1] - 43:19
**13** [1] - 52:20
**1300** [1] - 41:10
**15** [3] - 51:18, 51:22, 52:12
**16** [2] - 54:21, 54:22
**17** [1] - 44:2
**1:045** [1] - 43:20
**1:05** [2] - 43:17, 43:18
**1:10** [1] - 43:20
**1:15** [1] - 14:5

## 2

**2** [1] - 47:6
**200** [1] - 40:25
**2006** [15] - 2:7, 2:9, 11:8, 12:22, 19:17, 20:17, 42:12, 43:6, 47:2, 47:6, 47:11, 60:10, 62:6, 65:4, 68:23
**2007** [12] - 2:11, 2:13, 16:25, 25:1, 28:2, 28:3, 33:20, 34:6, 43:15, 43:22, 47:13, 73:16

**2008** [4] - 1:10, 17:13, 47:3, 75:5
**2009** [1] - 75:10
**202** [10] - 39:15, 39:22, 40:25, 41:6, 41:16, 41:21, 42:13, 43:7, 43:8, 49:16
**202-373-4804** [1] - 39:16
**21201** [1] - 1:24
**22-year-old** [1] - 52:15
**23rd** [2] - 2:11, 15:15, 15:21, 15:24, 16:20, 28:2, 43:15, 47:11, 62:20
**25** [1] - 21:24
**26** [3] - 1:10, 33:20, 75:5
**26th** [2] - 34:6, 73:15
**27th** [2] - 15:6, 15:9
**28** [1] - 32:18
**29th** [2] - 25:11, 37:3
**2nd** [7] - 2:7, 11:8, 14:24, 42:12, 58:25, 62:6, 65:4

## 3

**30** [2] - 47:8, 62:13
**300** [6] - 17:3, 17:4, 17:5, 41:5, 60:5, 66:14
**303** [2] - 40:1, 49:17
**303-210-8148** [1] - 41:18
**305** [3] - 43:23, 44:2, 49:17
**305-537-8911** [1] - 41:22
**30th** [2] - 2:9, 12:22, 15:2, 24:17, 25:6, 36:23, 37:21, 37:23, 43:6
**33** [1] - 54:22
**3rd** [11] - 2:13, 15:6, 15:10, 16:25, 28:2, 38:6, 43:22, 47:13, 63:1, 66:14

## 4

**45** [1] - 46:2

## 5

**50** [1] - 9:19
**50%** [1] - 9:19
**5515** [1] - 1:23

## 6

**60** [1] - 41:1

## 8

**80** [1] - 41:4
**80,000** [1] - 13:16

## 9

**914** [4] - 41:8, 41:21, 42:13, 49:17
**914-906-8738** [1] - 41:8
**924(c** [1] - 10:13

## A

**a.m** [3] - 43:7, 43:9
**abetted** [2] - 8:7, 10:24
**abetter** [2] - 7:10, 8:13
**abetting** [4] - 6:6, 7:6, 7:25, 26:21
**ability** [1] - 20:15
**able** [3] - 38:1, 64:16, 67:1
**absolutely** [6] - 4:8, 7:25, 8:6, 29:11, 68:1, 70:7
**abundance** [1] - 39:19
**accept** [2] - 49:4, 50:3, 53:13
**access** [3] - 20:13, 20:15, 59:15
**accompanies** [1] - 25:19
**accompanying** [1] - 23:14
**accomplice** [5] - 15:22, 18:8, 19:10, 25:4, 44:10
**accomplices** [4] - 3:9, 4:19, 5:3, 23:24
**according** [6] - 4:15, 9:20, 10:8, 26:12, 26:13, 42:25
**accosted** [1] - 15:13
**accosting** [2] - 6:12, 11:16
**accosts** [1] - 13:4
**accurate** [4] - 46:18, 61:13, 64:5, 75:8
**accurately** [1] - 32:7
**accused** [1] - 45:21
**Act** [5] - 8:21, 9:12, 10:9, 47:5, 52:21
**act** [1] - 35:15
**acted** [3] - 7:16, 60:24,

61:25
**acting** [3] - 7:3, 25:22, 57:5
**action** [2] - 26:18, 53:9
**actions** [2] - 5:11, 36:14
**activities** [3] - 9:17, 10:5, 56:22
**activity** [4] - 9:21, 10:3, 33:23, 38:13
**acts** [6] - 5:9, 46:10, 47:24, 49:6, 61:12, 61:17
**actual** [4] - 26:5, 26:25, 49:21, 54:25
**ad** [1] - 39:13
**addition** [4] - 10:11, 26:24, 73:11, 73:12
**address** [3] - 39:18, 40:8, 41:6
**addressed** [1] - 69:10
**Administration** [1] - 41:3
**Admits** [2] - 37:21, 38:3
**admits** [2] - 41:19, 52:2
**admitted** [10] - 19:13, 29:13, 38:14, 40:2, 51:14, 51:24, 52:1, 52:5, 60:19, 61:2
**advance** [1] - 6:13
**advantage** [5] - 18:24, 51:16, 53:19, 54:8, 57:23
**advises** [1] - 37:6
**affair** [1] - 59:2
**affairs** [1] - 63:14
**affect** [2] - 10:10, 45:21
**affixed** [1] - 75:9
**afraid** [1] - 58:12
**African** [1] - 16:10
**afternoon** [2] - 2:3, 14:18, 14:20, 45:3, 64:13
**age** [1] - 36:7
**agencies** [1] - 59:4
**agent** [1] - 41:11
**Agent** [20] - 16:13, 16:17, 16:19, 34:2, 35:19, 36:12, 40:3, 40:15, 42:19, 49:18, 54:3, 54:7, 57:12, 57:15, 57:20, 65:24, 68:21, 70:4, 71:21, 74:2
**ago** [2] - 55:12, 70:5
**agree** [1] - 66:20
**agreement** [8] - 4:2, 51:4, 53:21, 54:20, 56:14, 56:20, 56:21, 57:20
**agrees** [4] - 23:11, 23:13, 66:12, 66:15
**aided** [2] - 8:7, 10:24
**aider** [2] - 7:9, 8:13
**aiding** [5] - 6:6, 7:6,

7:24, 26:21, 26:22
**ain't** [1] - 35:12
**Aiosa** [2] - 16:8, 16:12
**AKA** [1] - 61:4
**Alexander** [4] - 4:25, 17:9, 17:15, 18:9
**alibi** [7] - 3:16, 34:4, 37:8, 37:24, 44:13, 68:13, 73:17
**alibis** [1] - 36:20
**alleged** [9] - 46:9, 46:15, 47:1, 47:7, 47:8, 47:9, 47:10, 47:12
**allegedly** [2] - 48:10, 59:15
**allied** [1] - 59:3
**allows** [1] - 55:12
**alluded** [2] - 67:5, 71:25
**ally** [1] - 52:25
**almost** [7] - 16:15, 50:24, 55:22, 58:3, 61:23, 70:6, 72:9
**Alternative** [1] - 7:6
**amazing** [1] - 67:14
**AMD-08-046** [2] - 1:6, 75:5
**America** [2] - 10:6, 64:22
**AMERICA** [1] - 1:4
**amount** [2] - 45:17, 67:14
**ample** [1] - 9:10
**analysis** [1] - 49:11
**analyzing** [1] - 72:24
**Andre** [1] - 1:12
**angels** [1] - 29:21
**Anne** [2] - 35:5, 69:11
**apart** [2] - 19:8, 19:11
**Apologize** [1] - 43:20
**apologizes** [2] - 49:3, 57:25
**apparent** [1] - 36:9
**appearance** [1] - 41:25
**Appearances** [1] - 1:15
**applicable** [1] - 17:23
**applying** [2] - 45:15, 45:24
**apprehend** [1] - 34:7
**approach** [1] - 21:23
**approached** [5] - 21:3, 23:9, 27:7, 28:9, 29:5
**approaches** [3] - 20:19, 29:7, 44:23
**approaching** [1] - 21:22
**Area** [1] - 41:18
**area** [9] - 16:7, 22:1, 22:3, 22:12, 25:22, 43:10, 48:7, 48:19, 59:5
**areas** [2] - 48:16, 49:9

**argue** [1] - 56:21
**argument** [8] - 45:4, 45:8, 46:2, 50:23, 60:23, 64:19, 66:24, 68:20
**Arguments** [3] - 1:10, 2:1, 74:11
**arguments** [1] - 14:7
**armed** [6] - 11:17, 12:25, 14:25, 15:2, 29:13, 65:8
**Armored** [13] - 2:12, 4:12, 9:9, 10:5, 10:7, 15:7, 27:13, 27:23, 38:7, 47:12, 47:21, 59:23, 63:2
**armored** [11] - 9:4, 15:10, 16:25, 17:1, 38:6, 43:22, 53:8, 53:9, 66:15, 67:17, 68:8
**arrangements** [1] - 22:22
**arrested** [5] - 17:14, 32:23, 34:2, 34:16, 35:20
**arrives** [3] - 21:25, 55:9, 55:10
**Arundel** [2] - 35:5, 69:12
**assembling** [1] - 50:8
**assessing** [4] - 30:7, 32:9, 35:25, 63:11
**assessment** [1] - 48:11
**assessments** [1] - 48:9
**assignment** [1] - 55:18
**assistance** [4] - 7:2, 7:12, 37:22, 55:16
**associate** [3] - 24:6, 29:24, 68:7
**associated** [4] - 4:5, 22:24, 40:14, 60:15
**associates** [1] - 40:21
**association** [2] - 50:4, 50:5
**associations** [1] - 63:18
**assume** [1] - 59:19
**assuming** [1] - 50:9
**assure** [1] - 6:5
**attacked** [1] - 71:14
**attempt** [13] - 26:8, 33:24, 35:22, 54:25, 55:2, 55:3, 65:14, 68:12, 72:1, 72:11, 73:17, 73:18
**attempted** [1] - 49:7
**attempting** [1] - 34:7
**attempts** [6] - 34:3, 41:17, 42:9, 73:25, 74:1, 74:4
**attention** [4] - 2:3, 45:7, 45:8
**attributable** [1] - 60:11
**August** [11] - 1:10, 2:7, 11:8, 14:24, 20:17,

42:12, 47:6, 58:25, 62:6, 65:3, 75:5
**automobile** [2] - 20:15, 57:15
**availability** [1] - 53:19
**available** [1] - 65:25
**Avenue** [1] - 43:17
**avoid** [2] - 34:21, 38:1
**aware** [1] - 38:20
**awareness** [3] - 33:13, 33:19, 34:20

### B

**baby** [1] - 68:21
**backed** [1] - 37:14
**background** [2] - 66:11, 73:24
**Bad** [1] - 22:23
**bad** [2] - 13:17, 21:8
**baggage** [2] - 29:10, 50:22
**bags** [1] - 11:19
**bail** [1] - 52:12
**Baltimore** [13] - 1:11, 1:24, 2:10, 19:19, 19:22, 19:23, 20:14, 20:24, 23:16, 24:5, 40:19, 42:22, 48:8
**Bank** [2] - 10:6, 15:16
**bank** [7] - 27:6, 32:22, 33:1, 51:19, 51:22, 51:25, 53:4
**Barbara's** [1] - 37:6
**Barber's** [1] - 69:3
**barely** [1] - 2:2
**base** [2] - 9:8, 54:19
**based** [13] - 45:23, 46:1, 46:3, 46:5, 49:10, 51:21, 55:16, 56:5, 57:15, 58:16, 59:17
**baseline** [1] - 51:15
**basing** [1] - 46:4
**bat** [1] - 70:16
**bear** [5] - 29:19, 30:2, 35:16, 36:3, 36:5
**bears** [1] - 46:21
**becomes** [1] - 20:18
**beforehand** [1] - 23:17
**began** [1] - 60:10
**begin** [5] - 14:9, 19:12, 19:15, 34:6, 64:17
**beginning** [4] - 2:5, 27:2, 39:15, 54:14
**Behalf** [2] - 1:16, 1:18
**behind** [2] - 12:1, 59:19
**believes** [1] - 38:20
**beneath** [2] - 46:13
**benefit** [1] - 61:15

**benefits** [1] - 64:3
**benevolence** [1] - 61:16
**benevolent** [1] - 61:11
**best** [1] - 51:17
**Bethesda** [1] - 24:15
**between** [6] - 4:3, 20:14, 31:24, 32:3, 39:22, 43:3
**beyond** [3] - 3:5, 7:7, 44:17, 45:18, 46:12, 46:23, 49:5, 63:13, 72:20, 73:21, 74:6
**big** [1] - 67:9
**Bill** [10] - 39:16, 39:20, 41:9, 41:22, 41:25, 42:3, 43:24
**Bill-Bill** [3] - 39:16, 39:20, 41:9
**Bishop** [3] - 48:6, 58:9, 61:4
**bit** [2] - 42:3, 43:20
**black** [10] - 16:8, 16:14, 23:19, 24:19, 25:21, 28:18, 31:5, 59:14, 59:16, 59:17
**Black** [1] - 31:20
**blame** [1] - 29:17
**blamed** [1] - 36:10
**block** [1] - 11:6
**blocks** [1] - 34:17
**board** [3] - 29:23, 69:6, 69:8
**bolster** [1] - 49:7
**booby** [1] - 13:8
**book** [1] - 39:18
**books** [2] - 40:8, 41:6
**boring** [1] - 39:24
**born** [1] - 57:3
**bottom** [1] - 72:15
**bought** [1] - 29:3
**bouncing** [1] - 43:16
**bounty** [1] - 59:24
**bowling** [1] - 49:22
**boyfriend** [1] - 57:17
**Bradley** [17] - 16:13, 16:17, 16:19, 34:2, 36:12, 40:3, 40:15, 42:19, 49:18, 54:3, 54:7, 57:12, 57:20, 65:24, 68:21, 70:4, 74:2
**Bradley's** [3] - 35:19, 57:15, 71:21
**branch** [1] - 70:22
**brandished** [1] - 10:18
**brandishing** [1] - 52:22
**Brandishing** [1] - 10:20
**break** [6] - 14:3, 14:22, 19:8, 19:11, 26:6, 44:22
**breaking** [3] - 13:2, 26:7

**briefly** [2] - 3:24, 37:10
**bring** [1] - 55:24
**bringing** [1] - 5:5
**brings** [3] - 29:10, 37:9, 56:13
**Brings** [1] - 66:23
**broke** [1] - 14:22
**broken** [3] - 13:7, 31:21
**brought** [4] - 48:22, 48:23, 50:17, 50:25
**buddy** [1] - 37:20
**bug** [1] - 67:1
**built** [2] - 58:3, 58:4
**bunch** [2] - 24:9, 70:24, 71:7
**burden** [2] - 46:21, 58:23
**buried** [1] - 72:12
**bury** [1] - 72:6
**business** [9] - 9:13, 9:14, 9:20, 12:19, 15:3, 15:8, 15:18, 29:1, 52:5
**businesses** [2] - 28:13, 38:12
**buttresses** [1] - 50:17
**buy** [1] - 20:15

### C

**calculated** [1] - 57:18
**Calculating** [1] - 69:19
**calculating** [2] - 57:7, 69:20
**calculation** [1] - 69:19
**camera** [5] - 18:24, 65:22, 65:25, 66:2, 66:4
**camouflage** [1] - 73:23
**candid** [2] - 27:19, 32:16
**cannot** [7] - 62:11, 62:19, 62:25, 63:13, 64:3, 64:4
**canvassing** [2] - 63:6, 63:7
**captured** [1] - 52:4
**Car** [4] - 4:12, 9:9, 27:14, 47:12
**car** [31] - 4:13, 9:4, 12:5, 12:9, 15:10, 16:11, 16:25, 17:2, 17:19, 22:21, 24:3, 24:21, 25:16, 25:23, 25:25, 34:16, 38:6, 43:22, 53:9, 59:19, 60:5, 60:7, 66:15, 66:16, 66:17, 66:19, 66:21, 67:17, 68:5, 68:8
**Car's** [1] - 10:5
**care** [4] - 64:23, 64:24, 65:2

**carefully** [4] - 49:18, 61:21, 63:10, 63:19
**carried** [3] - 2:15, 8:19, 66:9
**carry** [2] - 3:2, 7:8
**carrying** [8] - 3:6, 6:21, 10:1, 15:17, 26:21, 27:1, 37:11, 54:17
**cars** [6] - 3:14, 12:6, 23:18, 28:15, 34:12, 53:8
**cart** [1] - 11:19
**carts** [2] - 11:20, 12:2
**Case** [1] - 75:5
**case** [105] - 2:5, 2:6, 2:25, 4:8, 5:3, 5:22, 5:25, 6:3, 6:7, 6:10, 8:1, 8:5, 8:22, 8:24, 9:10, 11:9, 12:23, 13:13, 13:20, 14:10, 14:23, 15:12, 15:24, 17:10, 17:12, 17:21, 17:25, 18:1, 18:2, 18:20, 19:8, 22:10, 24:6, 24:20, 25:5, 26:24, 28:5, 29:19, 30:13, 33:18, 34:4, 34:14, 34:24, 35:1, 35:17, 36:14, 37:13, 37:15, 38:10, 38:17, 38:19, 39:2, 39:4, 39:12, 44:10, 44:18, 45:5, 45:8, 45:16, 45:20, 46:4, 46:9, 46:12, 46:13, 46:15, 46:22, 46:24, 47:1, 49:21, 50:16, 51:6, 51:12, 54:7, 54:9, 54:15, 58:3, 58:24, 60:14, 60:17, 60:22, 60:25, 61:7, 61:9, 61:19, 61:20, 62:9, 62:23, 63:4, 63:13, 64:8, 64:22, 65:6, 65:8, 66:8, 66:10, 67:11, 67:13, 67:24, 68:23, 72:9, 72:15, 72:17, 72:24, 73:22, 73:23
**CASE** [1] - 1:5
**cases** [3] - 15:8, 15:13, 51:3
**cash** [2] - 11:17, 11:18
**cashes** [1] - 9:19
**cashing** [8] - 26:8, 28:16, 28:19, 28:25, 29:5, 30:20, 31:15, 32:19
**Cashing** [2] - 2:9, 9:22, 12:21, 23:15, 25:7, 30:15, 59:7, 65:23
**caught** [2] - 7:18, 56:6
**caused** [1] - 51:10
**Cawthorne** [11] - 9:2, 9:20, 12:23, 13:7, 26:9, 26:13, 26:14, 31:12,

47:19, 59:9, 66:5
**Cawthorne's** [3] - 12:24, 13:11, 72:8
**celebrate** [1] - 37:4
**cell** [19] - 28:21, 31:6, 38:21, 38:22, 38:24, 39:1, 39:4, 39:5, 43:8, 48:16, 49:8, 49:10, 49:12, 49:20, 50:12, 60:9, 64:24
**cellular** [2] - 26:2, 30:20
**Center** [2] - 35:5, 69:12
**centerpiece** [1] - 58:5
**certain** [3] - 16:1, 64:20
**certainly** [9] - 4:22, 7:14, 41:11, 45:22, 51:4, 55:6, 56:25
**Certainly** [2] - 11:7, 61:12
**certainty** [1] - 49:14
**CERTIFICATE** [1] - 75:1
**certify** [2] - 75:3, 75:6
**chair** [1] - 52:17
**chairs** [1] - 14:11
**challenge** [5] - 18:20, 19:8, 29:18, 29:19, 30:2
**challenges** [1] - 38:19
**character** [2] - 19:22, 63:17
**charge** [2] - 50:5, 51:22
**charged** [7] - 4:2, 6:1, 6:18, 10:11, 11:8, 14:23, 53:5
**charger** [1] - 59:14
**Charger** [15] - 16:8, 16:11, 16:14, 23:19, 24:19, 24:22, 24:23, 24:24, 25:21, 28:18, 31:5, 31:20, 57:14, 59:14, 59:16
**charges** [10] - 8:4, 10:14, 29:12, 37:18, 46:23, 47:4, 47:5, 47:8, 54:21, 62:1
**charging** [2] - 52:21, 53:22
**charts** [1] - 63:24
**chase** [6] - 17:2, 34:10, 34:11, 43:25, 58:16
**chasing** [1] - 34:12
**Check** [35] - 2:9, 2:23, 4:11, 5:13, 6:3, 6:23, 7:20, 8:19, 9:2, 9:7, 9:18, 10:15, 12:21, 13:3, 13:10, 13:15, 15:2, 23:15, 25:6, 30:15, 31:6, 31:21, 37:21, 43:8, 47:8, 47:19, 53:1, 59:7, 62:13, 65:22, 65:23
**check** [9] - 26:8, 28:16,

28:19, 28:25, 29:5, 30:20, 31:15, 32:19, 43:19
**Checkpoint** [1] - 30:15
**checks** [2] - 9:19, 9:22
**child** [2] - 35:7, 55:4
**chilling** [1] - 11:14
**choose** [1] - 29:24
**chooses** [1] - 65:8
**chose** [1] - 61:11
**Chris** [1] - 61:4
**Christopher** [1] - 48:6
**Chrysler** [12] - 17:3, 17:5, 17:19, 17:20, 38:8, 60:5, 66:14, 66:21, 67:18, 67:20, 68:5
**Chubbs** [1] - 32:20
**circumstances** [2] - 31:8, 36:11
**cited** [1] - 58:17
**citizens** [2] - 29:16, 30:4
**City** [9] - 2:8, 2:10, 11:10, 21:11, 22:18, 23:16, 42:14, 42:22, 65:3
**civilian** [1] - 34:15
**claimed** [2] - 53:11, 71:17
**claims** [2] - 53:7, 53:10
**clear** [15] - 2:20, 2:21, 2:22, 4:9, 4:18, 7:25, 20:18, 25:18, 33:1, 41:25, 42:3, 64:21, 65:10, 68:16, 70:18
**Clearly** [1] - 40:2
**clearly** [1] - 16:20
**client** [2] - 58:13, 64:6
**client's** [1] - 49:6
**close** [7] - 24:6, 25:8, 30:14, 30:16, 52:1, 61:19, 72:2
**closer** [2] - 61:19, 67:21
**closest** [4] - 43:10, 43:16, 44:3, 59:13
**Closest** [1] - 43:20
**closing** [10] - 11:14, 14:7, 45:4, 60:23, 64:18, 66:24, 68:20, 69:20, 73:15
**Closing** [3] - 1:10, 2:1, 74:11
**clothes** [1] - 20:16
**club** [1] - 49:25
**cocaine** [1] - 54:19
**coconspirator** [5] - 5:8, 6:6, 6:17, 7:7, 39:17
**coconspirators** [4] - 6:19, 37:11, 65:1, 65:5
**code** [1] - 41:18
**coincidentally** [1] -

55:9
**color** [3] - 4:5, 36:15, 51:11
**Columbia** [1] - 67:12
**combination** [3] - 40:20, 40:22, 44:7
**combined** [2] - 22:25
**coming** [5] - 3:18, 18:19, 18:21, 36:3, 70:8
**comments** [2] - 37:19, 65:15
**commerce** [2] - 9:12, 10:10
**Commercial** [1] - 38:11
**commercial** [3] - 9:17, 10:2, 28:13
**commit** [9] - 4:3, 4:7, 5:19, 5:24, 10:25, 18:22, 29:21, 33:8, 47:2
**committed** [15] - 6:19, 6:21, 7:10, 10:16, 15:7, 17:1, 17:20, 18:3, 25:10, 27:13, 27:14, 37:22, 46:10, 52:17, 62:1
**committing** [4] - 6:10, 26:22, 29:6, 62:24
**common** [10] - 28:20, 39:22, 40:23, 45:13, 45:24, 46:6, 49:11, 50:9, 63:10, 63:20
**communicating** [3] - 28:20, 30:21, 31:5
**communication** [1] - 26:3
**communications** [2] - 49:21, 50:14
**community** [6] - 19:19, 19:24, 19:25, 20:24, 28:9, 48:17
**companies** [1] - 38:25
**company** [4] - 9:21, 10:6, 10:7, 17:15
**complete** [1] - 75:8
**composite** [2] - 61:21, 63:10
**comprises** [1] - 54:20
**concept** [1] - 10:20
**concepts** [1] - 6:6
**concern** [1] - 55:11
**concerned** [2] - 55:10, 56:18
**concerning** [2] - 3:13, 46:23
**concerns** [2] - 38:17
**conclude** [2] - 63:13, 64:5
**concluded** [2] - 58:9, 58:22
**Conclusion** [1] - 74:11
**conclusion** [4] - 11:21,

41:6, 42:7, 64:8
**conduct** [11] - 3:12, 3:15, 5:15, 5:20, 5:21, 18:11, 32:15, 33:12, 34:18, 44:11, 50:7
**confederates** [1] - 22:21
**confessed** [1] - 19:13
**confession** [5] - 18:13, 37:20, 44:5, 44:13
**confidence** [1] - 7:17
**confidently** [1] - 56:18
**confirm** [1] - 70:9
**confirmed** [1] - 13:21
**confirms** [2] - 65:5, 68:22
**confused** [2] - 17:9, 52:10
**connection** [1] - 47:10
**consciousness** [3] - 33:13, 36:1, 73:16
**Consciousness** [1] - 33:14
**consecutive** [1] - 54:23
**consequences** [2] - 33:22, 34:21
**consider** [4] - 3:1, 35:24, 36:1, 71:3
**Consider** [1] - 32:12
**considered** [1] - 51:8
**considering** [1] - 33:6
**consistent** [5] - 17:21, 27:4, 71:22, 72:7, 72:8
**consistently** [1] - 3:21
**Consistently** [1] - 67:24
**consisting** [1] - 49:11
**Conspiracies** [1] - 5:15
**conspiracies** [1] - 5:20
**conspiracy** [43] - 4:1, 4:8, 4:18, 5:16, 5:18, 5:23, 5:24, 6:18, 6:20, 6:24, 7:4, 8:10, 8:12, 8:15, 10:25, 16:18, 16:21, 18:5, 19:8, 19:9, 19:11, 21:14, 23:6, 25:2, 26:22, 27:22, 29:19, 29:20, 30:1, 46:15, 47:2, 47:4, 48:10, 50:2, 50:4, 50:7, 50:8, 50:10, 53:22, 58:2, 61:25, 72:12
**constantly** [1] - 25:1
**constitute** [1] - 75:6
**construct** [3] - 3:16, 58:7, 73:17
**constructing** [1] - 44:12
**contact** [7] - 7:21, 39:19, 52:3, 66:14, 73:4
**Contacts** [4] - 41:13, 41:14, 41:15
**contacts** [7] - 23:25,

40:25, 41:1, 41:10, 42:5, 42:6, 43:2
**contained** [1] - 16:1
**containing** [1] - 25:23
**contemplating** [1] - 5:2
**Continue** [1] - 14:8
**continue** [2] - 9:16, 74:2
**continues** [1] - 60:11
**contradictory** [1] - 56:25
**controls** [2] - 71:20, 71:23
**controversial** [1] - 18:3
**conveniently** [2] - 55:9
**conversation** [2] - 36:16, 69:16
**conversations** [1] - 35:9
**convict** [3] - 50:6, 50:7, 50:10
**convicted** [1] - 55:7
**convictions** [1] - 54:17
**convince** [1] - 55:25
**cooperated** [1] - 52:19
**cooperating** [15] - 5:4, 7:23, 13:21, 19:3, 26:23, 29:9, 33:11, 44:10, 55:16, 61:9, 65:18, 70:11, 70:16, 73:10, 73:11
**cooperation** [4] - 54:20, 56:19, 56:20, 57:19
**cooperator** [1] - 25:4
**cooperators** [3] - 57:25, 58:6, 58:18
**cops** [1] - 21:20
**copy** [1] - 36:21
**Corey** [5] - 16:18, 20:1, 24:6, 31:16, 43:11
**corporate** [1] - 9:24
**corporation's** [1] - 9:16
**correct** [1] - 8:6
**correctional** [1] - 55:20
**Corrigan** [3] - 39:21, 41:9, 41:20
**corroborate** [4] - 22:4, 30:9, 32:5, 73:10
**Corroborated** [1] - 42:23
**corroborated** [15] - 12:16, 13:8, 21:1, 26:13, 30:11, 31:8, 31:19, 31:22, 33:8, 37:13, 38:16, 67:13, 67:15, 68:6, 68:11
**Corroborating** [1] - 3:12
**corroborating** [3] - 33:11, 44:8

corroboration [2] -
32:11, 68:19
counsel [6] - 44:21,
65:11, 68:22, 71:14,
71:19, 74:10
counsel's [1] - 67:5
Counsel's [1] - 19:21
Count [11] - 4:2, 5:23,
6:18, 47:4, 47:6, 47:7,
47:8, 47:9, 47:10, 47:12,
50:5
counter [1] - 18:24
country [1] - 10:8
counts [5] - 6:2, 6:3,
7:5, 11:1, 52:20
County [7] - 21:11,
35:5, 38:4, 42:22, 57:10,
57:12, 69:12
couple [1] - 33:10,
50:23, 52:18, 67:3, 70:4
course [19] - 2:4, 3:7,
7:10, 8:24, 10:19, 15:20,
16:5, 20:3, 32:2, 33:8,
36:19, 43:2, 44:4, 47:25,
51:25, 52:2, 52:8, 65:17,
67:2
court [5] - 36:3, 36:7,
53:24, 59:9, 70:3
Court [12] - 13:23,
44:25, 45:2, 45:5, 45:23,
45:25, 46:5, 47:5, 50:1,
51:8, 63:16, 75:15
COURT [11] - 1:1, 11:7,
13:25, 14:3, 14:14,
14:16, 14:18, 44:21,
45:1, 64:12, 74:10
Court's [4] - 45:17,
46:11, 46:25, 51:2
Courthouse [1] - 1:23
courtroom [5] - 14:17,
29:10, 51:1, 63:22, 67:1
cover [3] - 65:13, 65:14,
72:12
crash [1] - 40:2
crashed [1] - 41:19
credibility [5] - 30:7,
32:6, 32:10, 33:6, 57:2
crew [3] - 22:24, 23:5,
23:14
crime [12] - 4:3, 4:7,
8:14, 8:17, 10:12, 10:15,
15:15, 19:7, 24:17,
29:24, 36:23, 52:18
crimes [5] - 3:6, 6:19,
7:9, 7:10, 7:12, 18:5,
28:4, 46:10
criminal [10] - 5:16,
5:22, 19:11, 29:11,
29:12, 32:15, 37:17,
45:12, 46:22, 67:9

CRIMINAL [1] - 1:5
Criminal [1] - 5:20
criminals [1] - 29:25
cross [4] - 6:9, 51:23,
53:17, 54:2
cut [1] - 22:23

D

Dallas [6] - 20:1, 23:20,
24:1, 24:8, 31:13, 43:11
dance [1] - 49:24
dangerous [1] - 54:17
data [1] - 63:25
date [4] - 3:20, 43:14,
44:15, 73:13
David [3] - 9:3, 15:9
Davis [4] - 1:12, 3:23,
6:2, 10:19
days [7] - 10:16, 32:19,
47:14, 48:4, 48:22, 67:3,
70:3
DC [5] - 40:9, 41:5,
41:13, 42:6, 55:5
deadly [1] - 54:18
deaf [1] - 40:1
deal [5] - 29:10, 32:6,
36:23, 53:15
dealer [3] - 12:9, 12:17,
29:13
dealing [2] - 28:8, 33:18
dealt [1] - 23:24
debt [1] - 55:3
December [15] - 2:9,
12:22, 15:2, 24:17, 25:6,
25:11, 32:18, 36:23,
37:3, 37:21, 37:23, 43:6,
47:8, 62:13, 68:23
decides [2] - 29:6,
36:22
deciding [1] - 45:19
defendant [57] - 3:5,
3:10, 3:20, 4:17, 4:20,
4:24, 5:4, 5:6, 5:9, 6:1,
6:8, 7:8, 7:11, 8:2,
10:22, 11:1, 18:16,
18:19, 19:15, 19:18,
20:13, 24:15, 24:16,
27:7, 28:4, 30:17, 30:18,
32:17, 35:2, 36:15, 39:5,
39:7, 39:10, 39:19,
39:21, 39:23, 40:4, 40:6,
40:13, 40:18, 40:19,
40:22, 41:10, 41:24,
42:1, 42:15, 42:16,
42:13, 43:15, 44:5,
44:14, 67:8, 68:22,
68:25, 70:9, 71:5, 72:13
Defendant [2] - 1:7,

1:18
defendant's [46] - 3:9,
3:11, 3:15, 3:17, 5:8,
5:11, 7:1, 7:12, 16:22,
18:11, 20:17, 24:7,
26:20, 28:6, 32:8, 33:12,
33:18, 33:24, 34:19,
34:22, 35:22, 35:25,
36:19, 39:10, 39:14,
40:20, 40:21, 41:3, 41:5,
41:7, 41:15, 41:16,
41:18, 42:8, 42:9, 42:23,
44:9, 44:11, 44:13,
44:18, 68:12, 69:1,
73:15, 73:17, 73:18, 74:4
Defense [1] - 67:5
defense [2] - 35:17,
65:11, 69:20, 71:14,
72:15, 73:14
deficient [1] - 60:25
degree [2] - 32:5, 71:4
deliberations [1] - 14:9
democratic [1] - 45:14
demonstrate [2] -
33:13, 33:18
demonstrated [2] - 5:4,
33:21
demonstrating [2] -
26:20, 68:12
demonstrative [1] -
69:1
deny [1] - 69:21
departs [1] - 22:12
deposit [1] - 15:18
deposits [2] - 15:12,
27:11
describe [7] - 16:23,
17:16, 26:1, 30:13, 31:2,
31:3, 34:1
Described [1] - 30:19
described [18] - 15:22,
17:17, 27:23, 28:17,
30:18, 31:1, 31:10,
31:11, 31:13, 31:16,
32:18, 32:22, 33:15,
45:25, 47:5, 48:2, 55:15,
69:13
describes [4] - 23:19,
26:3, 26:16, 38:13
describing [1] - 24:24
description [2] - 30:15,
33:7, 46:25
designed [1] - 6:21
desperate [2] - 33:20,
60:19
despite [4] - 50:11,
50:12, 54:21, 74:3
detail [12] - 6:4, 12:3,
12:16, 17:17, 37:19,
56:1, 67:3, 67:14, 68:10,

68:14, 69:2
detailed [3] - 36:25,
69:16, 69:24
details [8] - 3:13, 3:23,
15:15, 17:22, 17:23,
31:20, 55:23, 68:2
Detective [3] - 16:8,
16:12, 17:13
detective [3] - 16:12,
58:17, 59:16
Detention [2] - 35:5,
69:12
determined [1] - 56:5
develop [1] - 48:11
different [8] - 17:10,
18:18, 18:19, 32:1, 32:2,
32:4, 46:14, 73:5
difficult [1] - 45:15
Dingle [59] - 4:23, 5:7,
7:13, 12:11, 12:15,
13:21, 18:8, 19:4, 19:15,
19:16, 20:6, 20:11,
20:18, 20:25, 21:15,
22:12, 22:15, 22:19,
22:23, 23:3, 24:10,
24:13, 24:14, 24:24,
24:25, 26:1, 26:4, 26:20,
26:24, 27:4, 30:13, 32:1,
32:14, 32:22, 36:9,
36:14, 38:13, 39:12,
42:15, 43:11, 48:25,
52:3, 53:4, 54:1, 54:4,
56:13, 56:15, 56:17,
59:14, 62:10, 62:17,
70:19, 71:3, 71:6, 71:9,
71:15, 72:5, 72:17, 73:3
Dingle's [10] - 16:14,
23:6, 24:18, 25:8, 25:22,
30:15, 30:22, 43:1,
70:21, 71:10
Dionne [1] - 37:2
direct [2] - 51:24, 67:25
directly [2] - 53:25, 56:2
disagree [1] - 21:9
disappear [1] - 13:18
disclose [2] - 54:2, 54:3
disclosed [2] - 54:7,
57:16
discuss [4] - 11:3,
37:10, 58:22, 70:12
discussed [10] - 6:9,
7:22, 15:1, 15:20, 17:22,
35:12, 46:14, 50:15,
66:24, 73:9
discusses [1] - 37:25
discussing [2] - 4:24,
35:11
discussion [3] - 14:9,
59:4, 59:11
disinterested [1] - 57:5

displayed [1] - 50:12
disprove [1] - 37:8
disproven [1] - 69:7
distance [1] - 42:10
distribute [2] - 53:22,
54:19
distribution [1] - 54:19
District [1] - 67:11
DISTRICT [2] - 1:1, 1:1
ditch [1] - 22:5
divide [4] - 5:13, 8:9,
24:12, 43:12
divides [1] - 24:13
dividing [1] - 31:1
DIVISION [1] - 1:2
DNA [5] - 59:2, 59:10,
59:12, 59:23, 65:16,
65:20
documentation [2] -
56:7, 69:11
documenting [1] - 59:8
documents [2] - 68:11,
68:12
Dodge [18] - 12:9,
12:12, 12:13, 12:17,
16:8, 16:11, 20:21,
20:22, 20:23, 22:14,
24:19, 24:22, 24:23,
24:24, 34:9, 41:19
doling [1] - 31:7
dollars [1] - 13:15
Dominic [1] - 63:3
done [11] - 5:13, 6:23,
8:11, 27:16, 28:1, 33:12,
34:23, 34:25, 35:2,
47:15, 70:22
door [5] - 17:7, 50:19,
56:16, 56:19
doubt [16] - 3:5, 7:8,
29:11, 44:18, 45:18,
45:25, 46:13, 46:23,
49:5, 54:14, 61:15,
63:14, 63:21, 72:20,
73:21, 74:7
down [10] - 4:4, 11:14,
15:16, 15:25, 16:4,
21:18, 37:7, 40:5, 40:7,
67:11
drive [2] - 28:16, 53:1
driven [2] - 4:13, 12:13
driver [4] - 15:10, 17:2,
17:4, 34:13
drives [2] - 20:23,
21:12, 26:5, 59:15
driving [6] - 4:15,
12:15, 16:19, 23:17,
31:4, 60:7
drove [1] - 66:13
drug [5] - 29:13, 54:24,
55:1, 55:2

**drugs** [2] - 28:8, 55:4
**drying** [1] - 25:16
**Dunbar** [13] - 2:12, 4:12, 6:23, 9:9, 10:5, 10:7, 15:6, 27:23, 38:6, 47:12, 47:21, 59:23, 63:2
**during** [30] - 2:4, 2:18, 3:7, 5:12, 6:9, 7:22, 8:23, 9:2, 9:7, 10:18, 15:5, 15:20, 16:5, 16:16, 20:3, 33:15, 40:3, 47:25, 51:25, 52:2, 52:8, 64:18, 66:6, 66:14, 66:24, 67:2, 68:20, 69:19, 73:14

**E**

**early** [1] - 22:5, 68:22
**earth** [3] - 35:14, 36:5, 66:25
**Eason** [19] - 8:19, 13:13, 13:19, 26:12, 32:23, 34:24, 35:1, 35:4, 36:16, 52:1, 52:25, 53:4, 54:4, 57:17, 61:3, 66:3, 72:9, 73:18
**Eason's** [1] - 52:3
**east** [1] - 23:15
**easy** [3] - 18:22, 27:16, 72:9
**effect** [3] - 9:11, 36:1, 58:2
**effective** [1] - 67:12
**effort** [1] - 71:12
**efforts** [3] - 35:9, 52:23, 73:23
**either** [5] - 6:14, 8:2, 13:17, 42:20, 46:7
**electronic** [2] - 39:18, 40:8
**element** [1] - 9:12
**elements** [2] - 8:20, 33:10
**Ellicott** [2] - 2:8, 11:10, 21:11, 22:18, 42:14, 65:3
**embark** [1] - 20:20
**embarrass** [2] - 35:6, 73:19
**employees** [5] - 6:12, 11:10, 13:4, 26:9, 26:11
**employment** [1] - 20:9
**end** [4] - 11:25, 23:7, 61:22, 63:25
**enemies** [1] - 72:5
**enforcement** [3] - 3:10, 17:6, 34:7
**engaged** [1] - 58:5
**engagement** [1] - 61:1
**engages** [1] - 9:21

**enjoying** [1] - 25:9
**enter** [1] - 57:19
**entered** [1] - 11:15
**enters** [1] - 14:17
**enthusiastic** [1] - 42:4
**entire** [1] - 58:3
**envelope** [1] - 15:17
**equally** [1] - 68:15
**especially** [1] - 29:16
**Esquire** [2] - 1:16, 1:18
**Essentially** [3] - 12:14, 17:18, 36:22
**essentially** [6] - 10:13, 11:18, 22:5, 23:20, 37:19, 39:5
**establish** [1] - 50:4
**established** [1] - 42:11
**establishing** [1] - 46:22
**evade** [1] - 33:22
**evaluate** [1] - 51:4
**evaluation** [1] - 51:7
**event** [1] - 42:5
**events** [19] - 12:22, 13:6, 13:11, 25:3, 25:8, 30:14, 48:2, 48:4, 52:13, 53:11, 57:14, 58:15, 60:15, 63:6, 63:7, 63:10, 63:18, 64:5, 73:6
**evidence** [85] - 2:21, 2:22, 2:24, 3:1, 3:4, 3:8, 3:17, 3:22, 3:25, 4:9, 4:19, 5:22, 6:10, 6:12, 6:14, 6:15, 6:22, 7:1, 7:11, 7:25, 8:5, 9:10, 10:23, 11:3, 11:4, 12:5, 14:10, 16:22, 17:24, 17:25, 18:4, 18:7, 18:10, 18:14, 18:18, 18:19, 23:1, 30:12, 32:12, 33:9, 33:16, 34:19, 35:25, 37:13, 37:14, 38:18, 39:2, 39:4, 39:12, 39:20, 41:20, 44:17, 45:17, 46:6, 46:8, 46:14, 46:22, 47:15, 49:10, 50:3, 50:12, 50:15, 58:1, 58:22, 59:21, 60:6, 60:12, 60:17, 60:18, 60:22, 61:21, 63:2, 63:20, 64:9, 65:9, 66:13, 66:16, 66:20, 68:7, 73:2, 73:14, 74:5, 74:6
**evidenced** [1] - 71:9
**evident** [2] - 47:16, 61:5
**evidently** [2] - 28:1, 58:9
**Exactly** [1] - 38:9
**exactly** [5] - 13:9, 21:15, 27:13, 27:14, 69:5
**examination** [6] - 6:9,

51:24, 53:18, 54:2, 54:23
**examine** [1] - 63:20
**examined** [1] - 63:10
**example** [1] - 8:16
**except** [6] - 40:23, 41:12, 42:21, 65:4, 66:8, 70:8
**Excerpt** [2] - 1:10, 2:1
**excerpt** [1] - 75:7
**excuse** [2] - 50:6, 55:2, 63:1
**excused** [1] - 14:11
**exercise** [2] - 39:25, 42:9
**exercised** [1] - 23:11
**exhaustively** [1] - 46:24
**Exhibit** [6] - 51:18, 51:22, 52:11, 52:20, 54:21, 56:14
**expect** [2] - 20:2, 65:17
**expectation** [4] - 48:24, 51:21, 52:22, 54:9, 55:16, 64:3
**expectations** [1] - 55:14
**experience** [6] - 23:8, 28:3, 28:4, 40:24, 47:18, 56:6
**experienced** [3] - 55:19, 55:20, 56:4
**explanation** [1] - 67:5
**expressing** [1] - 55:11
**extensive** [1] - 74:1
**exterior** [1] - 17:7
**extraordinary** [1] - 45:7
**eyewitnesses** [5] - 62:7, 62:16, 62:22, 63:3

**F**

**fab** [5] - 48:22, 48:25, 70:13, 70:17, 71:1
**fabricated** [1] - 69:21
**fabulous** [2] - 46:19, 50:19
**face** [1] - 70:21
**facing** [1] - 37:18
**fact** [13] - 6:15, 6:24, 12:17, 16:13, 16:15, 23:1, 23:17, 32:7, 41:2, 48:13, 56:20, 57:6, 67:6
**factor** [1] - 33:6
**facts** [1] - 17:21
**failed** [1] - 53:3
**fairness** [1] - 45:14
**faith** [1] - 49:23
**falls** [1] - 46:7
**false** [7] - 3:16, 34:4, 36:20, 37:23, 44:12,

68:13, 73:17
**familiar** [2] - 9:13, 15:18
**far** [4] - 17:22, 34:1, 42:2, 69:20
**Fats** [3] - 48:6, 58:10, 61:4
**favorable** [2] - 51:10, 51:23
**FBI** [1] - 59:3
**fear** [1] - 36:8
**feared** [1] - 58:14
**fell** [1] - 58:6
**female** [1] - 11:25
**fence** [1] - 57:21
**few** [7] - 11:4, 12:7, 12:16, 17:16, 17:23, 64:17, 65:14
**fight** [1] - 42:2
**fighting** [1] - 13:2
**figure** [2] - 22:11, 41:10
**figures** [1] - 17:12
**film** [2] - 59:1, 59:9
**finally** [8] - 2:12, 3:17, 9:10, 10:14, 18:14, 23:1, 34:3, 44:14
**Finally** [2] - 16:25, 41:22
**financial** [1] - 29:1
**fine** [1] - 70:10
**fingerprint** [6] - 42:23, 60:2, 60:3, 63:2, 66:16, 68:6
**fingerprinted** [1] - 17:6
**fingerprints** [8] - 3:13, 17:7, 18:24, 62:7, 62:14, 62:22, 65:16, 65:20
**firearm** [10] - 8:8, 8:10, 8:13, 8:17, 9:6, 10:12, 10:18, 47:7, 47:9, 52:22
**firearms** [4] - 2:15, 2:22, 6:4, 8:4
**First** [1] - 47:15
**first** [6] - 11:8, 11:16, 20:20, 39:9, 49:11, 54:12
**fits** [1] - 73:8
**five** [12] - 46:19, 48:22, 48:23, 48:25, 50:19, 58:4, 61:22, 63:11, 70:3, 70:13, 70:17, 71:1
**Five** [2] - 47:9, 73:4
**flee** [1] - 13:17
**fleeing** [4] - 3:12, 18:11, 34:18, 44:11
**flight** [4] - 33:20, 33:21, 34:6, 73:15
**Florida** [2] - 20:12, 20:14, 40:17
**flush** [2] - 40:5, 40:7
**flying** [1] - 34:9
**focused** [1] - 48:7

**foiled** [1] - 55:5
**follow** [4] - 24:2, 27:10, 46:11, 59:18
**following** [1] - 45:17
**follows** [2] - 24:3, 30:16
**Follows** [1] - 24:4
**footage** [1] - 65:25
**FOR** [1] - 1:1
**force** [2] - 9:6, 9:8
**forced** [2] - 12:25, 52:7, 53:10
**forcing** [2] - 11:18, 13:5
**foregoing** [1] - 75:6
**forget** [1] - 55:6
**form** [2] - 3:8, 5:18
**formal** [1] - 4:5
**former** [2] - 3:9, 4:19
**forth** [1] - 20:14
**forward** [5] - 5:10, 46:24, 50:13, 51:3, 55:25
**four** [21] - 2:6, 3:18, 4:15, 18:1, 29:9, 30:3, 30:10, 37:10, 42:7, 47:1, 47:14, 48:3, 48:22, 50:19, 51:25, 61:2, 74:3
**Four** [2] - 47:8, 54:17
**frame** [1] - 11:22, 16:16
**frames** [1] - 43:18
**frankly** [1] - 69:25
**free** [1] - 51:4
**freelancing** [2] - 51:13, 60:21
**freight** [3] - 51:16, 70:13, 70:17
**frequent** [1] - 24:21
**frequently** [1] - 16:15
**Fresh** [2] - 21:25, 22:1
**fresh** [1] - 53:15, 55:12
**friend** [2] - 60:2, 72:2
**friend's** [1] - 37:5
**friends** [4] - 20:5, 35:10, 40:14, 73:19
**front** [1] - 73:19
**fruits** [1] - 25:10
**frustrated** [1] - 70:7
**fugitive** [1] - 51:19
**full** [1] - 44:5
**fun** [1] - 36:7
**function** [3] - 23:21, 28:8, 30:23
**furtherance** [6] - 6:20, 8:11, 8:14, 8:17, 10:12, 10:25

**G**

**Gas** [1] - 38:11
**gas** [1] - 27:10
**generating** [1] - 49:14

**gentlemen** [30] - 2:3, 3:4, 5:11, 11:11, 12:21, 14:4, 14:18, 14:21, 15:4, 18:21, 29:17, 34:19, 34:25, 35:24, 39:3, 39:24, 43:18, 44:17, 45:3, 50:11, 54:11, 55:22, 57:3, 62:3, 63:9, 64:11, 64:14, 69:24, 71:23, 73:1

**getaway** [8] - 12:5, 12:6, 17:5, 17:19, 22:16, 22:21, 25:25, 66:21

**girl** [1] - 36:23

**girlfriend** [3] - 20:12, 54:6, 70:22

**girlfriends** [1] - 40:14

**given** [6] - 23:9, 45:7, 45:24, 59:3, 61:14, 62:17

**glass** [4] - 13:7, 13:8, 26:7, 31:21

**glasses** [1] - 26:6

**gloves** [2] - 5:9, 25:17

**Gordon** [5] - 8:25, 11:12, 11:16, 11:25, 47:17

**Government** [2] - 1:16, 54:21

**government** [34] - 38:20, 38:23, 46:17, 46:21, 47:23, 48:6, 48:12, 48:14, 48:21, 49:2, 49:7, 50:22, 51:4, 52:19, 53:24, 55:13, 55:15, 56:17, 57:24, 57:25, 58:11, 58:12, 58:21, 58:23, 60:1, 60:18, 61:8, 63:5, 63:12, 63:24, 64:19, 65:2, 66:12, 69:8

**Government's** [5] - 51:18, 51:21, 52:11, 52:20, 56:14

**government's** [5] - 47:15, 48:3, 60:16, 62:9, 72:16

**grab** [2] - 2:16, 27:11

**grabbed** [2] - 15:14, 16:2

**Grabbed** [1] - 38:7

**grade** [1] - 29:22

**grand** [2] - 41:25, 42:4

**great** [6] - 6:4, 6:8, 20:1, 29:10, 32:6, 71:4

**Gregory** [5] - 8:19, 13:13, 13:19, 26:12, 32:22, 34:24, 35:1, 35:4, 36:16, 52:1, 52:25, 57:17, 61:3, 72:9, 73:18

**grew** [1] - 19:20

**group** [29] - 4:11, 5:14, 5:17, 6:21, 6:22, 6:25, 7:2, 8:12, 11:15, 12:25, 15:1, 15:3, 16:1, 18:21, 19:23, 24:5, 24:11, 25:19, 25:23, 26:2, 26:6, 26:18, 27:9, 28:15, 28:22, 31:15, 70:12, 70:23, 71:1

**guilt** [13] - 6:14, 7:5, 33:14, 33:19, 34:20, 36:1, 44:10, 44:18, 46:23, 60:15, 73:1, 74:6

**guilty** [20] - 3:5, 6:19, 7:9, 8:2, 8:12, 8:16, 10:22, 11:1, 33:3, 34:18, 44:19, 52:20, 53:21, 54:23, 59:22, 61:7, 64:6, 64:10, 67:21, 74:8

**gun** [9] - 6:11, 8:6, 8:18, 8:19, 10:14, 10:21, 11:2, 12:18, 14:25

**gunman** [4] - 11:17, 12:1, 13:4, 13:12

**gunmen** [2] - 26:11, 26:12

**gunpoint** [3] - 11:16, 13:12, 13:14

**guns** [3] - 62:6, 62:14, 62:21

**guy** [6] - 38:7, 38:8, 66:11, 66:25, 67:9, 70:20

**guys** [3] - 24:10, 32:21, 71:7

## H

**hand** [6] - 8:6, 18:23, 48:14, 48:15, 49:2, 49:3

**handgun** [1] - 51:23

**hands** [6] - 5:18, 10:7, 25:17, 43:5, 58:15, 58:19

**handwriting** [1] - 68:18

**hang** [1] - 20:4

**Hanlon** [3] - 1:16, 13:25, 14:12, 14:14, 14:19, 45:3, 45:5, 50:18, 53:24, 59:13, 59:17, 60:22, 64:12

**HANLON** [6] - 2:2, 11:8, 14:1, 14:15, 14:20, 64:13

**Hanlon's** [2] - 46:2, 46:25

**Hannah** [3] - 16:18, 24:6, 31:16

**harass** [1] - 33:25, 35:17, 35:22

**harassment** [1] - 36:2

**Harford** [2] - 23:15,

23:22

**haul** [1] - 13:17

**Headquarters** [1] - 9:24

**hear** [9] - 12:10, 12:22, 12:24, 13:6, 25:3, 35:21, 38:9, 38:13, 73:14

**heard** [54] - 2:7, 2:8, 2:10, 2:12, 2:14, 2:23, 3:7, 3:22, 4:10, 4:19, 5:24, 8:23, 11:11, 12:20, 15:5, 16:7, 17:13, 18:6, 18:7, 18:9, 18:10, 18:12, 18:14, 19:12, 20:8, 24:21, 24:22, 24:23, 26:9, 27:11, 27:12, 28:23, 30:23, 33:3, 33:5, 34:5, 34:10, 35:1, 35:2, 36:17, 37:10, 37:15, 39:11, 40:5, 47:16, 47:18, 47:19, 47:20, 64:18, 65:15, 74:5

**hearing** [1] - 45:19

**hears** [3] - 28:20, 70:10, 70:25

**heart** [2] - 5:23, 57:23

**heartily** [1] - 66:15

**hearts** [1] - 47:22

**held** [6] - 8:6, 8:18, 11:2, 13:12, 13:14, 71:16

**help** [4] - 4:20, 8:8, 52:10, 72:3

**helped** [2] - 5:4, 7:8, 72:4

**helping** [7] - 3:2, 5:10, 5:12, 6:12, 6:13, 7:3, 7:19

**helps** [1] - 30:24

**hence** [1] - 7:5

**HENLEY** [1] - 1:6

**Henley** [130] - 6:18, 6:24, 7:23, 8:5, 8:6, 8:12, 15:21, 15:23, 16:15, 17:17, 17:18, 18:1, 18:4, 19:25, 20:7, 21:3, 21:17, 21:25, 22:11, 22:21, 23:4, 23:9, 23:14, 23:17, 23:25, 24:1, 24:3, 24:7, 24:13, 24:19, 24:21, 24:25, 25:11, 25:16, 25:20, 27:7, 27:15, 27:24, 28:10, 28:12, 28:17, 30:17, 30:18, 31:8, 32:19, 32:23, 33:1, 33:3, 33:5, 33:8, 33:12, 34:7, 34:12, 34:13, 34:14, 34:16, 34:23, 35:3, 35:8, 36:3, 36:22, 36:25, 37:6, 37:16, 37:18, 37:25, 38:8, 38:12, 40:23,

41:12, 41:15, 43:3, 44:1, 45:3, 45:6, 46:9, 48:1, 49:9, 51:17, 52:6, 53:8, 56:1, 56:11, 58:5, 59:2, 59:8, 59:19, 59:22, 59:25, 60:4, 60:6, 60:12, 60:23, 61:12, 61:18, 61:24, 62:8, 62:16, 63:4, 63:14, 63:22, 64:20, 64:23, 64:24, 64:25, 65:3, 65:5, 65:7, 65:23, 66:11, 66:13, 66:17, 66:19, 66:20, 67:8, 67:20, 68:3, 68:4, 68:5, 68:7, 68:18, 69:12, 69:15, 69:22, 72:13, 74:6, 75:5

**Henley's** [30] - 3:1, 5:21, 6:10, 6:20, 7:24, 10:11, 12:12, 12:15, 17:14, 21:10, 22:6, 22:15, 22:17, 22:20, 23:3, 23:18, 24:25, 25:14, 27:24, 28:10, 28:23, 31:3, 35:17, 38:17, 38:20, 41:4, 59:15, 60:3, 67:17, 68:7

**hereby** [2] - 5:18, 75:3

**hereunto** [1] - 75:9

**heroin** [1] - 53:23

**herself** [9] - 21:1, 21:2, 21:7, 21:8, 22:24, 23:22, 57:18, 72:18

**Hi** [1] - 68:21

**hide** [2] - 41:17, 74:4

**Hill** [5] - 12:14, 12:15, 20:21, 20:22, 21:2

**himself** [19] - 3:16, 6:11, 7:10, 10:23, 11:2, 20:11, 20:16, 34:4, 36:20, 42:10, 51:21, 52:12, 52:17, 52:18, 53:1, 56:6, 66:19, 68:14, 70:6

**history** [1] - 37:17

**hit** [1] - 42:20

**hitting** [3] - 7:20, 42:14, 43:8

**Hobbs** [5] - 8:21, 9:12, 10:9, 47:5, 52:21

**hold** [2] - 11:17, 12:18

**holding** [3] - 5:18, 10:20, 72:14

**holds** [1] - 11:17

**home** [7] - 22:2, 40:15, 40:21, 41:4, 41:15, 55:7, 59:5

**homosexual** [2] - 35:15, 69:13

**Honda** [1] - 57:13

**honestly** [1] - 23:24

**Honor** [8] - 2:2, 11:6, 13:23, 14:2, 14:15, 14:20, 44:20, 64:13

**Honorable** [1] - 1:12

**hood** [2] - 35:16, 36:5

**hope** [3] - 64:21, 64:22, 65:9

**hopeful** [1] - 52:23

**horrendous** [1] - 54:16

**horrific** [1] - 47:18

**hostage** [1] - 11:18

**hotel** [3] - 37:8, 69:3, 69:4

**hour** [5] - 14:6, 14:12, 42:21, 46:2

**house** [14] - 18:13, 24:5, 24:8, 26:16, 26:17, 31:3, 37:5, 37:6, 37:20, 40:4, 43:12

**Howard** [5] - 21:11, 38:4, 42:22, 57:10, 57:12

**huge** [2] - 9:13, 48:8

**humiliate** [1] - 35:5

**hurt** [2] - 35:6, 41:24

## I

**idea** [5] - 27:11, 35:4, 38:21, 68:2, 70:7

**ideas** [1] - 8:20

**identical** [1] - 27:15

**identifiable** [1] - 20:9

**identification** [5] - 19:1, 49:12, 49:19, 59:8, 62:23

**identified** [14] - 13:13, 13:19, 16:6, 24:6, 31:12, 34:13, 36:4, 37:2, 48:1, 48:8, 62:16, 62:23, 66:3, 66:4

**identifies** [1] - 13:13

**identify** [4] - 18:22, 49:13, 50:24, 63:4

**identifying** [1] - 65:20

**illegal** [2] - 20:20, 21:5

**image** [4] - 70:15, 70:16, 72:3, 72:15

**imagination** [2] - 28:11, 69:24

**imagine** [1] - 72:25

**immediately** [1] - 20:19

**impacts** [1] - 3:24

**implicate** [1] - 62:7

**implicated** [1] - 31:13

**implicates** [2] - 71:9, 72:13

**implicating** [1] - 71:4, 71:5

**implication** [1] - 61:15

**implications** [1] - 61:18
**important** [9] - 6:7, 8:3, 22:7, 32:9, 45:10, 45:11, 45:22, 57:22, 63:20
**importantly** [3] - 3:20, 10:22, 22:11
**impugn** [1] - 48:13
**impugned** [1] - 19:22
**impugning** [1] - 48:14
**impulse** [1] - 46:1
**impulsively** [1] - 64:9
**IN** [1] - 1:1
**inaccurately** [2] - 56:10, 56:11
**inappropriate** [1] - 48:17
**inch** [1] - 50:24
**including** [12] - 3:12, 18:12, 20:11, 22:10, 26:12, 44:11, 44:12, 45:6, 54:17, 71:7
**incorrect** [1] - 43:17
**incredible** [2] - 63:8, 63:11
**independent** [1] - 30:12
**index** [1] - 11:22
**indicated** [3] - 54:23, 62:11, 62:18
**indicative** [1] - 49:5
**indictment** [5] - 3:24, 4:2, 52:21, 53:22, 62:1
**individual** [38] - 11:4, 17:11, 18:5, 20:1, 28:8, 34:24, 40:19, 45:21, 47:19, 47:21, 48:18, 49:14, 51:23, 51:25, 52:2, 52:4, 52:11, 52:19, 53:3, 53:5, 53:7, 53:12, 53:25, 54:5, 54:8, 54:16, 54:25, 55:8, 55:14, 56:4, 56:23, 58:11, 58:13, 69:10, 69:11, 69:12, 71:13, 72:23
**individually** [1] - 72:17
**individuals** [31] - 19:19, 19:24, 25:23, 29:14, 46:4, 46:10, 47:18, 47:24, 48:5, 48:9, 48:13, 48:15, 48:23, 50:25, 51:2, 51:13, 53:15, 58:2, 58:4, 60:17, 60:19, 61:2, 61:9, 61:23, 62:11, 63:12, 63:15, 64:1, 70:23, 71:12, 73:12
**informal** [1] - 4:4
**information** [16] - 12:17, 37:1, 43:23, 44:6, 44:7, 56:1, 59:8, 63:25, 66:3, 67:2, 67:3, 67:7, 67:10, 69:13, 70:2, 73:6

**initial** [2] - 11:25, 66:21
**inmate** [1] - 55:5
**inner** [2] - 29:20, 30:1
**innocence** [1] - 63:21
**inside** [10] - 7:21, 13:1, 13:6, 19:9, 29:3, 38:15, 65:23, 66:2, 67:1
**insider** [1] - 37:23
**insisting** [1] - 45:18
**instruct** [1] - 51:2
**instructed** [4] - 21:17, 46:5, 50:1, 51:8
**instructing** [1] - 5:7
**instruction** [1] - 22:15
**instructions** [3] - 5:6, 7:15, 14:10, 21:11, 33:15, 45:18, 45:23, 46:12, 63:17
**integrity** [1] - 64:2
**intelligent** [1] - 70:1
**intended** [1] - 10:6
**intent** [1] - 54:18
**interaction** [1] - 40:3
**interest** [1] - 64:2
**interested** [1] - 48:24
**interesting** [1] - 51:12
**interstate** [9] - 9:12, 9:16, 9:21, 10:2, 10:6, 10:10
**intimidate** [5] - 33:24, 34:23, 35:18, 35:23, 73:18
**intimidated** [1] - 36:17
**intimidating** [5] - 3:15, 18:12, 44:12, 68:13, 73:24
**invasion** [1] - 55:7
**investigate** [1] - 13:3
**investigation** [9] - 33:19, 48:4, 48:7, 58:9, 60:10, 61:24, 65:12, 65:15, 74:2
**invite** [1] - 44:22
**invited** [1] - 72:23
**involve** [2] - 15:23, 21:7
**involved** [30] - 2:22, 4:10, 4:12, 4:14, 5:1, 7:13, 12:11, 19:5, 22:10, 24:4, 25:5, 25:6, 26:7, 26:25, 27:6, 31:11, 31:15, 32:17, 32:20, 33:5, 34:11, 37:11, 48:1, 48:10, 52:13, 54:1, 54:6, 54:25, 58:5, 63:14
**involvement** [9] - 3:1, 7:12, 16:22, 19:14, 23:6, 28:6, 32:8, 61:1, 67:17
**involving** [5] - 2:16, 15:3, 25:10, 27:6, 30:14
**issue** [6] - 2:25, 19:23,

30:3, 30:4, 30:6, 50:2
**issues** [1] - 14:8
**items** [1] - 59:1
**itself** [2] - 72:22, 72:23

## J

**Jackson** [4] - 41:22, 42:1, 42:3, 43:24
**jail** [4] - 18:13, 37:20, 40:4
**jailhouse** [1] - 44:13
**January** [16] - 2:11, 15:5, 15:9, 15:15, 15:21, 15:24, 16:20, 17:13, 25:1, 28:2, 35:20, 43:15, 47:2, 47:11, 62:20, 63:1
**Jarrett** [8] - 8:25, 11:12, 11:16, 12:1, 47:17
**Jeezie** [25] - 13:14, 18:12, 19:25, 21:12, 21:13, 22:10, 24:8, 29:7, 31:10, 31:11, 32:25, 33:25, 34:1, 34:22, 35:4, 35:11, 35:20, 36:16, 37:24, 43:1, 72:1, 72:2, 72:3, 72:4, 72:6
**Jeezie's** [1] - 72:2
**job** [10] - 15:11, 21:17, 21:18, 40:9, 41:2, 41:14, 42:6, 65:23
**jobs** [1] - 52:6
**Johnson** [2] - 7:21, 66:1
**join** [1] - 45:5
**joint** [1] - 7:24
**joints** [1] - 38:12
**Joseph** [18] - 4:25, 17:8, 17:9, 17:15, 18:9, 27:3, 27:5, 28:3, 32:15, 32:25, 39:17, 51:18, 51:19, 63:3, 66:15, 70:22, 72:6, 73:3
**Judge** [4] - 1:12, 3:23, 6:2, 10:19
**judges** [1] - 57:2
**judgment** [2] - 21:8, 23:11, 64:8
**Julie** [1] - 17:13
**July** [11] - 2:13, 4:12, 15:6, 15:10, 16:25, 28:2, 38:6, 43:22, 47:13, 63:1, 66:14
**jump** [2] - 17:3, 34:9
**jumped** [4] - 16:2, 16:3, 17:4, 17:20
**Jumped** [1] - 38:7
**jumping** [2] - 4:13, 17:8
**jumps** [1] - 34:16

**June** [1] - 47:2
**jury** [7] - 7:7, 14:5, 14:16, 33:15, 41:25, 42:4, 44:21
**Jury** [2] - 1:13, 14:17
**jury's** [1] - 14:11
**justice** [7] - 3:15, 18:12, 45:12, 51:19, 68:13, 69:1, 72:25

## K

**keep** [3] - 14:8, 20:2, 36:13
**Kelbagh** [6] - 8:24, 11:12, 11:24, 12:2, 12:4, 47:17
**Kelbagh's** [1] - 12:10
**Kevin** [2] - 15:9, 47:20
**kids** [1] - 57:21
**kind** [11] - 18:20, 20:9, 36:1, 38:13, 46:14, 56:21, 58:5, 60:5, 61:13, 68:24, 70:12
**knock** [2] - 7:24, 21:16
**knocked** [1] - 16:4
**knocking** [2] - 27:25, 28:13
**Knocking** [3] - 18:22
**knowing** [2] - 29:18, 30:24, 69:21
**knowingly** [2] - 60:24, 61:25
**knowledge** [2] - 32:16, 32:24, 67:25
**known** [2] - 16:18, 31:17
**knows** [7] - 20:19, 21:4, 21:5, 21:6, 25:13, 28:19, 56:7

## L

**lack** [2] - 63:17, 64:1
**ladies** [30] - 2:3, 3:4, 5:11, 9:1, 11:11, 12:20, 14:4, 14:18, 14:21, 15:4, 18:20, 29:16, 34:19, 34:25, 35:24, 39:2, 39:23, 43:17, 44:17, 45:2, 50:11, 54:11, 55:21, 57:2, 62:3, 64:11, 64:14, 69:23, 71:23, 73:1
**Ladies** [1] - 63:9
**lady** [4] - 37:2, 37:5, 40:17, 41:5
**language** [1] - 68:15
**Lapusnik** [6] - 9:3, 10:4, 10:8, 15:10, 17:1,

47:21
**large** [2] - 10:6, 24:11
**largely** [1] - 15:8
**last** [7] - 15:5, 40:17, 46:2, 50:23, 52:18, 67:2, 70:3
**Lastly** [1] - 62:3
**Late** [1] - 42:21
**late** [1] - 38:4
**law** [4] - 3:10, 4:1, 17:6, 34:6
**lawyer** [3] - 37:3, 37:5, 51:20
**laymen's** [1] - 67:22
**leaders** [1] - 61:5
**least** [7] - 12:5, 33:17, 53:10, 55:11, 64:16, 65:14, 67:22
**leave** [2] - 14:11, 22:12
**leaving** [1] - 21:22
**Lee** [9] - 4:15, 9:3, 9:25, 15:9, 15:12, 15:15, 15:24, 16:1, 47:20
**Lee's** [1] - 16:4
**left** [1] - 12:1
**length** [1] - 33:22
**lengths** [1] - 34:20
**lengthy** [2] - 37:17, 54:20
**leniency** [3] - 48:24, 48:25, 52:23
**lens** [1] - 63:20
**less** [2] - 23:8, 56:23
**letter** [9] - 36:21, 36:24, 37:2, 37:7, 69:9, 69:14, 69:17
**letters** [3] - 68:15, 68:17, 68:19
**Levine** [1] - 45:3
**liability** [3] - 6:6, 6:17, 7:7
**license** [1] - 16:11
**lie** [1] - 69:8
**lied** [4] - 52:3, 57:9, 57:11, 57:13
**lies** [2] - 46:14, 58:18
**life** [1] - 33:21
**lifehood** [1] - 52:17
**light** [1] - 38:18
**limited** [1] - 73:4
**line** [1] - 58:6
**lineup** [1] - 66:5
**link** [2] - 17:23, 18:16
**linked** [5] - 15:21, 38:21, 39:21, 39:23, 40:1
**linking** [3] - 3:19, 17:25, 18:4
**links** [3] - 24:19, 25:1, 68:7

**liquor** [3] - 9:4, 15:12, 15:16
**Liquor** [10] - 4:14, 9:8, 9:25, 15:6, 15:9, 15:20, 25:2, 27:13, 43:16, 47:11
**liquors** [1] - 47:20
**Liquors** [3] - 2:11, 59:11, 62:21
**listed** [4] - 39:16, 41:2, 41:8, 41:22
**listening** [1] - 70:3
**listing** [2] - 40:10
**lists** [2] - 40:9, 40:12
**literally** [1] - 15:14
**live** [2] - 29:23, 63:25
**lived** [1] - 19:18
**living** [1] - 36:15
**load** [1] - 11:19
**located** [3] - 2:8, 11:10, 17:6
**location** [8] - 7:16, 7:20, 12:16, 21:19, 38:4, 42:24, 43:9, 60:13
**locations** [3] - 5:6, 30:20, 31:16
**logical** [1] - 67:19
**logically** [1] - 66:2
**Lombard** [1] - 1:23
**Lonesome** [51] - 4:22, 5:8, 5:9, 7:13, 8:16, 13:9, 13:22, 15:22, 18:8, 19:4, 19:15, 24:23, 25:4, 25:5, 25:12, 25:17, 25:19, 25:21, 26:1, 26:3, 26:5, 26:12, 26:13, 26:16, 26:19, 26:24, 27:4, 27:23, 30:13, 30:23, 31:25, 32:14, 32:18, 36:9, 38:14, 49:1, 52:15, 62:17, 62:24, 63:6, 70:21, 71:3, 71:6, 71:8, 71:9, 71:15, 72:6, 72:19, 73:3
**Lonesome's** [3] - 25:15, 27:25, 28:3
**Look** [1] - 72:20
**look** [13] - 21:4, 21:17, 23:13, 30:8, 56:20, 57:1, 57:3, 61:21, 66:10, 66:11, 67:21, 72:17, 73:1
**looked** [3] - 21:19, 52:9, 57:6
**looking** [5] - 19:9, 32:3, 46:8, 53:8, 72:18
**lookout** [13] - 5:7, 5:10, 7:3, 7:16, 8:8, 17:19, 23:21, 25:22, 30:21, 30:24, 38:8, 66:19, 68:5
**looks** [1] - 23:22
**lottery** [2] - 10:1, 29:3

**loves** [1] - 39:10
**luck** [1] - 22:23
**Luigi** [3] - 27:10, 27:11, 27:16
**lunch** [2] - 14:4, 14:22
**Luncheon** [1] - 14:13
**lure** [1] - 26:9

## M

**M.O** [1] - 38:9
**Magnum** [7] - 12:9, 12:12, 12:13, 12:17, 20:22, 22:14, 22:15
**major** [1] - 17:25, 54:17
**male** [2] - 16:10, 59:17
**man** [5] - 4:13, 15:13, 34:18, 35:5, 52:16
**manner** [2] - 33:18, 55:8
**manufacture** [1] - 34:3
**manufacturing** [1] - 36:20
**mapping** [2] - 60:9, 60:15
**March** [4] - 33:20, 34:6, 40:2, 73:15
**marched** [1] - 51:14
**marked** [1] - 34:11
**Mart** [36] - 2:8, 2:23, 4:10, 6:3, 6:23, 8:24, 9:7, 9:13, 10:15, 11:9, 11:20, 12:18, 12:24, 13:12, 13:17, 14:24, 15:1, 21:4, 21:10, 21:13, 21:19, 21:21, 21:23, 22:13, 23:9, 30:16, 38:3, 38:4, 42:14, 47:6, 47:8, 47:17, 57:11, 58:25, 62:6, 65:3
**Mary** [3] - 1:22, 75:3, 75:14
**MARYLAND** [1] - 1:1
**Maryland** [8] - 1:11, 1:24, 2:10, 11:10, 21:11, 42:14, 42:22, 65:3
**mask** [3] - 5:9, 25:17, 66:6
**match** [1] - 32:5
**matched** [1] - 17:8
**material** [1] - 59:1
**matter** [10] - 40:23, 45:22, 46:18, 48:13, 56:20, 57:6, 60:12, 67:6, 75:4, 75:8
**Matthews** [24] - 4:25, 18:9, 24:22, 27:3, 28:7, 28:11, 28:15, 28:17, 28:19, 29:2, 29:5, 30:19,

31:14, 32:14, 38:14, 49:1, 53:14, 53:16, 54:5, 54:8, 63:6, 71:16, 73:4
**maximum** [1] - 70:5
**McDonald's** [4] - 54:4, 57:17, 71:16, 71:22
**mean** [1] - 61:14
**meandering** [1] - 12:6
**means** [3] - 30:21, 49:19, 70:8
**meet** [3] - 21:25, 26:15, 70:4
**meeting** [2] - 8:9, 31:6
**meets** [2] - 24:4, 25:19
**Melvin** [20] - 7:22, 17:16, 18:13, 34:5, 35:2, 36:21, 37:9, 37:12, 38:15, 42:16, 44:4, 54:13, 62:10, 62:18, 63:7, 66:18, 70:23, 73:4
**member** [5] - 5:14, 6:20, 6:24, 6:25, 8:10, 8:12, 26:5
**Members** [1] - 44:21
**members** [2] - 8:14, 21:14
**membership** [5] - 5:22, 7:2, 7:4
**memory** [2] - 11:22, 71:18
**men** [3] - 11:15, 12:25, 15:3
**mention** [2] - 53:3, 71:6
**mentioned** [1] - 36:24
**mentions** [1] - 71:7
**mere** [2] - 50:2, 50:8
**Mere** [3] - 50:3, 50:5, 50:7
**met** [1] - 55:14
**Michael** [29] - 1:16, 4:22, 5:7, 8:16, 13:8, 13:22, 18:8, 19:15, 24:23, 25:4, 26:19, 27:23, 28:3, 30:13, 32:14, 32:18, 36:9, 52:15, 62:17, 62:23, 63:5, 71:3, 71:6, 71:8, 71:9, 72:5, 72:19, 73:3
**might** [3] - 7:13, 53:17, 71:10
**Mike** [1] - 7:13
**mile** [1] - 16:9
**mind** [4] - 8:20, 14:8, 29:19, 30:2
**mine** [2] - 71:20, 71:24
**minimal** [3] - 7:9, 9:11, 56:21
**minimum** [2] - 51:24, 57:1
**minute** [2] - 48:20,

50:21
**minutes** [7] - 11:4, 12:7, 16:24, 17:16, 21:24, 46:2, 50:23
**Mobley** [2] - 48:6, 61:4
**mom** [1] - 40:21
**moment** [5] - 27:21, 35:20, 53:16, 55:5, 62:3
**momentarily** [1] - 46:20
**Momma** [1] - 40:9
**Mommy** [3] - 41:2, 41:14, 42:6
**Mommy's** [1] - 40:9
**money** [27] - 2:17, 4:16, 5:13, 8:9, 8:21, 9:20, 9:23, 11:19, 12:2, 15:11, 15:14, 16:2, 20:7, 20:13, 20:17, 21:7, 21:9, 23:11, 24:11, 27:20, 29:1, 29:2, 31:1, 43:12, 60:21
**month** [1] - 41:1
**months** [3] - 23:7, 42:19, 54:22
**most** [1] - 3:20
**mother** [4] - 35:7, 40:14, 41:4, 41:15
**motherhood** [1] - 57:22
**motivation** [2] - 51:9, 51:10
**move** [3] - 26:11, 57:18, 57:19
**moved** [1] - 55:18
**moving** [1] - 15:11
**MR** [8] - 2:2, 11:8, 14:1, 14:15, 14:20, 44:25, 45:2, 64:13
**Multiple** [1] - 55:20
**multiple** [3] - 9:14, 23:18, 30:18
**multistate** [1] - 10:1
**murder** [5] - 54:25, 55:2, 55:3, 56:6
**Musselman's** [4] - 12:12, 20:21, 20:23, 57:14
**must** [3] - 45:16, 66:25
**mystery** [2] - 58:8

## N

**N's** [2] - 35:13, 35:15
**name** [9] - 4:5, 35:12, 38:22, 38:23, 38:24, 42:1, 48:5, 71:7, 71:8
**named** [6] - 20:1, 23:20, 27:10, 37:23, 39:17, 41:5
**names** [7] - 20:2, 24:10, 39:11, 50:9, 70:20, 70:25, 73:25

**nauseam** [1] - 39:13
**near** [4] - 3:14, 21:19, 21:21, 42:14
**nearby** [3] - 16:4, 16:8, 43:11
**necessarily** [2] - 19:5, 61:14
**necessary** [1] - 36:15
**Neck** [1] - 55:10
**need** [3] - 21:8, 23:10, 36:13
**needed** [3] - 21:7, 41:20, 52:10
**Needleman** [1] - 68:22
**needs** [2] - 6:15, 56:7
**neighborhood** [1] - 35:6
**neighbors** [1] - 73:19
**Nell** [1] - 40:10
**never** [7] - 8:18, 20:9, 52:5, 53:9, 55:6, 57:16
**New** [3] - 36:25, 37:4
**next** [4] - 15:4, 15:11, 25:15, 55:18
**Nice** [1] - 63:15
**nice** [1] - 30:3
**nickname** [1] - 39:19
**Nicole** [10] - 9:2, 12:23, 13:6, 26:9, 26:13, 26:14, 31:12, 47:19, 66:5, 72:8
**night** [11] - 11:14, 12:13, 22:8, 22:14, 23:2, 25:9, 25:11, 38:4, 42:21, 65:4
**nine** [1] - 18:24
**NO** [1] - 1:5
**Nobody** [4] - 20:10, 28:25, 29:1
**non** [2] - 61:17, 61:18
**non-acts** [1] - 61:17
**non-implications** [1] - 61:18
**None** [1] - 71:17
**none** [3] - 8:5, 47:25, 62:8, 67:6
**Northern** [1] - 55:10
**NORTHERN** [1] - 1:2
**northwest** [1] - 48:7
**notable** [2] - 24:18, 68:14, 68:15
**note** [1] - 14:11
**noted** [2] - 12:4, 16:12
**nothing** [3] - 32:20, 33:2, 67:25
**notion** [2] - 71:1
**notwithstanding** [1] - 23:7, 41:17, 41:23
**Number** [13] - 6:17, 10:14, 22:7, 30:10, 33:19, 33:24, 34:3,

51:22, 52:12, 52:20, 54:21, 56:14, 71:15

**number** [21] - 16:2, 19:18, 22:13, 22:14, 22:17, 24:9, 30:8, 40:15, 40:16, 40:21, 41:2, 41:4, 41:14, 48:8, 51:13, 64:15, 65:12, 65:15, 66:7, 67:10

**Number(s** [1] - 75:5

**numbers** [1] - 16:12, 40:9, 40:13, 40:20, 40:22, 49:11

**numerous** [3] - 9:14, 40:25, 73:25

**O**

**obligations** [1] - 63:19
**observe** [1] - 16:8
**obsessed** [2] - 33:25, 35:19
**obstruct** [1] - 68:12, 69:1
**obstructing** [2] - 3:15, 18:11
**obtaining** [2] - 48:25, 49:11
**obviously** [6] - 10:2, 45:21, 56:5, 58:23, 69:15, 71:7
**occasions** [1] - 55:15
**occurred** [5] - 47:16, 52:4, 53:5, 58:25, 63:23
**odd** [2] - 20:20, 20:25
**OF** [2] - 1:1, 1:4
**offense** [2] - 10:19, 27:15
**offenses** [1] - 6:4
**officers** [6] - 3:11, 16:7, 34:7, 34:10, 34:14
**official** [1] - 75:7
**Official** [1] - 75:15
**officials** [1] - 40:6
**often** [5] - 5:15, 9:22, 40:13
**once** [6] - 10:11, 23:9, 23:13, 25:19, 28:18, 28:21
**one** [74] - 3:18, 3:21, 4:1, 4:9, 4:10, 4:16, 6:14, 6:15, 6:17, 8:23, 9:11, 10:14, 10:18, 11:14, 11:17, 12:5, 14:5, 14:11, 14:12, 15:11, 15:21, 15:22, 19:25, 22:7, 22:13, 25:5, 25:7, 25:10, 27:24, 29:9, 29:13, 30:10, 32:15,

33:4, 33:19, 35:9, 35:18, 36:4, 38:1, 39:6, 39:20, 40:22, 41:5, 43:4, 43:10, 48:14, 49:2, 50:19, 50:20, 50:24, 52:7, 53:10, 53:15, 57:18, 59:16, 62:3, 64:8, 64:9, 64:18, 64:21, 67:7, 68:16, 70:9, 70:18, 70:22, 70:23, 71:15, 72:10, 72:21, 72:22, 73:5

**One** [11] - 4:2, 5:23, 6:18, 12:3, 16:2, 28:15, 33:10, 40:10, 47:4, 50:5, 66:12
**ongoing** [3] - 10:25, 16:21, 48:5
**open** [1] - 14:8
**opening** [1] - 6:10
**operates** [1] - 10:7
**operation** [2] - 56:24, 58:6, 65:22
**opportune** [1] - 27:21
**opportunities** [1] - 60:21
**opportunity** [10] - 23:10, 51:16, 51:17, 52:11, 53:19, 54:9, 58:7, 58:21, 59:6, 63:11
**order** [4] - 7:17, 20:21, 29:3, 65:13
**organized** [1] - 19:1
**original** [1] - 53:21
**originally** [2] - 53:17, 61:20
**outset** [2] - 58:24, 60:23
**outside** [1] - 42:22
**overrated** [1] - 50:15
**own** [27] - 3:11, 3:15, 8:18, 18:11, 19:13, 19:14, 28:6, 29:12, 33:12, 33:14, 34:20, 35:7, 35:8, 35:22, 37:17, 38:17, 40:14, 42:25, 44:11, 54:20, 55:11, 55:18, 56:13, 56:19, 58:7, 73:16
**owner** [3] - 9:25, 15:8, 27:10

**P**

**p.m** [7] - 11:23, 22:4, 22:18, 42:13, 43:24, 44:2
**pads** [1] - 14:11
**pages** [1] - 75:6
**paid** [1] - 55:1
**pains** [1] - 6:8
**paper** [1] - 50:24

**parade** [1] - 51:15
**parcel** [1] - 16:21
**parked** [2] - 21:18, 21:20
**parking** [4] - 12:3, 12:7, 13:2, 26:8
**part** [11] - 8:11, 9:16, 9:21, 9:23, 16:21, 26:22, 45:10, 48:11, 51:6, 66:2, 72:12
**Part** [1] - 51:17
**participant** [1] - 4:10
**participants** [2] - 5:21, 61:5
**participate** [4] - 23:10, 45:10, 53:11, 54:4
**participated** [5] - 53:9, 60:24, 61:25
**participating** [3] - 3:2, 3:6, 5:10
**participation** [3] - 19:14, 45:13, 45:14
**particular** [5] - 5:1, 19:23, 23:19, 40:16, 45:7, 45:22, 48:18, 51:14, 51:15, 53:3, 59:2, 59:25, 68:10, 68:24, 69:14
**particularly** [8] - 8:3, 9:1, 22:24, 25:1, 29:15, 36:8, 54:24, 71:2
**parties** [2] - 45:6, 45:11
**partnered** [1] - 60:18
**partners** [1] - 12:1
**partnership** [2] - 46:15, 46:16
**party** [1] - 4:17
**passenger** [2] - 17:7, 25:17
**past** [4] - 22:3, 22:4, 43:20, 66:10
**pattern** [1] - 30:16
**patterns** [3] - 41:21, 49:12, 50:13
**Pause** [1] - 62:4
**PCP** [1] - 54:19
**people** [49] - 3:7, 3:9, 4:3, 4:6, 4:11, 4:15, 4:20, 4:21, 4:25, 5:5, 5:17, 7:4, 7:16, 8:8, 9:22, 10:21, 13:8, 15:1, 16:1, 16:2, 16:6, 18:21, 19:5, 19:18, 22:9, 24:9, 24:16, 28:10, 28:15, 28:20, 29:23, 30:3, 30:21, 30:24, 31:5, 31:7, 31:10, 31:11, 35:18, 37:11, 40:13, 43:14, 44:16, 48:8, 58:12, 69:8, 70:24

**People** [1] - 13:1
**people's** [2] - 39:11, 73:25
**perfect** [2] - 18:25, 55:22
**perfectly** [1] - 68:16
**Perhaps** [1] - 4:21
**perhaps** [2] - 37:16, 37:17
**period** [3] - 2:19, 41:1, 44:1
**perpetrators** [1] - 13:14
**person** [12] - 4:14, 4:21, 8:22, 13:19, 15:8, 28:11, 51:20, 57:7, 57:8, 57:9
**person's** [1] - 10:24
**personally** [2] - 18:4, 69:16, 69:18
**persons** [3] - 60:25, 61:1, 63:15
**perspectives** [2] - 32:4, 73:5
**persuade** [1] - 61:24
**phone** [73] - 16:23, 18:15, 21:1, 22:3, 22:4, 22:6, 22:10, 22:17, 22:25, 23:25, 24:1, 28:5, 31:6, 31:22, 39:2, 39:4, 39:15, 39:16, 39:18, 39:22, 39:25, 40:1, 40:2, 40:3, 40:4, 40:6, 40:7, 40:10, 40:13, 40:16, 40:20, 40:22, 40:25, 41:4, 41:6, 41:7, 41:8, 41:9, 41:16, 41:19, 41:20, 42:5, 42:6, 43:4, 43:7, 43:8, 43:23, 43:24, 43:25, 44:2, 44:7, 44:14, 48:12, 48:19, 49:8, 49:10, 49:16, 49:17, 49:20, 59:18, 64:24, 65:5, 72:7, 72:21, 73:7, 73:9, 73:12
**phones** [32] - 3:17, 3:18, 3:19, 28:21, 30:20, 38:21, 38:22, 38:24, 39:5, 39:10, 39:14, 39:21, 39:23, 40:8, 41:2, 41:21, 42:7, 42:8, 42:10, 42:11, 42:12, 42:13, 42:20, 43:4, 48:16, 49:14, 50:12, 60:9, 73:25
**photographs** [2] - 22:1, 65:16
**physical** [2] - 9:7, 9:8
**physically** [2] - 2:17, 15:13
**pick** [3] - 20:21, 22:22, 67:1
**picked** [5] - 22:15,

25:15, 61:11, 66:4, 67:2
**picking** [2] - 5:7, 28:22
**pickup** [1] - 34:9
**picture** [1] - 46:18
**piece** [4] - 26:17, 31:2, 39:12, 72:16
**pieces** [2] - 18:7, 18:18
**pitched** [1] - 53:1
**Pittochelli** [1] - 17:13
**place** [28] - 2:18, 2:20, 3:20, 15:11, 17:18, 21:16, 22:7, 22:17, 23:1, 23:4, 26:15, 28:5, 28:22, 28:23, 28:24, 37:1, 39:6, 42:17, 42:18, 43:13, 43:25, 44:4, 44:15, 64:25, 65:19, 66:1, 69:3, 73:13
**places** [7] - 27:22, 28:16, 28:19, 30:22, 42:15, 64:20
**placing** [1] - 44:14
**plainly** [1] - 71:9
**plan** [4] - 5:5, 25:18, 29:7, 53:1
**planned** [4] - 3:10, 22:14, 65:1, 66:9
**planning** [9] - 3:2, 3:6, 5:1, 6:21, 18:10, 27:1, 27:15, 28:4
**plans** [1] - 27:22
**plate** [1] - 16:11
**playing** [3] - 23:21, 30:22, 32:2
**Plaza** [1] - 44:3
**plea** [2] - 51:22, 53:23
**pled** [3] - 52:20, 53:21, 54:23
**plenty** [2] - 29:14, 29:15
**plot** [1] - 56:6
**plus** [4] - 41:4, 41:5, 41:9, 41:11
**point** [41] - 6:8, 13:4, 13:25, 14:1, 14:3, 26:14, 30:11, 31:8, 31:9, 31:19, 31:23, 38:16, 38:17, 44:9, 50:23, 54:5, 57:6, 58:11, 58:14, 58:15, 58:18, 66:7, 66:12, 66:23, 67:14, 67:22, 68:17, 68:24, 71:23, 71:25, 73:9
**Point** [28] - 2:9, 2:23, 4:12, 5:13, 6:3, 6:23, 7:20, 8:19, 9:2, 9:18, 9:19, 10:15, 12:21, 13:3, 13:10, 13:15, 15:2, 23:15, 31:6, 31:22, 37:21, 43:9, 47:9, 47:19, 53:2, 59:7, 62:13, 65:22

**Point/Wal** [1] - 9:7
**Point/Wal-Mart** [1] - 9:7
**points** [4] - 64:15, 64:17, 65:12, 66:8
**Polaroid** [1] - 18:25
**police** [18] - 3:12, 18:11, 21:4, 21:18, 21:23, 23:13, 23:23, 31:20, 33:20, 34:10, 34:11, 34:14, 34:18, 55:5, 57:10, 57:11, 73:15
**Police** [1] - 16:7
**poor** [1] - 58:25
**portrayed** [2] - 56:10, 56:11
**position** [1] - 66:22
**positions** [1] - 23:22
**positive** [1] - 49:19
**positively** [1] - 34:13
**posits** [1] - 63:24
**possessed** [2] - 8:11, 10:18
**possessing** [3] - 8:13, 8:17, 10:12
**possession** [5] - 8:7, 10:20, 10:24, 10:25, 54:18
**possible** [2] - 33:25, 67:7
**possibly** [1] - 67:4
**post** [1] - 61:24
**post-investigation** [1] - 61:24
**potential** [1] - 10:10
**powerful** [2] - 17:25, 33:6
**Powerful** [1] - 34:19, 68:19
**powerfully** [1] - 42:23
**precisely** [1] - 42:15
**Precisely** [2] - 42:16, 42:17
**predicate** [1] - 12:14
**preliminary** [1] - 27:2
**preparation** [5] - 22:16, 27:15, 29:4, 31:4, 56:8
**prepared** [1] - 30:17
**preparing** [1] - 37:11
**presence** [7] - 8:22, 13:20, 42:24, 49:9, 50:1, 50:2, 65:6
**present** [2] - 5:8, 45:6
**presented** [4] - 8:1, 30:12, 46:17, 47:23
**presenting** [1] - 46:22
**presents** [1] - 13:11
**presumption** [3] - 48:18, 59:17, 63:21
**prevents** [2] - 27:18, 27:20

**primary** [1] - 25:25
**principal** [5] - 50:16, 60:16, 62:9, 62:16
**principally** [2] - 63:12, 64:1
**principles** [1] - 45:15
**print** [1] - 60:3
**prints** [4] - 59:2, 59:10, 59:12, 60:13
**problem** [1] - 64:19
**proceed** [1] - 14:19
**proceedings** [2] - 45:8, 46:17, 75:4, 75:7
**proceeds** [5] - 10:1, 10:4, 10:5, 15:19, 31:7
**Proceeds** [1] - 10:2
**process** [4] - 15:10, 16:5, 26:7, 63:19
**procuring** [1] - 12:12
**products** [1] - 9:14
**professional** [3] - 54:13, 63:8, 68:20
**profitable** [1] - 13:16
**program** [1] - 10:1
**promised** [1] - 36:4
**promoted** [1] - 61:23
**proof** [7] - 45:18, 46:12, 46:22, 49:5, 58:23, 72:20, 73:21
**property** [3] - 8:21, 9:4, 9:5
**proposition** [1] - 69:7
**protect** [2] - 72:1, 72:11
**protection** [1] - 72:14
**prove** [5] - 3:4, 28:5, 44:17, 46:23, 59:21
**proved** [1] - 64:10
**proven** [9] - 5:15, 5:20, 5:21, 6:15, 6:18, 31:23, 32:12, 44:10, 59:22
**proves** [7] - 5:22, 6:14, 7:4, 7:11, 23:4, 33:19, 65:19
**provide** [2] - 51:9, 58:19
**provided** [12] - 7:11, 7:14, 11:13, 40:15, 55:23, 56:1, 67:6, 68:10, 68:11, 68:25, 70:2, 73:21
**Provident** [1] - 15:16
**provides** [1] - 5:8
**proving** [2] - 43:4, 74:6
**public** [2] - 45:10, 56:15
**pull** [1] - 39:3
**pulls** [1] - 15:25
**purchase** [1] - 55:1, 57:14
**purchasing** [1] - 57:13
**purpose** [1] - 39:25
**put** [20] - 6:13, 7:3,

12:14, 22:3, 23:3, 38:24, 39:18, 40:12, 46:24, 50:13, 52:23, 58:14, 58:18, 65:5, 66:19, 67:18, 67:20, 72:7, 73:7, 73:13
**Put** [2] - 73:2, 73:20
**putting** [4] - 27:2, 37:24, 39:10, 66:20

## Q

**quality** [1] - 18:25
**quarter** [1] - 16:9
**quarterback** [1] - 56:23
**questions** [2] - 10:13, 45:15
**quick** [1] - 68:17
**quite** [4] - 15:14, 16:15, 27:4, 54:20

## R

**Rachel** [1] - 16:8
**racketeering** [1] - 54:24
**Racquel** [32] - 4:23, 5:7, 7:13, 12:11, 13:21, 16:13, 18:8, 19:15, 24:24, 25:22, 26:20, 30:13, 32:14, 32:22, 36:9, 36:13, 39:12, 42:15, 43:1, 56:13, 56:15, 56:17, 59:14, 62:10, 62:16, 71:3, 71:6, 71:9, 72:5, 72:17, 73:3
**Ram** [2] - 34:9, 41:19
**Ramos** [1] - 49:18
**ran** [2] - 15:14
**rarely** [1] - 5:16
**reach** [1] - 58:1
**react** [1] - 64:9
**Ready** [1] - 14:14
**ready** [8] - 14:19, 25:12, 25:13, 25:15, 27:20, 27:25, 43:12, 45:1
**real** [6] - 60:25, 61:1, 61:5
**really** [9] - 10:17, 18:1, 58:1, 69:4, 69:13, 69:17, 70:19, 71:14, 71:17
**reason** [3] - 25:21, 29:14, 29:15
**reasonable** [15] - 3:5, 7:8, 14:1, 44:18, 45:18, 45:25, 46:13, 46:23, 49:5, 63:13, 63:21, 64:8, 72:20, 73:21, 74:6
**reasons** [4] - 61:6, 62:11, 62:18, 64:7

**received** [2] - 44:5, 54:22
**receiving** [1] - 70:8
**recently** [1] - 53:23
**recess** [2] - 14:12, 14:13
**recipient** [1] - 69:17
**recitation** [1] - 64:5
**reckless** [1] - 57:8
**recognizable** [1] - 15:18
**recollection** [3] - 71:19, 71:20, 71:23
**recollections** [2] - 32:3, 71:13
**reconstruction** [1] - 58:3
**record** [1] - 54:16
**recorded** [1] - 75:3
**recordings** [1] - 49:20
**records** [33] - 16:23, 18:15, 21:1, 22:3, 22:4, 22:6, 22:10, 22:17, 22:25, 23:3, 28:5, 29:11, 31:23, 37:7, 37:8, 39:3, 42:19, 43:1, 43:19, 43:23, 43:25, 44:14, 48:12, 48:19, 49:8, 59:18, 72:7, 72:22, 73:7, 73:9, 73:12
**recover** [1] - 58:17
**Recovered** [1] - 41:18
**recovery** [2] - 3:13, 59:1
**recruit** [1] - 7:4
**recruited** [8] - 4:20, 4:22, 7:14, 25:6, 25:9, 30:17, 32:1
**recruiting** [4] - 4:21, 5:5, 7:2, 8:8, 26:21, 31:4
**red** [6] - 4:16, 15:25, 16:3, 16:5, 16:17, 16:19
**reduction** [1] - 67:11
**referred** [4] - 6:2, 69:10, 70:12, 70:13
**regarding** [3] - 53:24, 63:6, 63:7
**registered** [1] - 24:20
**rehearsal** [1] - 29:4
**rehearsed** [1] - 55:23
**Reisterstown** [1] - 44:3
**reject** [2] - 51:6, 56:12
**related** [10] - 18:14, 47:7, 48:5, 48:9, 49:9, 55:19, 57:11, 58:1, 58:15
**relates** [3] - 25:7, 47:1, 50:4
**relating** [1] - 48:4
**relationship** [3] - 35:7, 40:18, 40:19
**relevance** [1] - 12:4

**relevant** [1] - 12:10
**reliance** [5] - 50:16, 50:17, 57:24, 60:17, 62:9
**relies** [1] - 63:12
**rely** [1] - 64:1
**remains** [1] - 48:13
**remarkable** [1] - 38:18
**remarkably** [1] - 30:14
**Remember** [3] - 27:21, 43:25, 65:23
**remember** [2] - 49:17, 66:3
**remembered** [2] - 70:20, 71:8
**reported** [2] - 16:10, 35:8
**Reported** [1] - 1:22
**Reporter** [1] - 75:15
**REPORTER'S** [1] - 75:1
**reporting** [2] - 68:3, 70:25
**reports** [1] - 70:10
**request** [2] - 12:12, 12:15
**resided** [1] - 19:24
**residence** [1] - 41:15
**resources** [1] - 59:3
**respect** [28] - 8:3, 9:18, 36:16, 45:20, 46:9, 50:6, 50:8, 50:10, 50:12, 51:9, 53:8, 55:3, 56:22, 57:11, 58:24, 59:7, 59:12, 60:24, 63:4, 63:18, 68:9, 68:14, 69:9, 69:25, 70:11, 71:19
**respond** [2] - 60:12, 64:16, 64:17
**responding** [1] - 64:18
**response** [1] - 34:8
**responsibilities** [1] - 61:3
**responsibility** [3] - 49:6, 53:11, 59:25
**responsible** [5] - 6:25, 47:24, 55:1, 55:3, 61:12
**rest** [5] - 19:4, 26:18, 28:12, 31:21, 58:10
**result** [1] - 53:12
**resume** [1] - 14:6
**return** [1] - 61:6
**Revenues** [1] - 9:15
**rich** [1] - 24:14
**Ridge** [1] - 21:21
**Road** [3] - 21:21, 23:15, 23:22
**roads** [1] - 21:22
**rob** [6] - 12:19, 26:14, 28:22, 52:8, 64:25, 66:1
**robbed** [5] - 10:2, 10:4, 17:3, 22:13, 23:2

**robber** [4] - 17:4, 17:8, 17:20, 67:22
**robberies** [82] - 2:6, 2:14, 2:15, 2:16, 2:18, 2:20, 2:23, 3:3, 3:10, 3:19, 3:21, 4:9, 4:18, 4:20, 4:24, 5:2, 5:5, 5:10, 5:12, 5:19, 5:24, 6:11, 6:13, 6:22, 7:1, 7:3, 7:25, 8:23, 9:2, 9:4, 9:7, 9:11, 10:9, 10:16, 11:1, 11:5, 14:23, 14:24, 15:4, 15:7, 15:19, 18:1, 18:2, 18:6, 18:10, 18:16, 19:5, 19:14, 25:6, 26:22, 26:25, 27:2, 27:6, 27:8, 28:12, 29:21, 32:4, 33:1, 33:2, 33:7, 33:23, 34:8, 37:12, 38:11, 38:21, 39:6, 47:1, 47:2, 47:16, 49:10, 51:25, 54:24, 65:8, 65:19, 66:9, 67:24, 70:22, 74:3, 74:5
**robbers** [3] - 7:17, 29:13, 39:8
**Robbery** [1] - 43:17
**robbery** [121] - 2:7, 2:9, 2:10, 2:12, 3:14, 3:18, 4:11, 4:12, 4:13, 4:14, 5:13, 6:3, 8:9, 8:11, 8:21, 9:1, 9:9, 9:12, 9:15, 11:9, 11:21, 11:23, 12:14, 12:18, 12:20, 12:21, 13:16, 13:20, 14:25, 15:2, 15:6, 15:7, 15:24, 16:10, 16:20, 16:21, 16:25, 17:17, 17:18, 17:20, 17:22, 18:22, 19:1, 21:14, 23:4, 23:10, 25:2, 25:7, 25:10, 25:18, 25:24, 26:6, 26:18, 27:8, 27:14, 27:18, 29:5, 30:14, 30:16, 30:24, 31:7, 31:22, 32:4, 32:18, 32:19, 32:22, 37:21, 38:3, 38:5, 38:6, 39:7, 42:17, 42:21, 42:24, 43:4, 43:7, 43:22, 43:24, 44:3, 47:6, 47:9, 47:10, 47:11, 47:12, 51:20, 51:22, 52:3, 52:12, 52:21, 53:3, 53:4, 54:1, 54:4, 54:6, 54:18, 55:8, 57:17, 58:25, 62:13, 62:20, 62:24, 63:2, 65:1, 65:4, 65:19, 66:6, 66:15, 67:17, 67:21, 68:8, 68:23, 71:16, 71:22, 72:7, 73:13

**robbery's** [1] - 43:18
**robbing** [1] - 4:11
**Robin** [6] - 20:8, 40:16, 41:1, 41:11, 42:5, 43:3
**rode** [1] - 53:7
**role** [8] - 26:20, 30:22, 31:4, 56:22, 57:1, 57:10, 57:13, 57:16
**roles** [1] - 32:2
**Room** [1] - 1:23
**room** [3] - 11:17, 11:18, 14:5
**roughly** [2] - 43:19, 43:24
**RPR** [1] - 1:22
**rumors** [1] - 35:4
**running** [1] - 2:17
**ruse** [2] - 13:1, 13:7

**S**

**safe** [1] - 36:14
**safety** [1] - 55:11
**saints** [1] - 29:21
**Sarah** [1] - 11:16
**sat** [2] - 52:16, 57:4
**satisfactory** [1] - 23:8
**save** [1] - 57:18
**saw** [3] - 11:20, 12:4, 36:21
**scale** [2] - 73:2, 73:7
**scales** [1] - 72:25
**scene** [4] - 19:7, 25:24, 40:2, 50:2
**scenes** [1] - 3:14
**scheme** [1] - 19:1
**scoping** [1] - 64:25
**scouting** [2] - 30:20, 31:15
**scrutiny** [1] - 45:16
**Sean** [16] - 4:25, 18:9, 24:22, 27:3, 28:7, 30:19, 31:14, 32:14, 53:14, 53:16, 54:5, 54:7, 63:6, 71:16, 73:3
**search** [4] - 59:4, 59:12, 59:23
**searches** [1] - 60:11
**seat** [1] - 25:17
**second** [7] - 10:17, 12:20, 17:14, 25:4, 29:22, 48:3, 55:2
**Secondly** [1] - 49:20
**seconds** [1] - 16:4
**Section** [1] - 10:13
**Security** [1] - 41:3
**see** [6] - 11:9, 29:3, 36:15, 36:20, 69:4, 73:8
**seeing** [4] - 3:14, 28:4,

28:21, 70:20
**sees** [1] - 17:2
**seizing** [1] - 40:6
**self** [3] - 48:24, 56:25, 64:2
**self-contradictory** [1] - 56:25
**self-interest** [1] - 64:2
**self-interested** [1] - 48:24
**sends** [1] - 29:2
**sense** [20] - 20:10, 28:20, 45:13, 45:24, 46:6, 61:24, 63:11, 63:20, 70:18, 71:2
**sentence** [1] - 54:22
**separate** [1] - 53:23
**separating** [1] - 72:18
**series** [11] - 6:1, 12:22, 13:11, 25:3, 25:5, 25:8, 27:6, 30:14, 33:1, 40:12, 73:6
**serious** [1] - 54:21
**serves** [1] - 11:22, 28:7
**service** [1] - 45:10
**sets** [1] - 38:1
**Seven** [1] - 47:12
**several** [3] - 18:7, 55:15, 55:20
**Several** [1] - 23:7
**sex** [1] - 35:4
**Shanell** [2] - 40:11, 42:6
**Shanell/Nell** [1] - 41:13
**Shitty** [10] - 20:1, 21:12, 21:13, 24:9, 25:14, 25:16, 25:17, 31:16, 43:2, 43:11
**Shitty's** [1] - 26:6
**shopping** [3] - 24:15, 64:20, 64:23
**short** [2] - 5:11, 46:12
**Shortly** [1] - 45:19
**shortly** [1] - 44:1
**shot** [1] - 18:25
**show** [3] - 10:23, 12:5, 23:23
**showed** [1] - 48:21
**showing** [2] - 7:1, 10:21
**shown** [2] - 30:1, 48:3
**shows** [5] - 5:13, 6:22, 8:5
**sic)** [1] - 28:2
**side** [1] - 46:7
**sides** [1] - 57:21
**signature** [1] - 75:10
**significant** [2] - 10:18, 45:17
**silly** [1] - 66:6
**silver** [1] - 34:9

**similar** [10] - 12:24, 13:12, 20:8, 25:3, 25:8, 28:7, 30:16, 30:23, 41:21, 69:9
**similarity** [1] - 50:7
**SIMMS** [2] - 44:25, 45:2
**Simms** [1] - 1:18, 44:22, 45:1, 60:8, 64:12, 64:15, 65:11, 66:7, 66:12, 71:20, 71:24
**simply** [10] - 4:2, 4:6, 10:20, 57:5, 60:15, 61:13, 64:3, 64:4, 64:9, 64:10
**single** [2] - 42:20, 67:13
**sirens** [1] - 34:12
**sister** [1] - 69:5
**sitting** [1] - 70:2
**situation** [1] - 61:22
**Six** [1] - 47:10
**six** [3] - 41:1, 42:19, 70:3
**slumped** [1] - 52:16
**smarter** [1] - 19:2, 38:24
**smartest** [1] - 66:25
**smashed** [1] - 34:16
**smashes** [1] - 34:13, 34:15
**snatch** [2] - 2:16, 9:3, 61:17
**snatching** [2] - 4:13, 4:16
**sneering** [1] - 57:4
**so-called** [2] - 58:15, 61:16
**Social** [1] - 41:3
**solely** [1] - 40:18
**someone** [2] - 2:16, 8:7, 15:18, 23:20, 50:6, 50:8, 50:10, 69:15
**sometime** [2] - 60:1, 65:11
**sometimes** [1] - 52:9
**Somewhat** [1] - 20:25
**somewhat** [1] - 20:25
**somewhere** [1] - 3:14
**sordid** [1] - 63:14
**Sordid** [1] - 63:15
**sorry** [2] - 27:1, 31:25, 40:9
**sort** [1] - 58:6
**sound** [1] - 58:16
**source** [2] - 20:17, 67:7
**sources** [1] - 18:18
**speaking** [1] - 22:9
**speaks** [1] - 32:6
**Special** [20] - 16:12, 16:17, 16:19, 34:2, 35:19, 36:12, 40:3,

40:15, 42:19, 49:18, 54:2, 54:7, 57:12, 57:15, 57:20, 65:24, 68:21, 70:4, 71:20, 74:2
**specific** [2] - 3:25, 33:16
**specifically** [3] - 21:13, 52:7, 69:16
**Specifically** [1] - 69:14
**specified** [1] - 37:4
**specifies** [1] - 38:3
**spend** [2] - 6:5, 20:7
**spent** [1] - 20:4
**spoken** [1] - 53:4
**Sports** [3] - 39:21, 41:9, 41:20
**spots** [1] - 28:25
**spread** [1] - 35:4
**stack** [1] - 50:24
**stand** [11] - 27:19, 30:5, 35:13, 36:10, 51:14, 52:5, 56:19, 60:20, 68:1, 70:1, 72:6
**Stand** [1] - 44:23
**standard** [1] - 45:25
**Stanley** [3] - 68:21, 68:22
**started** [1] - 51:18
**state** [4] - 9:22, 9:23, 53:17, 53:18
**statements** [1] - 62:17
**STATES** [2] - 1:1, 1:4
**States** [5] - 44:19, 64:22, 66:15, 72:9, 74:7
**states** [3] - 9:14, 9:19
**station** [1] - 27:10
**stations** [1] - 38:11
**statute** [1] - 10:13
**stay** [1] - 26:2
**stayed** [2] - 37:5, 69:3, 69:11
**staying** [1] - 73:24
**stays** [1] - 55:11
**stead** [1] - 52:24
**stenographically** [1] - 75:4
**step** [2] - 37:12, 49:11
**steps** [1] - 27:2, 36:13, 49:3
**Steven** [1] - 11:24
**still** [1] - 58:10
**stopping** [1] - 14:1
**store** [27] - 2:8, 4:11, 6:23, 8:19, 9:3, 9:4, 9:15, 10:15, 11:14, 11:15, 12:21, 12:24, 13:1, 13:3, 13:4, 13:6, 13:10, 15:12, 15:16, 19:6, 23:15, 26:8, 30:15, 43:10, 43:21, 65:25

**Store** [13] - 2:10, 2:11, 4:14, 9:8, 9:19, 9:25, 15:6, 15:9, 15:20, 25:2, 27:13, 43:16, 47:11
**store's** [1] - 9:23
**stores** [1] - 24:17
**stories** [1] - 67:16
**story** [5] - 11:13, 27:12, 36:24, 43:6, 57:20
**straight** [1] - 20:2
**Street** [1] - 1:23
**street** [4] - 12:2, 15:25, 38:9, 66:20
**stretch** [4] - 28:10, 44:22, 44:24, 55:24
**strongly** [1] - 25:12
**struggle** [1] - 12:3
**Stuart** [1] - 1:18
**stupid** [1] - 23:11
**subject** [1] - 67:18
**submit** [2] - 46:12, 47:14, 55:21, 56:9, 57:8, 62:18
**subsequent** [1] - 59:23
**substance** [2] - 49:21, 50:15
**substantial** [1] - 7:11
**substantive** [1] - 6:2
**success** [1] - 26:19
**successful** [2] - 30:25, 74:1
**successfully** [2] - 34:25, 36:17
**suddenly** [1] - 15:25
**suggest** [15] - 50:11, 59:20, 59:21, 60:14, 60:16, 61:6, 61:8, 61:19, 62:2, 62:8, 62:10, 62:25, 63:9, 64:7
**suggested** [3] - 19:21, 60:22, 61:11
**suggesting** [6] - 48:14, 48:15, 49:8, 51:6, 57:1, 61:15
**suggestion** [1] - 64:18
**suggests** [4] - 48:12, 57:25, 59:16, 63:5
**summation** [1] - 45:4
**summer** [1] - 19:17
**Super** [2] - 21:25, 22:1
**Supermax** [1] - 40:5
**superseding** [2] - 52:21, 53:22
**support** [2] - 20:10, 52:18
**supportive** [1] - 49:5
**supports** [2] - 6:16, 66:22
**suppose** [3] - 23:8, 70:14, 72:3

**supposed** [1] - 59:15
**surface** [1] - 66:10
**surveillance** [1] - 11:20
**suspect** [2] - 17:2, 17:3
**suspects** [2] - 16:6, 25:12
**suspicion** [1] - 34:8
**sweeping** [1] - 11:24
**symbol** [1] - 4:5
**sympathy** [2] - 46:3, 46:6
**system** [1] - 45:12
**systems** [1] - 55:20

## T

**table** [2] - 5:17, 44:23
**tags** [2] - 12:9, 12:17
**tale** [1] - 46:19
**Talks** [4] - 37:21, 37:23, 37:24, 38:6
**Tamara** [3] - 7:21, 37:23, 66:1
**Tammy** [1] - 11:16
**tape** [1] - 35:21
**teachers** [1] - 29:22
**team** [2] - 71:2, 71:12
**technique** [1] - 69:9
**telephones** [1] - 26:2
**terms** [6] - 50:13, 53:2, 56:6, 56:7, 57:13, 57:14
**terribly** [2] - 18:3, 70:19
**terrifying** [1] - 33:21
**terror** [1] - 36:8
**terrorize** [1] - 34:23
**testified** [39] - 13:9, 16:13, 17:10, 19:13, 20:6, 21:6, 21:8, 21:19, 21:20, 21:24, 23:12, 24:25, 25:4, 26:23, 28:9, 29:2, 31:14, 32:7, 32:15, 34:14, 35:3, 35:9, 35:21, 36:12, 39:17, 40:17, 42:3, 46:4, 46:16, 59:9, 61:2, 62:9, 62:15, 62:24, 65:24, 67:10, 68:1, 70:6, 74:2
**testifies** [6] - 19:17, 20:22, 23:16, 23:17, 23:18, 27:5
**testify** [2] - 36:11, 51:3
**testifying** [5] - 29:12, 34:24, 71:10, 71:13, 73:5
**Testifying** [1] - 36:7
**testimonies** [1] - 30:9, 30:10, 31:24
**testimony** [101] - 3:8, 3:9, 3:10, 3:13, 4:19, 5:3, 7:19, 7:22, 8:18,

11:11, 11:13, 12:10, 12:25, 13:11, 15:5, 16:14, 17:15, 17:21, 17:24, 18:13, 18:14, 18:15, 19:3, 19:10, 19:12, 19:16, 21:1, 22:13, 22:25, 24:18, 25:7, 26:19, 26:20, 27:3, 27:12, 28:7, 30:8, 31:17, 31:20, 32:6, 33:7, 34:4, 35:1, 35:19, 36:17, 36:20, 37:9, 37:12, 39:24, 41:24, 44:4, 44:8, 47:14, 47:16, 48:1, 48:22, 49:4, 49:8, 49:18, 51:5, 51:7, 51:11, 52:1, 52:2, 52:9, 52:23, 53:12, 53:13, 53:24, 55:17, 55:18, 55:21, 55:22, 55:23, 56:5, 56:12, 56:25, 57:16, 58:7, 59:11, 60:6, 60:18, 60:20, 62:14, 62:19, 62:21, 63:5, 63:8, 65:18, 66:19, 66:21, 66:23, 68:6, 68:14, 71:21, 72:8, 72:13, 72:16
**THE** [12] - 1:1, 1:1, 11:7, 13:25, 14:3, 14:14, 14:16, 14:18, 44:21, 45:1, 64:12, 74:10
**themselves** [2] - 29:24, 49:22
**theories** [2] - 6:15, 8:3
**theory** [6] - 7:6, 7:7, 8:1, 58:4, 71:15, 72:1
**therefore** [1] - 64:10
**they've** [1] - 30:4
**thinking** [2] - 69:2, 71:10
**third** [3] - 36:19, 48:21, 49:20
**Thompson** [5] - 20:8, 20:11, 39:12, 41:1, 41:11, 42:1, 42:5, 43:3
**Thompson's** [3] - 40:16, 41:12, 41:23
**thousands** [1] - 13:15
**threatened** [1] - 9:6
**threatening** [2] - 33:21, 73:18
**Three** [1] - 47:7
**three** [13] - 3:18, 4:15, 8:24, 11:11, 22:17, 28:19, 28:25, 29:13, 33:17, 34:3, 34:17, 39:20, 47:15
**throw** [4] - 59:13, 72:19, 72:20, 72:22
**thrust** [1] - 61:23

**tickets** [1] - 29:3
**tie** [2] - 18:15, 63:4
**tied** [1] - 16:17
**ties** [2] - 17:16, 60:3
**tip** [1] - 65:24
**tipped** [1] - 7:23
**today** [4] - 6:4, 60:11, 63:22, 74:3
**today's** [1] - 36:7
**together** [23] - 4:6, 5:17, 6:13, 7:3, 12:15, 17:17, 18:16, 18:21, 20:4, 22:9, 23:16, 25:24, 27:3, 36:25, 37:3, 37:24, 40:12, 50:8, 70:14, 73:2, 73:8
**toilet** [2] - 40:5, 40:7
**Tommy** [3] - 12:14, 12:15, 20:21
**took** [15] - 2:18, 2:20, 15:1, 17:18, 23:4, 28:5, 42:17, 44:4, 51:15, 52:11, 53:19, 54:8, 57:22, 57:23, 65:19
**tower** [2] - 42:20, 42:25
**towers** [8] - 22:18, 42:14, 43:8, 43:9, 43:16, 43:20, 44:2, 49:12
**track** [1] - 37:7
**train** [4] - 51:16, 70:13, 70:14, 70:17
**transacts** [1] - 29:1
**transcribed** [1] - 75:7
**transcript** [1] - 75:7
**trap** [1] - 13:8
**travel** [1] - 20:13
**treatment** [3] - 34:22, 51:10, 51:23
**tree** [1] - 34:15
**trend** [1] - 59:18
**trial** [7] - 2:4, 3:8, 15:21, 18:6, 20:3, 35:12, 53:5
**tried** [3] - 32:25, 40:5, 42:2
**trip** [2] - 20:20, 20:25
**trouble** [2] - 37:25, 38:1
**TROY** [1] - 1:6
**Troy** [9] - 3:1, 16:15, 33:1, 36:3, 40:23, 67:8, 68:18, 74:6, 75:4
**Truck** [1] - 2:12
**trusted** [2] - 37:16, 37:18
**trustworthy** [4] - 22:24, 57:9, 64:4
**truth** [7] - 30:5, 56:10, 56:12, 67:23, 68:4,

73:23, 74:4
**truthful** [1] - 64:5
**truthfulness** [1] - 30:7
**try** [6] - 13:9, 41:24, 49:12, 55:25, 61:24, 63:22
**trying** [5] - 3:16, 12:6, 35:10, 48:13, 72:3
**Tuesday** [1] - 1:10
**turn** [3] - 11:3, 33:12, 51:20
**turned** [1] - 55:4
**turns** [1] - 18:6
**twins** [2] - 54:12, 54:13
**Two** [3] - 2:15, 26:23, 47:6
**two** [37] - 2:16, 2:22, 3:18, 4:3, 4:6, 6:6, 6:14, 8:2, 8:20, 9:1, 10:13, 10:14, 11:18, 11:25, 13:21, 14:23, 14:24, 15:4, 15:19, 19:12, 22:14, 28:15, 28:16, 32:19, 33:24, 34:10, 34:17, 40:12, 42:20, 52:20, 53:15, 54:11, 54:12, 54:13, 55:12, 57:21, 71:14
**tying** [3] - 59:1, 59:25, 60:12
**types** [1] - 18:19

## U

**U.S** [1] - 1:23
**ultimate** [1] - 29:4
**ultimately** [2] - 24:4, 29:7
**under** [5] - 4:1, 6:14, 8:1, 34:8, 36:11
**underlying** [4] - 50:14, 50:18, 62:1, 68:2
**understandable** [1] - 41:23
**undertaken** [1] - 59:5
**underworld** [1] - 5:16
**unfair** [1] - 48:17
**unfortunately** [1] - 19:24
**Uniformed** [1] - 34:11
**UNITED** [2] - 1:1, 1:4
**United** [4] - 44:19, 64:22, 66:15, 72:9, 74:7
**unknown** [1] - 49:25
**unless** [1] - 64:24
**unlike** [1] - 56:14
**unpleasant** [1] - 58:4
**up** [47] - 2:17, 4:15, 5:7, 5:18, 8:9, 10:21, 12:18,

15:14, 15:25, 17:8, 17:24, 19:20, 20:21, 21:25, 22:15, 22:18, 22:22, 23:23, 24:4, 24:19, 25:15, 25:19, 26:15, 28:18, 30:9, 31:6, 31:17, 32:5, 32:12, 33:17, 35:3, 36:24, 37:14, 38:2, 43:12, 44:23, 50:18, 60:11, 67:1, 67:2, 67:20, 69:6, 69:23, 72:12, 73:10, 73:12
**UPS** [1] - 55:8
**urge** [4] - 30:8, 35:24, 56:12, 73:1
**urges** [2] - 49:4, 59:18
**urging** [1] - 56:25
**USA** [1] - 75:4
**useful** [2] - 32:9, 33:11
**user** [1] - 49:19
**Utah** [1] - 9:24

## V

**Valid** [1] - 66:8
**van** [6] - 4:16, 15:25, 16:3, 16:5, 16:17, 16:19
**variances** [2] - 31:24, 32:3
**various** [4] - 4:18, 5:24, 7:20, 11:10
**vehicle** [6] - 17:5, 20:22, 22:16, 24:25, 28:18, 34:15
**vehicles** [4] - 25:20, 28:17, 30:18, 66:8
**verdict** [4] - 45:20, 45:21, 46:5, 61:7
**versus** [1] - 72:9
**veteran** [3] - 55:20, 56:4
**vicinity** [2] - 23:14, 43:8
**victim** [8] - 2:17, 4:15, 11:9, 11:24, 12:23, 13:20, 26:10, 31:12
**victim's** [1] - 12:16
**victims** [8] - 2:21, 2:24, 8:25, 11:18, 11:25, 13:4, 15:13, 18:25
**video** [2] - 11:20, 18:24
**view** [2] - 21:22, 67:22
**viewed** [1] - 46:6
**viewing** [1] - 46:8
**violate** [1] - 47:4
**violence** [5] - 8:14, 8:17, 9:6, 10:12, 10:15
**virtual** [2] - 49:9, 50:1
**visit** [2] - 28:18, 28:25
**visiting** [1] - 28:16

**voice** [5] - 28:23, 35:22, 49:20, 68:11, 68:18

## W

**waiting** [1] - 17:4
**wake** [1] - 29:12
**Wal** [35] - 2:8, 2:23, 4:10, 6:3, 6:23, 8:24, 9:13, 10:15, 11:9, 11:20, 12:18, 12:24, 13:12, 13:17, 14:24, 15:1, 21:4, 21:10, 21:13, 21:19, 21:21, 21:23, 22:13, 23:9, 30:16, 38:3, 38:4, 42:14, 47:6, 47:8, 47:17, 57:11, 58:25, 62:6, 65:3
**Wal-Mart** [35] - 2:8, 2:23, 4:10, 6:3, 6:23, 8:24, 9:13, 10:15, 11:9, 11:20, 12:18, 12:24, 13:12, 13:17, 14:24, 15:1, 21:4, 21:10, 21:13, 21:19, 21:21, 21:23, 22:13, 23:9, 30:16, 38:3, 38:4, 42:14, 47:6, 47:8, 47:17, 57:11, 58:25, 62:6, 65:3
**walk** [1] - 56:18
**walked** [3] - 50:25, 52:16, 56:15
**walking** [2] - 15:16, 15:25
**wasting** [1] - 57:7
**watch** [1] - 27:22
**watching** [1] - 27:23
**ways** [2] - 61:11, 71:14
**weapon** [7] - 54:17, 54:18, 58:14, 58:17, 58:19, 59:24
**weapons** [3] - 59:2, 59:10, 59:12
**wear** [1] - 66:6
**Wednesday** [1] - 39:24
**week** [2] - 15:5, 40:17
**weeks** [2] - 55:12, 70:5
**weigh** [1] - 61:20
**weighing** [1] - 72:25
**West** [2] - 1:23, 24:5
**west** [5] - 19:19, 19:22, 19:23, 20:23, 40:18
**whatsoever** [1] - 59:5
**wheel** [1] - 59:19
**Whereof** [1] - 75:9
**Whirl** [4] - 16:18, 20:1, 31:17, 43:11
**Whirl's** [2] - 24:5
**White** [20] - 4:25, 17:10, 18:9, 27:3, 27:5, 27:6,

27:8, 27:16, 32:15, 32:25, 38:14, 39:17, 48:25, 51:18, 51:19, 52:7, 70:22, 72:6, 73:3
**White's** [3] - 27:19, 28:3, 52:9
**who've** [1] - 51:13
**whole** [11] - 22:20, 35:14, 35:16, 36:5, 39:25, 41:7, 46:6, 51:5, 70:18, 71:2
**wholesale** [1] - 49:4
**Wider** [45] - 17:16, 17:18, 18:13, 34:5, 35:2, 35:3, 35:21, 36:21, 36:22, 37:1, 37:6, 37:9, 37:12, 37:14, 37:16, 37:18, 38:8, 38:15, 40:7, 42:16, 44:4, 44:13, 49:1, 54:13, 55:6, 55:19, 62:10, 62:18, 63:7, 66:18, 66:25, 67:7, 67:9, 67:16, 67:19, 67:23, 67:25, 68:9, 68:17, 68:24, 69:14, 69:23, 70:24, 73:4
**Wider's** [11] - 7:2, 17:21, 37:17, 37:18, 38:16, 38:25, 66:18, 66:21, 66:23, 67:9, 68:6
**wife** [1] - 16:4
**Wilkens** [19] - 2:11, 4:14, 6:23, 9:8, 9:25, 15:6, 15:9, 15:12, 15:20, 16:20, 25:2, 27:13, 43:16, 43:17, 43:21, 47:11, 47:20, 59:11, 62:20
**willing** [1] - 34:20
**willingness** [2] - 33:22, 69:1
**windows** [2] - 13:2, 26:7
**wiretap** [1] - 67:1
**wish** [1] - 13:23
**Witness** [1] - 75:9
**witness** [24] - 3:16, 15:13, 15:22, 25:3, 30:5, 33:5, 34:1, 35:16, 35:18, 35:23, 36:4, 36:5, 51:14, 54:14, 56:19, 60:20, 63:8, 66:4, 67:13, 68:13, 68:19, 68:20, 69:21, 72:6
**witnesses** [58] - 5:4, 6:9, 7:20, 7:23, 8:24, 13:21, 17:24, 18:8, 18:9, 18:12, 19:4, 19:12, 20:6, 23:1, 26:23, 26:25, 29:9, 29:20, 30:10, 30:19, 31:2, 31:14, 31:18,

31:23, 32:10, 33:4, 33:11, 36:2, 36:3, 36:8, 37:10, 38:9, 44:8, 44:11, 44:12, 46:16, 47:17, 55:16, 56:10, 56:15, 62:16, 64:2, 65:18, 65:21, 69:6, 70:11, 70:17, 71:13, 71:22, 72:4, 72:21, 73:4, 73:8, 73:10, 73:11, 73:24
**woman** [1] - 40:17
**women** [1] - 11:17
**word** [1] - 27:17
**words** [2] - 35:8, 69:6
**workings** [2] - 29:20, 30:1
**works** [1] - 41:4
**world** [1] - 67:9
**worry** [1] - 39:2
**Wright** [4] - 17:9, 17:12, 17:15, 63:3
**WRIGHT** [1] - 17:9
**Wright's** [1] - 66:16
**written** [1] - 4:4
**wrote** [1] - 36:22

## Y

**years** [2] - 52:18, 54:22
**Years** [2] - 36:25, 37:4
**yesterday** [8] - 7:22, 16:13, 34:5, 36:13, 55:17, 55:25, 57:3, 65:25
**Yo** [12] - 35:10, 35:11, 35:12, 35:13, 35:14, 69:10, 69:11, 69:17
**York** [1] - 36:25
**young** [5] - 35:10, 37:2, 37:5, 40:16, 52:16
**younger** [3] - 24:9, 70:20, 71:7
**yourself** [1] - 60:8

## Z

**Zajac** [3] - 1:22, 75:3, 75:14